**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL NOS. 5:18-00081**
**0:18-00005**
**5:20-00004**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**


**V.**            **UNITED STATES'S SENTENCING MEMORANDUM**


**ADRIAN MITAN**                                              **DEFENDANT**

\* \* \* \* \* \*

The United States of America, through counsel, submits its position with respect to objections to the Presentence Investigation Report ("PSR") and the appropriate sentence for the Defendant, Adrian MITAN, across three cases – the AOAF Network Conspiracy case (5:18-CR-81), the Brute Force case, (0:18-CR-05), and the Bank Fraud case (5:20-CR-04). The Defendant's objections to the PSR are multitudinous, but, as to the Guidelines calculation, can be distilled into three principal issues: an objection to the loss amount, objection to the leadership enhancement, and objection for sophisticated laundering. The United States agrees with the PSR's Guidelines calculation, but revises its approach to the loss amount calculation given intervening case law and sentencing decisions. Accordingly, the United States agrees that the Defendant's Total Offense Level is 34, and that the Defendant's Criminal History Category is III. [PSR at ¶¶ 54, 59-60.] The Defendant's applicable Guidelines range is thus 188 to 235 months' incarceration. [*Id*. at ¶ 74.]

Pursuant to the factors contained in 18 U.S.C. § 3553(a), and for the reasons set forth below, the United States believes that a sentence at the low end of the Guidelines range is sufficient but not greater than necessary to achieve relevant sentencing goals.

## I.      Procedural Background

MITAN was charged by three separate Indictments for these crimes—two within the Eastern District of Kentucky and one within the Western District of North Carolina. On January 13, 2020, MITAN pleaded guilty to one count of conspiracy to commit a RICO offense in violation of 18 U.S.C. § 1962(d) for the AOAF Network scheme, one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h) for the Brute Force scheme, and one count of conspiracy to commit bank fraud in violation of 19 U.S.C. § 1349 for Brank Fraud scheme. The parties also agreed to transfer the Brank Fraud scheme to the Eastern District of Kentucky for plea and sentencing.  [R. 84: Plea Agreement].[1]

## II.     Unresolved Objections to the Guidelines Calculations

### 1.  Loss Amount

Since the United States Probation Office wrote its final PSR, two changes have occurred: the Court sentenced co-Defendant Ybarra, and the Sixth Circuit decided *US v. Riccardi*, 989 F.3d 476 (6th Cir. 2021). These two decisions have influenced the United

---

[1] Unless otherwise noted, the record citations relate to the filings in 0:18-CR-00005.  The same Plea Agreement is filed in the two companion Adrian MITAN cases.

2

States's position on how to calculate the loss amount, but do not alter its position as to the 18 level-increase.

The United States previously calculated MITAN's loss amount in the following ways: (1) $2,739,360.00 in losses as a result of the AOAF Network conspiracy (5:18-CR-81), (2) $130,808.55 in individual liability due to his tainted bitcoin addresses (5:18-CR-81) as part of the same conspiracy, and (3) several millions of dollars based on proof that MITAN possessed over 18,000 unauthorized access devices in furtherance of the Brute Force case (0:18-CR-05) and the transferred Bank Fraud case (5:20-CR-04), which were each ascribed a $500 valuation based on the commentary to the Guidelines.

The United States revises its own loss calculation only to correct Numbers 1 and 3, based on the decisions mentioned above and additional investigation.  The United States does not object to the Probation Officer's 18-level increase.

### A.  The AOAF Network Conspiracy

In the Ybarra sentencing, the Court calculated the loss amount by finding an average loss per month across the course of the conspiracy (December 2013 through December 2018, 61 months) as mentioned in the Indictment ($~45,000), and then multiplied that number by the number of months Ybarra was involved in the conspiracy. Because Ybarra, like MITAN, never evidenced his withdrawal from the conspiracy, the Court included the loss amount for the months the conspiracy continued, even though the plea agreement mentioned a date range that Ybarra worked with the Confidential Source, which ceased before the end of the conspiracy range.  Applying the same principles here,

3

MITAN joined the conspiracy in January of 2016, and the conspiracy concluded 24 months later. Thus, his loss amount as part of the AOAF Network conspiracy should only be $1,080,000.

MITAN argues that his loss amount should be limited to the amount of funds he personally sent to the Confidential Source, from a period of May 11, 2016 until at least July of 2016. [Mitan Sentencing Memorandum (sealed) at pp. 4.][2] However, according to the Guidelines,

> in the case of jointly undertaken criminal activity . . . all acts and omissions that were
>
> (i)    within the scope of the jointly undertaken criminal activity,
>
> (ii)   in furtherance of that criminal activity, and
>
> (iii)  reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense

shall be included as relevant conduct, and the pecuniary harm resulting therefrom shall be made part of the Defendant's loss amount. U.S.S.G. §§ § 1B1.3(a)(1)(B), 2B1.1.

This is certainly a case of jointly undertaken criminal activity, which the Defendant concedes in his Plea Agreement, wherein he acknowledges that he "was associated with the Alexandria Online Auction Fraud ('AOAF') Network . . . through Liviu Sorin Nedelcu and Dmitrious Antoine Brown." [R. 84: Plea Agreement at Page ID

---

[2] The United States does not have access to the file-stamped sealed filing, but believes this is located at R. 151 in 0:18-CR-00005.

#290].  The Defendant further acknowledged he "work[ed] in conjunction with others . . . to post advertisements for goods to sales websites," and that once he lured a victim into sending funds, "the Defendant reached out to the CS, and others in the United States who provided money laundering services similar to the CS, to convert the victim payment to bitcoin." [*Id.*]

To determine the scope of the criminal activity the defendant agreed to jointly undertake, the Court considers "the scope of the specific conduct and objectives embraced by the defendant's agreement," which may be proved from the conduct of the defendant or others.  U.S.S.G. § 1B1.3 cmt. n. 3(B).  The Defendant pleaded guilty to Count One in the Indictment in 0:18-CR-00081, which set forth the scope of the conspiracy as

> wide-scale online auction fraud scheme, that is, posting false advertisements for goods online, often using stolen identities and trademarks from legitimate online auction companies, with the intent to defraud United States-based victims out of money and laundering the money through channels in the United States and ultimately Europe.

[R. 249: Superseding Indictment (5:18-CR-81).]  Indeed, the Defendant's admissions align with this scope. [R. 84: Plea Agreement at Page ID #290.] The Defendant was part of a large-scale conspiracy.  That means something for purposes of the Guidelines' loss calculation as it relates to relevant conduct.

The defendants in AOAF Network case included fraudsters, money launderers, money mules, and cryptocurrency exchangers operating as money launderers.  The acts

of those participants, the defrauding of U.S.-based citizens out of millions of dollars and the laundering of that money, was in furtherance of the criminal activity.

The real crux of the issue was whether the acts of these co-conspirators were reasonably foreseeable to the Defendant. *See* U.S.S.G. § 1B1.3(a)(1)(B) (defendant held responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense"); *United States v. Donadeo*, 910 F.3d 886, 894 (6th Cir. 2018) (defendant responsible for larger conspiratorial loss despite defendant's argument that he had "no independent knowledge of the operation of shell corporations" used in larger fraud); *United States v. Moody*, 787 F. App'x 857, 868 (6th Cir. 2019) ("middle of the tier" defendant responsible for $3.5 million loss even though he received only $550,000).

MITAN admitted to working with Nedelcu and Brown, whose conduct included, cumulatively, hundreds of thousands in loss. They occupied roles on both sides of the fraud, with Nedelcu operating a fraud ring and Brown serving as a domestic money launderer. Indeed, in his objections to the initial PSR, MITAN acknowledged that Nedelcu was responsible for significant fraud, even employing ten to twenty individuals

to facilitate large-scale fraud.[3] And, of course, all the funds flowing through the Eastern District of Kentucky pooled with the Confidential Source.

Tracing out the tentacles associated with Nedelcu, Brown, and the Confidential Source draws a picture of a highly entangled network of actors. It is irrelevant that the Defendant was unaware of each of the other co-Defendants' precise activities. "Foreseeability is not equivalent to actual knowledge.  A defendant need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant." *United States v. Aslan*, 644 F. 3d 526, 537 (7th Cir. 2011).

The Defendant operated an online auction fraud scheme using the same modus operandi (including the same ad-posting sites, similar invoices, near-identical language when communicating with victims, and payment methods) as his co-defendants, and used the same money laundering tools. This is similar to the example in U.S.S.G. § 1B1.3 cmt. n. 4(C)(ii), where, when Defendants F and G worked together to design and execute a fraudulent scheme, and then they both profited separately, the Guidelines instruct that their loss amounts are attributable to the other.  The harm caused by the other fraudster members of the AOAF Network conspiracy was reasonably foreseeable to the Defendant, and the loss resulting therefrom should be attributed to him.

---

[3] MITAN previously advised the Confidential Source that MITAN employed ten to twenty individuals, but now claims that this was boasting and that MITAN was in fact referencing Nedelcu's operation. Under either interpretation, MITAN was fully aware that the enterprise required the employ of numerous individuals to satisfy its unlawful objective of perpetrating as much fraud as possible.

### B.  Brute Force and Bank Fraud cases

As for the Brute Force and Bank Fraud cases, the United States applied the U.S.S.G. § 2B1.1 cmt. n. 3F(i)[4] to the facts of the Plea Agreement, which stated that the Defendant possessed roughly 16,000 in unique credit/debit card codes as a result of the Brute Force case and 2,130 debit card numbers as a result of the Bank Fraud case [R. 84 at Page ID # 291-92], resulting in a loss amount of an additional $9,065,000.  When the Sixth Circuit decided *Riccardi*, the United States endeavored herein to obtain additional information to support the fact that a $500 per card approximation (which is no longer an automatic loss amount for every gift card per *Riccardi*), is a reasonable estimate of loss, as required by U.S.S.G. § 2B1.1 cmt. n. 3(C) and case law interpreting this Guideline.

The investigative team identified a number credit card codes on MITAN's devices and in his chats with the Confidential Source that it could attribute to two specific financial institutions.  Adrian MITAN's February 2016 Brute Force attack scheme mentioned in his Plea Agreement actually defrauded 94 First Tech Federal Credit Union ("First Tech") customers, who filed fraud reports on the theft from their credit/debit cards.  Those 94 First Tech customers lost a total of $60,672.98 as a result of the fraud. This meant that the average loss amount per card was $645.46. *See* Attachment A. MITAN also possessed the credit/debit card codes of 24 US Bank victims, who reported fraud on their accounts.  The average loss amount per card for these victims was $515.48.

---

[4] This comment reads, "In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device."

To be clear, the United States provided US Bank with 55 card numbers obtained from Adrian MITAN's devices, and 14 numbers were determined to be invalid. US Bank has yet to provide additional documents related to the remaining 17 cards. *See* Attachment B.[5]

The United States proposes a loss calculation for the Brute Force case and the Bank Fraud case, taking in all these considerations, of the following, which it believes is a reasonable estimate of the loss:

- Per Plea Agreement: <u>18,130</u> stolen debit/credit cards

- Reduced by 25%, per the US Bank returns indicating 14 invalid numbers out of 55 cards, resulting in <u>13,598</u> stolen debit/credit cards

- Multiplied by $500 (a figure that is less than the average identified in the First Tech Federal Credit Union and US Bank returns) = <u>$6,799,000</u>

Even without the loss caused by the AOAF Network conspiracy, the loss amount is squarely within the $3,500,000 to $9,500,000 range, albeit lower than the loss amount previously estimated, for an increase in 18 points.[6]

While the Guidelines commentary as to the $500 assessment per stolen access device is no longer automatic, it certainly offers guidance from the Sentencing

---

[5] Attachments A and B had previously been disclosed to defense counsel, in the form of the records provided to the defense counsel as well as a fully laid out recitation of the United States' position on loss amount.

[6] Even if the United States reduced the number of stolen credit/debit cards by 56%, by assuming that the 17 remaining US Bank cards were also invalid numbers, the loss amount would be $3,989,000. MITAN's Guidelines Range would not change.

Commission that possession of these cards in itself is extremely harmful and indicative that funds were derived therefrom.  True enough, identifying the financial institutions and specific fraud cases incident to these stolen credit card codes in order to obtain the exact loss amount of each and every of the 18,130 stolen cards is beyond the reasonably abilities of law enforcement in a case like this, where the theft of credit/debit card codes was so widespread.  With the information provided by US Bank and First Tech, supported by the Guidelines guidance in the commentary, the Court is in a firm position to attribute a reasonable loss amount of in excess of $3,500,000 sufficient to substantiate the 18-level enhancement for loss amount.

## 2.  Leadership Enhancement

The PSR accorded the Defendant a two-level enhancement for being an organizer, leader, manager, or supervisor in the criminal activity, as it relates to the Brute Force conviction. [PSR at ¶ 47.]  As to this offense, the Defendant admitted in his Plea Agreement that he

> participated in phishing customer information. . . . To retrieve hidden information on those same cards, he ran thousands of credit/debit card purchases or balance inquiries through point-of-sale systems he or his coconspirators hacked, until the transaction of inquiry was successful . . . Then, he and his coconspirators applied the credit/debit card information to blank cards with magnetic strikes, in order to create clone credit/debit cards.

[R. 84: Plea Agreement at Page ID # 291.]  From the particular intrusion described in this paragraph, the cloned debit cards were used at ATMs located in Queens and Flushing, New York and Macon, Georgia.  [*Id.*]  Because this Defendant has not been in the United

10

States since he left after his first United States fraud conviction, logic dictates that he had to have directed others on how to extract funds from these cards.

His conversations with the Confidential Source also dictate this conclusion. In conversations with the Confidential Source, MITAN stated said his cousin, who has a magnetic stripe reader (commonly known to be able to reencode cloned cards), was removing funds from ATM cards the cousin either produced or re-encoded, but is too scared to take on a large volume. In other communications with the Confidential Source, the Defendant referred to "my team" and "my workers" and stated, "I have a lot of people that they are working for me." When the Confidential Source asked to be connected with the Defendant's "state boys", the Defendant responded that it is weird for them "to meet somebody that they don't know." Later in this same conversation, MITAN even referred to "one dude" who "still ask me for pins", referring to numbers used to unlock access device cards.[7]

By the Defendant's own words, the leadership enhancement should apply, even though the Defendant too may have been working for others in executing his criminal scheme. In fact, the Guidelines provide for larger enhancements for people higher in the hierarchy. *See* U.S.S.G. § 3B1.1(a), (b). That the Defendant may have worked for others in the Brute Force scheme does not undermine the application of two-point leadership enhancement.

---

[7] The United States is prepared to offer evidence of these conversations at the hearing on August 16, 2021.

11

### 3. Sophisticated Laundering

The PSR also properly increases the Defendant's offense calculation by two-levels for sophisticated laundering as to the Brute Force conviction under U.S.S.G. § 2S1.1(b)(3). [PSR at ¶ 45.] To obtain this enhancement, the offense must involve sophisticated means. U.S.S.G. § 2S1.1(b)(3). Thus, unlike the sophisticated means enhancement under the fraud guideline of U.S.S.G. § 2B1.1, where "the defendant [must have] intentionally engaged in or caused the conduct constituting sophisticated means," U.S.S.G. § 2B1.1(b)(10)(C), "sophisticated laundering" in the money laundering context applies where "complex or intricate offense conduct pertain[s] to the execution or concealment of the 18 U.S.C. § 1956 offense." U.S.S.G. § 2S1.1 cmt. n. 5. Thus, the conduct of coconspirators can be considered for application of this enhancement.

The Application Notes for this enhancement provide a non-exhaustive list of four characteristics that typify "sophisticated laundering," two of which are present in this case. *Id.* First, there are multiple layers of transactions and transfers. According to the Plea Agreement, after the Defendant obtained "all the necessary credit card information", he applied the codes to cloned credit/debit cards. [R. 84 at pp. 12.] Then, coconspirators withdrew the funds from victim accounts at ATMs. Then, coconspirators converted the money to bitcoin, by sending the cash to someone like the Confidential Source, who then sent bitcoin at the direction of the Defendant. [*Id.*] The Defendant then had to exchange that bitcoin for cash, in whatever manner he so chooses. This multi-layer money laundering activity certain qualifies as sophisticated, especially given the amount of

12

coordination needed to complete the operation.  Second, as the transactions with the Confidential Source can attest, the money the Confidential Source wired out to MITAN – the fruit of his money laundering conduct – was sent offshore.  Rather than constituting some sort of double-counting, evidence that funds went offshore simply demonstrates the complexity of a money laundering operation.

Generally speaking, the Defendant's personal conduct, as well as the overall money laundering conspiracy comprised of a network of actors operated to conceal the nature and source of the funds and made the various actors involved in this money laundering scheme difficult to uncover, which is the crux of the sophisticated laundering enhancement. The sophistication of the laundering machinery used by MITAN and his conspirators lended to its success.  This process was so efficient that MITAN employed it to launder the proceeds of both the online auction fraud scheme and his brute force attack schemes. Moreover, MITAN's roles in the money laundering phase of these conspiracies were no less sophisticated than any other defendant's role, and this Court has already applied the enhancement to other defendants. *See, e.g.*, 5:18-CR-81, DE 757, 763.[8]

The PSR's application of this enhancement was proper and should likewise be upheld.

---

[8] This Court has previously declined to apply the enhancement for sophisticated laundering to at least one other defendant in this case, not because the laundering was not sophisticated as a matter of fact, but because as a matter of law, the enhancement only applies if Section 2S1.1(b)(2)(B) also applies. S*ee* 5:18-CR-81, DE 866. The Court's prior reasoning is not guiding here, as the parties agree that Section 2S1.1(b)(2)(B) applies. *See id.* at DE 452 at 5.

### III.     Sentencing Recommendation

ADRIAN MITAN must answer for engaging in three separate and wide-ranging criminal schemes. In advance of sentencing in this matter, the United States sets forth below its position on the appropriate sentence.

The advisory Sentencing Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). Accordingly, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines Range." *United States v. King*, 553 F. App'x 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

While the advisory Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis, *Bolds*, 511 F.3d 579-80, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, and the need to avoid unwarranted sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(1)-(3), (6). When fashioning the appropriate sentence, the Court endeavors to find a punishment that is "sufficient, but not greater than necessary" to address these considerations. 18 U.S.C. § 3553(a).

In achieving this task, district courts consider the Sentencing Guidelines *together* with the statutory factors set forth in § 3553(a). *See United States v. Booker*, 543 U.S.

14

220, 246 (2005). This is because the Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). The Guidelines therefore "seek to embody the § 3553(a) considerations, both in principal and in practice." *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) (*quoting Rita*, 552 U.S. at 350).

Balancing the seriousness of the offense and other factors in 18 U.S.C. § 3553(a), the government recommends a sentence at the low end of the Guidelines range. This sentence meets the objectives of 18 U.S.C. § 3553(a) in fashioning a sentence that is adequate, but not greater than necessary, as required by law.

### A. The Applicable Advisory Guidelines Range

Count Group Two, related to the Brute Force case, determines the offense level, because it is the group with the higher offense calculation. [PSR at ¶ 50.] For Count Group Two, the resulting Guidelines calculation is thirty-seven (37). After the three-level adjustment for acceptance of responsibility, the PSR correctly concludes that the total offense level is thirty-four (34). The Defendant's applicable Guidelines range is thus 188 to 235 months' incarceration. [*Id*. at ¶ 74.]

### B. Nature and Circumstances of the Offense

While the PSR and numerous pretrial filings have explained the general nature of the scheme, there are several factors that underscore the sophistication and skill of the

15

conspiracy. The AOAF Network conspiracy, aimed at defrauding U.S.-based victims of substantial sums of money, constantly evolved to become more and more convincing to its victims. The conspiracy exploited its victims' sympathy by posing as members of our armed forces or individuals grappling with deceased relatives who needed to sell vehicles quickly. It also cloaked itself under the goodwill of legitimate businesses such as Craigslist in order to lull victims into a false sense of security. Once a victim expressed interest, the conspiracy would forward a carefully crafted invoice that explained the purchase process, which often involved contacting a call center to complete the process. These call centers were critical in lending an air of credibility that convinced hundreds of victims to provide payment for goods that simply did not exist.

To evade detection, the conspiracy engaged in the money laundering operation already discussed above. Not only did the conspiracy rely on the decentralized and anonymous nature of cryptocurrency, the money-laundering scheme involved multiple layers of subterfuge to conceal fraud proceeds. As a result of this sophisticated laundering, the money laundering operation allowed the conspiracy's criminal acts to reach further, exploit more victims, and conceal higher volumes of proceeds. A Guidelines sentence should reflect the comprehensive and complete exploitation of the conspiracy's victims.

This does not even account for the brute force attack and the vishing schemes, discussed previously. Both schemes were technically sophisticated, involving the exploitation of a variety of systems including point-of-sale as well as VoIP systems. They

16

also exhibited a high degree of human intelligence, employing tactics to find vulnerable victims and trick them into providing sensitive banking information. [*See*, *e.g.*, R. 452 at pp. 13 (injecting scripts that targeted victims living in specific area codes that matched the selected banks and credit unions, impersonating financial institutions, and convincing victims that their accounts were compromised as a tactic to coerce banking credentials).] And as for the brute force scheme, MITAN used the same money laundering machinery as the AOAF Network conspiracy to conceal the proceeds of crime. Taken together, these features expanded MITAN's criminal reach to be able to victimize a higher volume of individuals, through multiple schemes, all while remaining hidden from detection.

### C.  History and Characteristics of the Defendant

MITAN's history and characteristics support a Guidelines sentence. Notably, this is not the first time MITAN has committed fraud in the United States. In 2009, just years[9] before his involvement in the current schemes, MITAN engaged in bank fraud and was ultimately convicted and sentenced to fifteen months imprisonment in 2011. *See* Attachment C (District of Connecticut Judgment), D (District of Connecticut Plea Agreement).[10] That MITAN committed not one but three separate fraud offenses within such temporal proximity of his prior offense and release from prison is particularly brazen. It also makes dubious his prior sentencing argument before the District of

---

[9] Per the plea agreement in the District of Connecticut matter, MITAN's offense conduct occurred in 2009. The bank fraud scheme occurred between May 2009 to October 2010. MITAN was sentenced in the District of Connecticut matter in 2011, and committed the online auction fraud and brute force schemes in 2016.

[10] MITAN's judgment included a $27,249.01 restitution order, but it is unclear whether this was ever satisfied.

17

Connecticut that he committed his prior bank fraud under duress. *See* Attachment E at 2-3 (Defense Sentencing Memorandum).[11] It is similarly troubling that MITAN's criminal conduct appears to be escalating following his prior fraud conviction. A sentence at the middle of the Guidelines range is necessary to both encompass the scope and scale of crimes committed by MITAN, but also to deter MITAN from any future criminal conduct and protect the American public.

### D. The seriousness of the offense, promote respect for the law, and protect the public

A Guidelines sentence will also reflect the seriousness of the offense, promote respect for the law, and protect the public. Cybercrime is not a victimless crime simply because it is committed from behind a keyboard. Money laundering is not a victimless crime simply because the perpetrator did not commit the underlying fraud. Rather, as this case makes clear, the extensive reach of the internet makes cybercrime, and the laundering of the proceeds of that crime, much more widespread than traditional fraud schemes.

### E. Deterrence

Unlike every other foreign defendant in this case, this Defendant remarkably is in Criminal History Category III, due to crimes he committed while in the United States, against United States victims. When he served his time and returned to Romania, he could not escape the lure of profits and greed in defrauding U.S.-based citizens of their

---

[11] It appears MITAN was also convicted in Queens County, New York for identity theft related to this scheme.

money.  A Guidelines sentence that is far more stringent than the one levied in his first U.S. conviction is necessary to serve as a deterrent to MITAN individually.

In addition to specific deterrence for this Defendant, general deterrence is a vital consideration in this case.  A Guidelines sentence would adequately deter criminals who falsely believe their conduct online or overseas will remain unchecked forever. The conspiracy took many steps to hide their criminal activity. MITAN hid behind the supposed anonymity of the internet and encrypted chat communications with coconspirators, the use of fake email addresses, and through cryptocurrency. Defendants believed they were protected by geographic and technological distance. It is the ease of these anonymizing technologies, along with an increased targeting of U.S. victims from foreign cybercriminals, that have frustrated law enforcement efforts. Indeed, this case alone took over four years to investigate. Foreign cybercriminals engage in this conduct, in part, because they believe it is doubtful that they will be caught and brought to justice. In cases where detection and apprehension does occur, the sentence must be commensurate to the increased need for deterrence.  A Guidelines sentence will both deter the Defendants in this case as well as those who seek to follow in their footsteps.

In this case, the defendants' eagerness to target U.S.-based victims combined with their lack of regard or empathy for those victims pose a specific and ongoing threat to the public. The victims' own words here reflect the weight of the crime. For example, in his victim impact statement, N.M. recounts arriving to military duty in California when he fell victim to the conspiracy:

19

> I was 19 years old at the time and did not know anyone. I needed a car because California and Camp Pendleton are very big places, so I went online and started looking for inexpensive used vehicles. Being newly married and having a 1-year old little girl alone in Nebraska, money was not something we had very much of. While on the website Craigslist I found an ad for a black 2004 Chevy Impala SS listed for $1,500.00.

He goes on to recount a sympathetic narrative peddled by the conspiracy:

> I soon received an email from what was said was the mother of the vehicle's owner. "She" stated her son passed away and thus the reason for the low price on the vehicle. Sympathetic, I understood and believed why she would want to sell the car for such a low price.

N.M. then describes in detail the numerous steps required to remit payment. Afterwards, N.M. "received an email from what looked like eBay with a receipt for my purchase. Being overly excited about buying such a nice car for so little I overlooked the obvious signs of a scam." Incredibly, members of the conspiracy convinced N.M. to pay an additional $1,500.00, and when N.M. learned from the real eBay that he was a victim of fraud, N.M. did "the hardest part of the whole ordeal."

> I had to call my wife who was all alone with our baby girl and tell her that $3000.00 which was all of our savings was now gone. I felt I had failed as a father and as a husband, because I had just lost all of our money[.]

Victims such as N.M. demonstrate that the harms inflicted by the conspiracy are particularly crushing for those already experiencing financial hardship, who are the most likely to be seeking to purchase low-cost, used vehicles.

Other victim statements demonstrate how the conspiracy was particularly successful at defrauding some of the most vulnerable members of our community, such

20

as senior citizens, including C.R.K., who has passed away. Her daughter and executrix,

S.R.G., detailed how the crime impacted not just C.R.K., but those close to C.R.K.

> These scammers not only cost mom $5000, but they robbed her of a normal
> daily life thereafter. The daily barrage of scam phone calls to mom robbed
> all of us of her remaining days because this consumed her life with worry.
> We considered changing her phone number that she had had for 71 years to
> try to stop it, however, she was diagnosed with dementia and we knew that
> she needed to hold onto that number in order for her to have a social life
> with friends and family.

Worried that C.R.K. would fall prey to additional fraud, S.R.G. and other family

members were forced to take steps to curtail C.R.K.'s independence. "My siblings and I

had to take mom's keys away because with every scam call, if we couldn't stop her, she

would run to Walmart or Kroger's to buy the cash cards to send, believing every word the

scammers had to say . . . cost[ing] mom her freedom to even run to the grocery store." In

addition to being more susceptible to fraud, senior citizens such as C.R.K. endure a

unique suffering after the fraud. S.R.G. recounts how her mother's dementia "worsen[ed]

much faster than it would've," and how C.R.K. remained "in a mental loop of panic over

these calls." Far from being victimless, the fraud perpetrated by this conspiracy and

supported through money laundering efforts of individuals like MITAN cause significant

harm to victims such as N.M., C.R.K., and long-lasting incidental harm to their loved

ones.

### F.  Remaining Factors

The United States does not believe there is a need to provide treatment to the Defendant, or to avoid unwarranted sentencing disparities.   The remaining § 3553(a) factors are not relevant to the Court's sentencing analysis.

### IV.    Conclusion

As this Court is aware, the Superseding Indictment charges twenty defendants. Seventeen had been convicted, by plea agreement or trial, for their roles in this offense. The Guidelines are the most consistent way to ensure that the sentences for these defendants, with varying levels of participation, are sentenced without unwarranted disparities.  As correctly concluded in the PSR, MITAN's offense level is 34, and his criminal history category is III. This Court should sentence MITAN to the middle of the Guidelines range of 168-210 months.

Respectfully Submitted,

CARLTON S. SHIER, IV
ACTING UNITED STATES ATTORNEY

By:     s/ Kathryn Anderson
        Assistant United States Attorney
        260 W. Vine Street, Suite 300
        Lexington, Kentucky 40507-1612
        (859) 685-4885
        Kathryn.Anderson@usdoj.gov

        Kenneth R. Taylor
        Assistant United States Attorney
        260 W. Vine Street, Suite 300
        Lexington, Kentucky 40507-1612

Ken.Taylor@usdoj.gov
(859)685-4874

Tim Flowers
Senior Trial Attorney
Computer Crime and Intellectual
Property Section
1301 New York Avenue NW, Suite 600
Washington, DC 20530
Timothy.Flowers@usdoj.gov
(202)353-0684

CERTIFICATE OF SERVICE

On August 9, 2021, I electronically filed this document through the ECF system,

which will send the notice of electronic filing to counsel of record:

Willis Coffey
*Attorney for Adrian Mitan*

s/ Kathryn M. Anderson
Assistant United States Attorney