```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                     CENTRAL DIVISION LEXINGTON

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5                              Docket Nos. 5:18-CR-81,
                               5:20-CR-04, 0:18-CR-05
6    VS.                       At Lexington, Kentucky
                               Friday, August 20, 2021
7                              8:59 a.m.
     ADRIAN MITAN,
8
          Defendant.
9                              - - -

10       TRANSCRIPT OF SENTENCING PROCEEDINGS BEFORE
            U.S. DISTRICT JUDGE ROBERT E. WIER
11
                               - - -
12
     APPEARANCES:
13
     For the United      KATHRYN ANDERSON
14   States:             KENNETH TAYLOR
                         RAJBIR DATTA
15                       Assistant United States Attorneys
                         260 West Vine Street
16                       Suite 300
                         Lexington, Kentucky  40507-1612
17                       (859) 685-4885

18   For the Defendant:  WILLIS G. COFFEY
                         Coffey & Ford, PSC
19                       P. O. Box 247
                         Mt. Vernon, Kentucky  40456
20                       (606) 256-4405

21   Court Reporter:     SANDRA L. WILDER, RMR, CRR
                         Official Court Reporter
22                       313 John C. Watts Federal Building
                         330 West Broadway, Suite 327
23                       Frankfort, Kentucky  40601

24
          Proceedings recorded by mechanical stenography,
25     transcript produced by computer.
```

```
 1              [Proceedings commenced at 8:59 a.m. in open

 2    court]

 3              THE COURT:  Okay.  Thank you very much.

 4              Good morning to everyone.  It's been so long

 5    since I've had a hearing in Courtroom D, I about lost

 6    my way down here.

 7              Okay.  If the clerk would call the 9:00

 8    matter.

 9              COURTROOM DEPUTY:  Yes, Your Honor.  Ashland

10    Criminal Action Number 18-5, Lexington Criminal Action

11    18-81, Lexington Criminal Action Number 20-4, United

12    States of America versus Adrian Mitan, called for a

13    sentencing.

14              THE COURT:  Thank you very much.

15              The Court recognizes Ms. Anderson for the

16    United States.  Good morning.

17              MS. ANDERSON:  Good morning, Your Honor.

18    Also to my left is Ken Taylor representing the United

19    States.

20              THE COURT:  Mr. Taylor, good morning.

21              MR. TAYLOR:  Good morning.

22              THE COURT:  And Mr. Coffey for the defense,

23    good morning.

24              MR. COFFEY:  Judge, good morning.  How are

25    you?
```

1          THE COURT:  I'm good.  Thank you.  How about

2 you?  I bet you had a foggy trip over the river this

3 morning.

4          MR. COFFEY:  I did; it was a little foggy

5 this morning.

6          And this is Mr. Palento who'll be assisting

7 me, judge, in the case.

8          And this is, of course, Mr. Mitan here in the

9 middle.

10          THE COURT:  Good morning.  Good morning to

11 all of you.  Mr. Mitan, good morning.

12          All right.  Starting with the courtroom setup

13 and COVID protocols, Courtroom D is a little bit

14 smaller.

15          What I've generally been doing is allowing

16 people who, who are fully vaccinated to, to go without

17 a mask.  But honestly, 'cause this room is a little

18 bit smaller, everybody's a little bit cramped

19 together, I think I will require everybody to, to

20 maintain their masks during the hearing, unless you're

21 speaking.

22          If you're speaking, then I'm fine with you

23 taking your mask down while you speak; that will

24 really help us communicate and understand a little bit

25 better.  And, of course, any, any witness will testify

1   without, without a mask.

2           Okay.  So we're here at long last for

3   sentencing in this case.  And Mr. Mitan, of course,

4   stands convicted on three distinct indictments, the

5   18-81 RICO conviction, the conspiracy conviction, the

6   18-5 brute force money laundering conviction, and the

7   20-4 vishing -- that's vishing with a "V" case from

8   the Western District of North Carolina transferred

9   here for inclusion under Rule 20.

10          So three cases.  It's taken close to three

11  years.  I think Mr. Mitan's had three different sets

12  of lawyers, so glad to finally be here at judgment

13  day.

14          I will say, Mr. Mitan, I've spent a great

15  deal of time reading about your case and preparing for

16  today, and so I know the case well.

17          I am coming into the hearing with an open

18  mind.  I know there are some issues to be resolved,

19  and I haven't made my mind up on those.  I haven't

20  made my mind up on the ultimate sentence, of course.

21  The sentence is the result of a process, and a big

22  part of that process is the hearing today.

23          So I want to hear everybody out, give

24  everybody a full chance to argue the issues and make

25  the case for their respective positions.  And then I

1  intend to impose a sentence that's fair and just and

2  appropriate, consistent with the standards I'm bound

3  to follow, but tailored to you as an individual person

4  with a unique path to be before the Court.  So that's

5  really the goal for the hearing today.

6          Do you understand that, sir?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Okay.  All right.  Let me just

9  make sure both sides are ready.  Ms. Anderson?

10          MR. ANDERSON:  Yes, Your Honor.

11          THE COURT:  Okay.  And, Ms. Anderson, if

12  you'll be sure that mic -- pull that mic a little

13  closer to you just so I can be, be sure to hear you

14  during the hearing.

15          And, Counsel, you can just stay seated during

16  your presentations today.

17          Mr. Coffey, the defense is ready?

18          MR. COFFEY:  Yes, sir.

19          THE COURT:  Thank you.

20          Officer Cardin wrote the presentence report

21  and she is here in the courtroom, and I appreciate her

22  work and her attendance today.

23          I've read the full record, I believe, in all

24  three cases, to the extent they pertain in any way to

25  the defendant.

1          I've read the sentencing-related filings, I
2  read the memos, I read the letters tendered on
3  Mr. Mitan's behalf, and glad to see those and consider
4  them.
5          Are there any other late breaking written
6  materials I need to be aware of and take into account,
7  Ms. Anderson?
8          MR. ANDERSON:  No, Your Honor.
9          THE COURT:  Mr. Coffey?
10          MR. COFFEY:  No.
11          THE COURT:  I know this to be true, but let
12  me confirm it on the record, that both sides got the
13  presentence report, had adequate time with it in
14  preparation for the hearing today.  Ms. Anderson?
15          MR. ANDERSON:  Yes, we did, Your Honor.
16          THE COURT:  Mr. Coffey?
17          MR. COFFEY:  Yes, sir.  Now, judge,
18  everything I got was, was already furnished before I
19  ever got it in the case.
20          THE COURT:  The same for you on the mic,
21  Mr. Coffey.  If you'd ...
22          MR. COFFEY:  I said, everything I've received
23  from probation actually was -- had already been
24  furnished to counsel before me and had already been
25  furnished to Mr. Mitan.  And I gave him another copy

1  just to make sure he had it, and we've gone over it so

2  he'd ought to have had ample time to have reviewed

3  everything probation prepared in this case.

4          THE COURT:  And he's been housed for as long

5  as I can remember in Woodford County; is that right?

6          THE DEFENDANT:  (Nod affirmatively).

7          THE COURT:  Okay.  And, Mr. Coffey, where

8  there is kind of a change-over in counsel -- and I

9  know that Ms. Mersch, his prior counsel, had gone

10 through the sentencing preparation process, have made

11 objections and then, and then got replaced sort of

12 pretty close to what I thought was being ready for

13 sentencing.

14         And then you came in, and I just want to make

15 sure you're confident that you covered all the ground

16 you needed to with him, addressed the status of the

17 report and the objections, and that you feel like he's

18 ready for today.

19         MR. COFFEY:  I do.

20         THE COURT:  Okay.  Thank you.

21         Mr. Mitan, that report is a critical piece of

22 sentencing.  It's really the foundation for federal

23 sentencing in many respects.  It's a comprehensive

24 history of the crimes the Court's considering and the

25 person the Court's considering.

1           So it's critical that the defendant get that

2    report, have plenty of time to go through it, and

3    critically time with counsel to go through it to

4    understand the legal and factual issues that are going

5    to matter, potential objections, things of that

6    nature.

7           Have you had time to do all of that?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  And do you feel ready for today?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Okay.  All right.  Thank you.

12          I'll treat your report as I treat the report

13   in every case, Mr. Mitan -- yes?

14          MR. COFFEY:  Judge, I forgot to ask.  He

15   wants to take some notes during the hearing, and he

16   asked me to have his cuffs removed so he could write,

17   so he could write to take the notes throughout the

18   hearing.

19          THE COURT:  Yeah.  Mr. Marshal, there's no

20   security concern with that, I presume?

21          DEPUTY U.S. MARSHAL:  Judge, it's up to you.

22          THE COURT:  Okay.  Unless you have a specific

23   worry about him security-wise, I will have you take

24   the cuffs off.

25          DEPUTY U.S. MARSHAL:  Okay.

1          MR. COFFEY:  Thank you.

2          THE COURT:  Thank you, sir.

3          What I'll do with the report, as I do in

4   every case, Mr. Mitan, I will put it in the record

5   under seal.  And that means it's available to the

6   people with a legitimate need to see the report.  I

7   can get to it, the lawyers here can get to it.  If

8   there's an appeal, the appellate court can get to it.

9   But it's not a public document available to anyone off

10  the street or a stranger to that group.  Somebody in

11  that category can't go to the clerk's office and ask

12  to see your report.  That's because the report content

13  often is sensitive as to the defendant and his family

14  and background or, and/or it's sensitive as to the

15  case and the investigation.  And so for that reason, I

16  do put it in the record under seal as I've described

17  it to you today.

18          Do you understand that, Mr. Mitan?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Okay.  Ms. Anderson, any victims

21  with the intent to participate today?

22          MR. ANDERSON:  No, Your Honor.

23          THE COURT:  Okay.  So this is how I would

24  propose we go forward in the, in the hearing today.

25          What my practice in the case has been,

1  Mr. Coffey, is -- has been to hear all of the proof,

2  so have the parties put on all of their proof related

3  to any of the objections, and both sides should fully

4  examine any witness up there for anything pertinent

5  to, to the objections.

6          Then I'll hear argument -- once the proof's

7  closed -- argument on all the objections.  And then

8  what I've typically done is taken a break at that

9  point and go -- an extended break, make my rulings --

10  formulate my rulings.  Then come back, announce my

11  rulings, and then we pick up the balance of the

12  sentencing at that point.  That's how I've done it,

13  and I would intend to do that again here today.

14          Ms. Anderson, does that sound workable to

15  you?

16          MR. ANDERSON:  Yes, Your Honor.

17          I just wanted to point out that if the

18  hearing extends beyond lunch today, Mr. Taylor will be

19  representing the United States without my presence.

20          THE COURT:  All right.  In the bullpen

21  warming up just in case.

22          Well, okay.  We'll be glad to, to accommodate

23  that, and maybe, maybe an efficient morning can get us

24  to the finish line by noon.  It would be a bit of a

25  surprise, but we'll make a good, good efficient use of

1 the time today.

2          Does that sound workable, Mr. Coffey?

3          MR. COFFEY:  Yes, sir.

4          THE COURT:  Okay.  So it's a little bit

5 unusual because Ms. Mersch made -- you know, sent a

6 letter with that whole laundry list of objections, and

7 then Mr. Coffey came in.

8          And as I read the report and the objections

9 and the briefing, it seems to me that we're really,

10 we're really down to four different areas for

11 discussion.  One is the proper loss calculation.

12          One is the inclusion of sophisticated

13 laundering, the plus 2 under 2S1.1.

14          Third is a role adjustment.

15          And fourth is restitution.  So those are the

16 four areas I think where there, there is an objection

17 that's going to require proof and/or argument and a

18 court ruling.

19          I don't see a need for a more granular ruling

20 on, you know, some of the minutia listed in

21 Ms. Mersch's letter.

22          Do you agree with that, Mr. Coffey?

23          MR. COFFEY:  I do.

24          THE COURT:  Okay.  That's, that's how we'll

25 go forward.

1        And, of course, just as a foundation -- we

2   all understand this -- but to, to kind of frame the

3   hearing, rules of evidence don't apply.  I'm looking

4   for reliable information as the basis for sentencing.

5   And so that means I can't consider things that

6   otherwise would not be admissible in a hearing

7   governed by the rules of evidence.

8        That doesn't mean that hearsay proof has the

9   same quality as an in-person witness testifying under

10  oath with personal knowledge.  So it matters, the

11  state and quality of the proof, but I'm looking for

12  reliability overall.

13       The burden on all these, I think, falls on

14  the government to prove the contested matter by a

15  preponderance.  Generally, the government's advocating

16  for a guideline calculation, and the party advocating

17  for that usually has the burden on it, and that's how

18  I would intend to approach things here.

19       Any disagreement with what I've said so far,

20  Ms. Anderson?

21       MR. ANDERSON:  No, Your Honor.

22       THE COURT:  Mr. Coffey?

23       MR. COFFEY:  No, sir; I agree.

24       THE COURT:  The one overarching point I would

25  make going in -- and I've discussed this with

1  probation -- I -- I'm not, I'm not in agreement with

2  how probation went about its grouping mechanism here.

3       The parties in the plea agreement had, had

4  agreed that everything would be grouped and would be,

5  you know, analyzed under 2S1.1 and the money

6  laundering framework.  That, that seems correct to me.

7  I think all these counts -- even though it's distinct

8  conduct -- I think all these counts center on

9  fraud-based activity with a monetary objective.  And I

10  think under the grouping rules, all of the counts

11  should group together, and essentially, we should

12  evaluate the whole of the conduct, which means on the

13  loss calculation, it seems to me it all really goes

14  into one bucket, and that's, that's what I need to

15  measure for the 2B1.1 application.

16       Probation created two groups, and then

17  recombined those groups.  And I'll, I'll confess, I

18  still can't really understand how probation got to

19  that.

20       And if probation -- if I can't understand it,

21  I'm not going to apply it in that way.

22       So the way I look at it is, it's really one

23  group and it's to be measured by the most, you know,

24  significant conduct or calculation under that group.

25  The parties agree that that'd be the 2S1.1 route.

1  That seems correct to me.

2        So that's, that's really how I'm approaching

3  it.  And if the parties disagree with that and we need

4  to look at it a different way, I'm glad to entertain

5  it.

6        I think at the end of the day, the

7  destination, the result is probably the same.  I think

8  it probably is academic here, probably is, but I've

9  got to route it in the way that I think's compliant

10  with the guidelines and my reading of it.

11        So, Ms. Anderson, what's your view on that?

12        MR. ANDERSON:  Your Honor, that's how I've

13  been at least conceiving of the loss amount in this

14  case, and the presentation I intend to put on today

15  aligns with what you've just described.

16        THE COURT:  Okay.  Mr. Coffey?

17        MR. COFFEY:  I'm with you; I agree with all

18  of that.

19        THE COURT:  Okay.  All right.  Then that's,

20  that's how we'll look at it.

21        All right.  Ms. Anderson, if you're ready to

22  put your proof on, you can call your first witness.

23        MS. ANDERSON:  Thank you, Your Honor.

24        The United States calls Sergeant Nathan

25  Moore.

1              THE COURT:  Sergeant Moore.

2              [THE WITNESS NATHAN MOORE WAS SWORN]

3              THE COURT:  Sir, good morning.

4              THE WITNESS:  Good morning, judge.

5              THE COURT:  Let me make sure everybody's got

6    a good sight line to you.

7              Can you see, Mr. Coffey?

8              MR. COFFEY:  Yes, sir.

9              THE COURT:  Mr. Mitan, can you see the

10   witness?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Ms. Anderson, you can.  You can

13   examine from there or from the podium.  Actually I

14   didn't notice the podium when I first came in.  If

15   you're more comfortable there, that's fine.  Wherever

16   you're more comfortable.

17             MS. ANDERSON:  I'll examine from the table.

18             I just wanted to put on the record that I'd

19   like to hand to the witness a copy of the exhibit

20   binder that the Court has already been furnished, as

21   has the defendant.

22             THE COURT:  Okay.  That's fine.  If you'd

23   walk that up to him.

24             Sir, if you first would state your name and

25   spell your last name.

 1            THE WITNESS:  Yes, Your Honor.  My name is
 2   Nathan Moore.  Last name is spelled M-O-O-R-E.
 3            THE COURT:  Thank you.  Ms. Anderson.
 4            MS. ANDERSON:  Thank you, Your Honor.
 5                     Government's Proof
 6                     DIRECT EXAMINATION
 7   BY:  MS. ANDERSON:
 8       Q.      Sergeant, Moore, could you please provide
 9   your title and job responsibilities for the record.
10       A.      Yes, ma'am.  I am a detective sergeant
11   with the Kentucky State Police.  I'm currently
12   assigned to the eastern branch of the Drug Enforcement
13   Special Investigation Section, and also dually
14   assigned as a federal task force officer with the
15   United States Secret Service.
16       Q.      And in your role as a United States Secret
17   Service task force officer, were you involved in this
18   sort of sprawling investigation at issue today?
19       A.      Yes, ma'am.
20       Q.      And have you been part of this
21   investigation since its onset?
22       A.      That's correct.
23       Q.      And jumping right into the loss
24   calculation, let's start with the RICO case.  Could
25   you just provide for the Court an overview of what

 1   occurred in what we're calling the RICO case, which is
 2   18-CR-81.
 3        A.      Yes, ma'am.  From an overview standpoint,
 4   the government and the United States Secret Service
 5   was working with a cooperating witness who had --
 6   repeatedly and perpetually was communicating with a
 7   group primarily based in Alexandria, Romania, but
 8   other portions of Romania as well, in eastern Europe,
 9   and where -- whereby they were working together
10   performing fraud, namely online advertisement fraud,
11   online auction fraud.  They would send proceeds of
12   those crimes through the informant to multiple other
13   network of domestic processors located in the United
14   States.
15           Those proceeds were converted to
16   cryptocurrency, sent back to the fraudsters that were
17   actually responsible for the postings and the fraud,
18   and then it would again be laundered once more and
19   converted into fiat currency.
20        Q.      And typically, how much were the vehicles
21   that were sold online; what was the typical price for
22   those?
23        A.      Generally anywhere from $2,000 to $5,000.
24        Q.      Were there occasions when it was more than
25   that?

1    A.      Absolutely.

2    Q.      Okay.  So did you participate in

3 calculating the loss amount associated with the RICO

4 case?

5    A.      Yes, ma'am.

6         MS. ANDERSON:  Let's pull up Exhibit 1A,

7 please.

8    Q.      Sergeant Moore, could you describe what

9 this exhibit shows.

10    A.      Yes, ma'am.  This describes a number of

11 the foreign-based defendants, and it would --

12 identifies the roles that they would have played

13 within the network, the AOAF Network, some of the

14 dates of those transactions, and then also the amounts

15 respectively that were sent through the Eastern

16 District of Kentucky in the form -- in various forms,

17 either gift cards, bank deposits, any number of

18 different iterations of that, and also the bitcoin

19 that was sent back through and from the Eastern

20 District of Kentucky.

21    Q.      The column there identified as, "Total

22 Success," what does that mean, "Total Success?"

23    A.      So that would be the -- again, the number

24 of -- that is the sum of the monies that were sent by

25 victims, or that was actually received by domestic

1    processors, but payments made by victims for

2    non-existent items, or from fraud.

3         Q.    Okay.  And "success," does that connote

4    that the money was actually received by the

5    confidential informants?

6         A.    That's correct.

7         Q.    In other words, was there an attempted

8    amount of fraud as well that did not go through?

9         A.    Yes, ma'am.

10        Q.    Okay.  And the second column there in

11   yellow is labeled, "Bitcoin Sent through EDKY."  What

12   is the difference there?  Why is there a difference?

13        A.    So as I said before, the cooperating

14   witness was working with a network of individuals

15   based domestically that would assist in the receiving

16   and the processing of these victim payments.  And

17   those payments were ultimately converted to bitcoin.

18             And for their activities, those domestic

19   processors, as well as the cooperating witness itself,

20   would maintain or keep a percentage or a fee of those

21   victim monies.  And so that's why you have the lesser

22   amount that was sent back to the originating

23   fraudsters.

24        Q.    Okay.  And over the course of the

25   conspiracy with just the defendants named on this

chart, how much money was sent to the Eastern District
of Kentucky successfully defrauded from these victims?

A.      $2,739,360.

Q.      Okay.  And is this chart inclusive of all
of the fraudsters involved in this ring?

A.      No, ma'am.

Q.      In fact, is there a subsequent indictment
currently pending with at least five others?

A.      That's correct.

Q.      And those are not included in this value?

A.      No, they're not.

Q.      Did your investigations also reveal
whether this is all of the money that these defendants
defrauded as part of the online auction fraud?

A.      Yes, it did reveal that this was not all
of the money they were involved with.

Q.      Can you explain.

A.      Certainly.  As part of the investigation,
naturally, we began to collect evidence and were able
to identify a number of bitcoin addresses specifically
and other email addresses that were rife with evidence
that was indicative of other similar activities going
on, though we were not involved particularly within
those activities.

Q.      And when you say, "We were not involved,"

1  that money was not sent to the Eastern District of

2  Kentucky?

3       A.      That's, that's correct.

4       Q.      And so does that mean that the, "Dates of

5  Conduct with EDKY," that column, is not necessarily

6  inclusive of all of the criminal activities that these

7  defendants perpetrated?

8       A.      Right.  With respect to them being

9  involved in criminal activity, no, that is not

10 inclusive of all that.

11      Q.      Okay.  Let's just focus for a moment on

12 Adrian Mitan.

13      A.      Okay.

14      Q.      What is the total successful amount he

15 sent to the Eastern District of Kentucky?

16      A.      $17,382.

17      Q.      And what is the amount that he got back

18 from that, that series of transactions?

19      A.      $10,801.

20      Q.      Okay.  And here we list a set of dates.

21 Could you provide that for the record.

22      A.      It says January 12, 2016, through July 22,

23 2016.

24      Q.      And did Adrian Mitan continue to work in

25 online auction fraud after this date?

1       A.      We believe so, yes.

2       Q.      And what is the basis for that belief?

3       A.      There were some Jabber communications with

4  us that seemed to indicate that he was still readily

5  involved in the fraud process.

6           MS. ANDERSON:  If we could pull up Exhibit

7  1E-1, please -- I'm sorry, 1K-1.

8       Q.      Sergeant Moore, what is the exhibit here

9  at 1K-1; what does this show?

10      A.      This is a snapshot of a Jabber

11  communication between the cooperating witness and the

12  defendant.

13      Q.      Okay.  And is the defendant -- what is the

14  username used by the defendant in this chat?

15      A.      abcd0.

16      Q.      And is the confidential informant's

17  username blacked out with the redacted box?

18      A.      That's correct.

19      Q.      Okay.  And for the record, what is the

20  date of this conversation?

21      A.      It began on August 23, 2016.

22      Q.      And this is after the dates of conduct

23  from the previous exhibit?

24      A.      Yes, ma'am.

25           MS. ANDERSON:  If you would, sir, you and I

1  could read this into the record.  If you would read

2  for the defendant.  I will read for the cooperating

3  witness.

4           THE WITNESS:  Okay.

5           "THE DEFENDANT:  are you there ?

6           CONFIDENTIAL WITNESS:  yo, what's up

7           THE DEFENDANT:  :)  No more wire ? :)

8           CONFIDENTIAL WITNESS:  Think you should work

9  towards Cashier's Checks and Money Orders.  Just

10  having a shit ton of problems with wires.  Money keeps

11  getting stuck and banks being closed.

12           THE DEFENDANT:  yes, but is very hard to do

13  that ...

14           CONFIDENTIAL WITNESS:  Bro?  all the other

15  teams are working the same thing

16           THE DEFENDANT:  because I have a dealer

17  website.

18           CONFIDENTIAL WITNESS:  yes, yes, so do other

19  guys.

20           THE DEFENDANT:  and I have the address in

21  Georgia.

22           CONFIDENTIAL WITNESS:  It's a totally

23  legitimate payment method

24           THE DEFENDANT:  for example, and I can not

25  tell to people to send the money to Indiana or

1 California.  you feel me?

2          CONFIDENTIAL WITNESS:  We have different

3 states.  What is the problem you are having  Most

4 people are having higher success rate by mailing money

5 orders/cashier's checks.  The victims think it's safer

6          THE DEFENDANT:  I all ready told you I will

7 try..."

8     Q.    Sergeant Moore, there was a reference in

9 there to a "dealer website."  In your experience with

10 this investigation, what did that mean to you?

11     A.    Generally, we had seen instances where

12 people were actually creating websites appearing to be

13 a legitimate auto dealer and attempting to sell

14 vehicles through that using that as a source of

15 contact for potential victims to purchase vehicles

16 that didn't exist.

17          MS. ANDERSON:  okay.  And let's go over to

18 the second page of this exhibit.  And if you could,

19 Sergeant Moore, begin with the conversation starting

20 with .

21          "THE DEFENDANT:  I'm here now.

22          CONFIDENTIAL WITNESS:  Yo.  need to buy some

23 ATT email addresses

24          THE DEFENDANT:  with access or without access

25 ?

1              CONFIDENTIAL WITNESS:  ?? need email:pass

2    email / pass, and hopefully ip Just need about 10

3    emails~

4              THE DEFENDANT:  I don't have :)

5              CONFIDENTIAL WITNESS:  Can you spam for them

6    What about cross referencing some of those craigs

7    accounts and see if they have ATT emails attached then

8    check if ATT email password matches craigs password

9              THE DEFENDANT:  :) bro I have something

10             CONFIDENTIAL WITNESS:  ok

11             THE DEFENDANT:  if your friends are

12   interested

13             CONFIDENTIAL WITNESS:  What is it.

14             THE DEFENDANT:  I post 9 from 10

15             CONFIDENTIAL WITNESS:  hey i give my friend

16   your contact to do biz

17             THE DEFENDANT:  30 days :) :) up :)"

18       Q.    There is a reference in this part of the

19   conversation, Sergeant Moore, to some of those craigs

20   accounts.  What does that reference mean to you?

21       A.    That would be referring to Mr. Mitan had

22   stated in other conversations that he had spammed and

23   was able to -- had -- able to come across and obtain a

24   large number of craigslist accounts and passwords, and

25   so those could be utilized in furtherance of putting

1  up fraudulent postings.

2      Q.     Okay.  Let's turn to Exhibit 1K-2.  What

3  is depicted here in 1K-2?

4      A.     This is another conversation with the

5  defendant and the cooperating witness on an encrypted

6  platform that took place on April 26, 2017.

7      Q.     Again, this is after the dates of conduct

8  from Exhibit 1A; is that correct?

9      A.     Yes, ma'am.

10         MS. ANDERSON:  Okay.  And if we could again

11  read into the record this conversation starting with

12  0's first chat.

13         "THE DEFENDANT:  hey how are you ?

14         CONFIDENTIAL WITNESS:  good, bro, how are

15  you?

16         THE DEFENDANT:  I'm good...:)  I know that I

17  ask you I don't know how many times

18         CONFIDENTIAL WITNESS:  videono one really

19  provides videos

20         THE DEFENDANT:  but... I will ask you again

21  :)))  BANK ACCOUNTS DO YOU HAVE??!!?!?!?!

22         CONFIDENTIAL WITNESS:  For cash deposits or

23  wires?  And how are you doing the transfers

24         THE DEFENDANT:  selling cars :)  but why you

25  dont put people to open the accounts and afther that

1  you buy bitcoin directly with the card from the

2  account:)"

3          MS. ANDERSON:  Thank you.

4          The -- if you could pull back up Exhibit 1A

5  please.  1A.

6      Q,     Sergeant Moore, again, the end date on

7  this is July 22, 2016.  Can you explain to the Court

8  why the conduct through the EDKY ceased -- the money

9  through EDKY ceased in July 2016.

10     A.     There could be a number of reasons varying

11  across different defendants on why those transactions

12  stopped, but I believe in this case, it was actually

13  on behalf of the government, and it was the

14  investigative team.

15         And then in conjunction with DOJ, it was our

16  intention that once suspects were identified

17  conclusively, and we felt comfortable with the

18  evidence that we had attained, that we had indeed

19  identified the individuals with whom we were working,

20  that we would no longer conduct transactions or

21  business with them.

22     Q.     So the confidential witness no longer was

23  willing to do business monetarily with this defendant?

24     A.     That's correct.  We intended to, to the

25  extent we could, we would -- all like to continue

communications and obviously keep up appearances, but had no intention of ever completing transactions as we had in the past, or originally.

Q.     Let's move on to the individual loss assessment.  Did -- were you -- did you participate in creating a presentation to defense counsel on our theory of individual liability?

A.     Yes, ma'am.

MS. ANDERSON:  Could you please pull up Exhibit 1B.

Q.     Is this that PowerPoint presentation provided to the defendant's initial counsel?

A.     Yes.

MS. ANDERSON:  Okay.  And let's go ahead and go to page 2.  Thank you.

Q.     Sergeant Moore, could you explain to the Court what is presented here on page 2.

A.     This is essentially a snapshot of how the profit percentages were determined to be.

So again, it's some of the same totals we've already discussed, the $17,382 would be the victim payments that were successfully received within the Eastern District of Kentucky with the $10,813 was what was returned ultimately to Mr. Mitan in the form of bitcoin.  And then, of course, using those two

1   figures, calculated an approximate percentage of 62

2   percent.

3       Q.      So that 62 percent, that represents what?

4       A.      That would be the percentage of bitcoin

5   that was ultimately -- from the original fraud

6   amounts, that was ultimately returned to Mr. Mitan.

7       Q.      Is that Mr. Mitan's profits?

8       A.      Correct.

9       Q.      Okay.  Now, what was the next step that

10  was applied in calculating this defendant's individual

11  loss?  And if we could move on to page 3.

12      A.      So throughout the investigation and in

13  communications in working with the defendant, we were

14  able to identify through various means multiple

15  bitcoin addresses that was utilized by the defendant.

16          And so then the investigative team would go

17  back, analyze those accounts and see other bitcoin

18  transactions that were sent to those exact same

19  bitcoin addresses.

20          And then, of course, using that 62 percent

21  profit margin, we would work backwards and determine

22  an individual -- a total individual loss amount from

23  there.

24      Q.      Did the defendant give you the bitcoin

25  addresses used in this part of the calculation?

1      A.      Yes.

2      Q.      In the -- in Jabber conversations or

3  otherwise?

4      A.      That's correct.

5      Q.      And did you calculate the amount of money

6  going through those accounts based on the value of

7  bitcoin on the date of transaction?

8      A.      That's correct.

9      Q.      And were all of the bitcoin accounts that

10 you used also used to launder the funds that came

11 through the Eastern District of Kentucky?

12     A.      That's correct.

13         MS. ANDERSON:  If we could skip to page 3 --

14 I'm sorry, 4.

15     Q.      And what does this slide represent,

16 Sergeant Moore?

17     A.      This is a snapshot from the blockchain

18 that would indicate the total amount of bitcoin

19 received from the 34NE wallet --

20         MS. ANDERSON:  Okay.

21     A.      -- or bitcoin address.

22     Q.      And that's one of the defendant's wallets?

23     A.      Yes, ma'am.

24     Q.      Okay.  And this is just showing how you

25 identified the other transactions in this wallet; is

1  that correct?

2       A.      Yes, that's correct.

3            MS. ANDERSON:  Okay.  And if we can go on to

4  5.

5       Q.      Is this similar to the previous slide?

6       A.      That's correct.

7            MS. ANDERSON:  Okay.  And then go on to 6.

8       Q.      Is the value of bitcoin on the date of the

9  transaction a publicly available valuation?

10      A.      It is.

11      Q.      And where, where does one find that?

12      A.      There's multiple different ways and -- or

13 different websites that are out, probably hundreds, if

14 not thousands, that would all project that.

15      Q.      Okay.  And so you used one of those

16 websites that -- did you deem that website to be

17 reliable?

18      A.      Yes.

19      Q.      Okay.  And then in the next slide, what

20 was the total amount of bitcoin that went through

21 these addresses?

22      A.      $12,322.30.

23      Q.      Okay.  So that was more than what was sent

24 through the Eastern District of Kentucky?

25      A.      Yes, ma'am.

 1      Q.      And using the profit percentage -- if you
 2 could go to the next slide -- what was the total loss
 3 attributable to the defendant's personal bitcoin
 4 accounts?
 5      A.      $81,376.
 6      Q.      Okay.  And then -- sorry, that was the
 7 total amount of -- let me rephrase this 'cause I think
 8 I just presented something a little confusing.
 9          The total amount of bitcoin that went through
10 the defendant's tainted bitcoin addresses is how much?
11      A.      $81,376.
12      Q.      Okay.  The $12,000 figure that you just
13 testified to was just one of those addresses, correct?
14      A.      That's right.
15      Q.      Okay.  And so using the profit percentage,
16 that 62 percent profit percentage, how much was the
17 individual loss that was attributed to this defendant?
18      A.      $130,808.55.  And let me clarify.  I think
19 we may have somewhat misspoke when we said just one
20 address.  The $81,376, that was the total that went
21 through all of the identified addresses.  I think we
22 may have just said one singular address, but that
23 would have been all of them.
24          The smaller amount, the $12,000 was that that
25 just went through EDKY.  So the 81 represents all

1 other bitcoins that came from -- were ever outside of

2 the Eastern District.

3         MS. ANDERSON:  Thank you.  And you mentioned

4 earlier that the defendant would have given us the

5 bitcoin addresses used in this calculation.

6         Could we please pull up Exhibit 1G.

7    Q.    Sir, what is this Exhibit?

8    A.    This would be another Jabber chat between

9 the defendant and the cooperating witness that took

10 place on June 2, 2016.

11   Q.    Okay.  And is this -- this is -- the

12 defendant was using a different username on this

13 Jabber chat; is that correct?

14   A.    That's correct.

15   Q.    And what is that username?

16   A.    xpl@jabber.at.

17   Q.    Okay.  And is the confidential witness

18 represented by the redacted boxes?

19   A.    Yes.

20         MS. ANDERSON:  Okay.  And let's start with

21 page 1.  If you could read for xpl.

22         "xpl:  a yes, my friend :)

23         CONFIDENTIAL WITNESS:  wheres my craigslist

24 accounts"

25         THE WITNESS:  xpl then sends a large number

1  of what appears to be craigslist accounts, but by

2  email address what appears to be a password as well as

3  an IP address.

4         MS. ANDERSON:  If you could scroll through.

5  Okay.  Continue to scroll.  Okay.

6         "xpl:  :)  a 100 bonus because you ar my

7  friend ;)

8         CONFIDENTIAL WITNESS:  lol"

9         THE WITNESS:  xpl then provides the 1MC6

10 bitcoin address, and then with a dash says, "My btc

11 address."

12     Q.    Would the confidential source then pay

13 with a bitcoin to an address like this provided by the

14 defendant?

15     A.    Yes.

16     Q.    Okay.  Did Adrian Mitan work with anybody

17 else in the online auction fraud case?

18     A.    Yes.

19         MS. ANDERSON:  Okay.  Let's pull up Exhibit

20 1D.

21         MR. COFFEY:  G?

22         MS. ANDERSON:  D.

23         MR. COFFEY:  D.

24     Q.    What is this Exhibit?

25     A.    This is a link chart involving various

1  members of the AOAF Network, as well as domestic

2  processors.

3       Q.     Okay.  Let's start at the very top.  Who

4  is listed there at the very top?

5       A.     That would be the defendant Mr. Mitan.

6       Q.     Okay.  And going directly underneath him,

7  who is the first connection underneath him?

8       A.     The first one to his left was Ionut

9  Ciprian Filip was an individual using the username

10  Pinky Pink.

11            Directly below him was Liviu Nedelcu, and

12  that was an individual using the username IDL100.

13            And then to his right was an African-American

14  male Dimitrius Brown that was operating as a domestic

15  processor.

16       Q.     And are you familiar with the defendant's

17  plea agreement?

18       A.     Yes.

19       Q.     In his plea agreement, did he admit to

20  working with Nedelcu and Mr. Brown?

21       A.     Yes.

22       Q.     Okay.  Let's start with Mr. Nedelcu.  Who

23  is he and what did he do in this scheme?

24       A.     Mr. Nedelcu operated as a poster.  I

25  believe he managed teams, and then was a -- did online

```
 1   auction fraud, among many other things.
 2           MS. ANDERSON:  Okay.
 3       A.      But he was also in communications -- we
 4   know he was also an acquaintance of Mr. Mitan, and
 5   that they also had communicated to the cooperating
 6   witness that they were physically at times working
 7   together, but also working in conjunction with each
 8   other as well.
 9       Q.      And when you say "work," is this the
10   online auction fraud work?
11       A.      Yes, ma'am.
12           MS. ANDERSON:  Okay.  Let's pull up Exhibit
13   1E-1.
14       Q.      What is this exhibit?
15       A.      Another snapshot of a Jabber
16   communications that took place on May 25, 2016.
17           MS. ANDERSON:  Great.  And if you would beg
18   -- or you would again read into the record this Jabber
19   chat.  I'll start with the confidential witness who's
20   represented by a black box.
21           "CONFIDENTIAL WITNESS:  what is his username
22           xpl:  now he see your address :))) and he
23   told me that you legit;) :)  anyway when you will send
24   the coins ?
25           CONFIDENTIAL WITNESS:  bro wtf i'm trying to
```

 1  right now you keep talking instead of putting your

 2  address

 3          xpl:  I already give you my address"

 4          xpl then provides the 1F4Z bitcoin address.

 5          "CONFIDENTIAL WITNESS:  its sent  i don't

 6  even know if the cards are even redeemed yet"

 7          xpl then provides what appears to be five

 8  code -- card codes with corresponding expiration dates

 9  and CVVs.

10      Q.      Sergeant Moore, are you familiar with

11  Jabber chats like that that contain the card codes?

12      A.      Yes.

13      Q.      And what are those used for; how do they

14  play into this scheme?

15      A.      So those are ones that generally have been

16  obtained by some -- you know, any variation of fraud.

17  But then that was one of the ways that they would be

18  provided to the cooperating witness to process, and so

19  he would provide those just in text through Jabber

20  chats.

21      Q.      And was it typical that victims would send

22  these codes in payment for the online vehicles?

23      A.      That's correct.

24          MS. ANDERSON:  Okay.  Let's pick up after

25  that.

1          "xpl:  my friend know you about 3 years :)))
2  hahhahaa small world haha
3          CONFIDENTIAL WITNESS:  who is he
4          xpl:  idl -- idls :)
5          CONFIDENTIAL WITNESS:  good I was hoping he
6  was not this guy named johnla23 or frank23
7          xpl:  no no  idls000 something like that he
8  have on jabber
9          CONFIDENTIAL WITNESS:  but he did have stupid
10  friend named jamesghost who can --"
11          MS. ANDERSON:  I will not read the rest of
12  that.
13          "xpl:  I don't know and I don't give a fuck
14  :))) idls100 none of thouse he sayd :) give one sheets
15  to post it there ;)
16          CONFIDENTIAL WITNESS:  okay, one second.
17  email
18          xpl:  omg  hold on from next cards we will
19  use the sheats that you give to idls ;) ok ?
20          CONFIDENTIAL WITNESS:  ok let me just give
21  you al ink i dont want to mix cards between you and
22  him
23          xpl:  yep he is next to me ;) yep yep dont
24  worry we have one :)"
25          MS. ANDERSON:  The confidential informant

1  then provides a link for sharing a Google spreadsheet

2  and continues:

3       "CONFIDENTIAL WITNESS:  i got a system

4  because i got so many people giving me cards i got to

5  know whats what and shit

6       xpl:  yep i know :) we will organize our self

7  to easy work for you ;)"

8    Q.    Sergeant Moore, could you explain what the

9  significance of Google Sheets are to this

10 investigation?

11   A.    Yes.  That was the typical platform with

12 which card codes and other information and the

13 ultimate ledger between the cooperating witness and

14 fraudsters was maintained, but is a Google Spreadsheet

15 that was shared between the two that allowed for

16 realtime collaboration.

17       So in the event that a fraudster had a victim

18 payment, be it in whatever form, he would generally

19 post that on their shared Google Sheet, and then they

20 could follow that transaction collaboratively in

21 realtime know if it had been processed or if there

22 were issues with it.  It was usually communicated on

23 that platform in that sheet.

24   Q.    Specific to Mr. Mitan and Mr. Nedelcu, did

25 they share a Google Sheet with the confidential

1  informant?

2      A.       During this period, yes.

3          MS. ANDERSON:  Let's pull up Exhibit 1E-2.

4      Q.       Sergeant Moore, what is at Exhibit 1E-2?

5      A.       This is another snapshot of a Jabber

6  conversation between the cooperating witness and the

7  defendant using the xpl Jabber username that took

8  place on June 30, 2016.

9      Q.       Okay.  June 13?

10     A.       June 13.  Sorry.

11         MS. ANDERSON:  Thank you.  And if you would

12  again read for xpl and I'll read for the confidential

13  witness.

14         "xpl:  aaaa hey bro  how are you? check the

15  sheets :)

16         CONFIDENTIAL WITNESS:  ok  im lookng see

17  nothing

18         xpl: ;) cool aaa :)

19         CONFIDENTIAL WITNESS:  ?

20         xpl:  How are you :) busy :)

21         CONFIDENTIAL WITNESS:  yes

22         xpl:  Very good :) did you made my cards ?

23         CONFIDENTIAL WITNESS:  bro are you talking

24  about idl i only got idl cards you put nothing on your

25  sheet

1          xpl:  idls card we talking we decide to use
2  only idls sheet ;)
3          CONFIDENTIAL WITNESS:  ok good make easier
4  for me
5          xpl: yep i know
6          CONFIDENTIAL WITNESS:  you guys are like
7  lovers do you share the same bed too
8          xpl: :) bitchis only;) i have 10 guys
9          CONFIDENTIAL WITNESS:  hows your garbage cat
10         xpl:  working for me posting shit on craig
11  fucking dumbs :))) I love suckers hah hahah  the
12  mother fucker craig is so easy"
13     Q.     He references to "craig" in this part of
14  the conversation.  Does that have any significance to
15  your investigation?
16     A.     Yes, ma'am.  They're referring to
17  Craigslist and posting on that website.
18          MS. ANDERSON:  Okay.  Let's turn back to
19  Exhibit 1D, please.
20     Q.     Turning next to Dimitrius Brown.  What is
21  the username that we knew Dimitrius Brown as?
22     A.     Dbrown, Dbrown Daytrader were probably the
23  most two commonly used by him.
24     Q.     And has he been convicted and sentenced
25  for his role in this offense?

1     A.     Yes, ma'am, he has.

2     Q.     I meant to ask that about Mr. Nedelcu.

3 Has he also been convicted and sentenced for his part

4 in this?

5     A.     Yes, he has.

6     Q.     Okay.  Thank you.  Let's pull up Exhibit

7 1F.  What is this at Exhibit 1F?

8     A.     This is an example of the Google

9 Spreadsheet that was shared between the cooperating

10 witness and the defendant, and again, demonstrates the

11 dates, the type of card that was sent originally by

12 the victims, but then provided to the cooperating

13 witness by Mr. Mitan.

14     And then obviously, the corresponding card

15 information, as well as the bitcoin address where

16 payment was to be supplied.

17     And in the end, you can see for ID, that was

18 the cooperating witness's.  He would fill that in as a

19 means to track what domestic processor ultimately

20 received those codes once they were initially received

21 by the cooperating witness.

22     Q.     Okay.  And in -- on this exhibit on 1F,

23 who is the, the domestic processor that was listed?

24 What does "DB" represent?

25     A.     DB is referring to Dmitrious Brown.

```
 1      Q.      Okay.  And again, this is something that
 2  the defendant has access to and can edit and review?
 3      A.      That's correct.
 4          MS. ANDERSON:  Okay.  Let's turn back to
 5  Exhibit 1D, please.
 6      Q.      Okay.  And did you also -- did your
 7  investigation also identify a transaction between
 8  Adrian Mitan and Mr. Filip?
 9      A.      That's correct, yes.
10          MS. ANDERSON:  Okay.  And let's pull up
11  Exhibit 1H.
12      Q.      Do you recognize this exhibit?
13      A.      Yes, ma'am.
14      Q.      What is it?
15      A.      It's just different snips of Jabber
16  communications as well as spreadsheets and other
17  evidence that was collected throughout the duration of
18  the investigation that demonstrates a number of the
19  addresses utilized by both Mr. Mitan and Mr. Filip.
20      Q.      Okay.  And if you would, please, walk us
21  through the steps that you took to identify this
22  transaction.
23      A.      Yes, ma'am.  Well, the first one's I
24  believe a snapshot of a Jabber communication that
25  we've already read into the Court that demonstrates
```

1  the "1MC6" address that was provided by the defendant

2  directly to the cooperating witness.

3       The next is a Google Sheet that was shared

4  between the cooperating witness and Pinky Pink, who is

5  Mr. Filip.

6       And as you can see, the "1FAQ" is the bitcoin

7  address that was supplied by Mr. Filip to receive the

8  proceeds of the processed OneVanilla cards that were

9  initially provided by the victims.

10     Q.     Okay.  So Mr. Mitan provides the address

11  "1MC6?"

12     A.     That's right.

13     Q.     And Pinky Pink provides the address

14  "1FAQ?"

15     A.     That's correct.

16     Q.     Okay.  Let's move on to the second page.

17     A.     That is a snapshot from Wallet Explorer

18  that indicates a transaction whereby the 1FAQ sent an

19  identified amount of bitcoin to the 1MC6 address.

20     So this just demonstrates that Pinky Pink's

21  bitcoin address sent bitcoin to the 1MC6.

22     Q.     Okay.  And what is the date of that

23  transaction?

24     A.     May 15, 2016.

25     Q.     Okay.  And that is within the conduct

 1  period that is -- that the defendant sent money to the

 2  Eastern District of Kentucky?

 3       A.     That's correct.

 4       Q.     Okay.  And then did you try to determine

 5  the value of the bitcoin sent in that transaction?

 6       A.     That is correct.  So this is another

 7  example of an open source valuation for the May 15

 8  date.  And then, of course, determining -- using that

 9  valuation and the amount of bitcoin sent, it

10  translated to roughly $100.

11            MS. ANDERSON:  Okay.  If we could pull back

12  up Exhibit 1D, please.

13       Q.     Sergeant Moore, you've testified about

14  Adrian Mitan, Mr. Filip, Mr. Nedelcu and Mr. Brown.

15  Could you just generally explain what the rest of the

16  figures on this chart represents.

17            THE COURT:  I'm sorry, where is Filip on

18  here?

19            MS. ANDERSON:  Sir, he is underneath

20  Mr. Mitan and the very left.  Ionut Ciprian Filip.

21            THE COURT:  All right.  Thanks.

22            MS. ANDERSON:  If you will look at the

23  screen, Your Honor, we have highlighted which one he

24  is.

25            THE COURT:  Okay.  Thank you.

1          MS. ANDERSON:  Okay.  Thank you.

2      Q.      Sergeant Moore, I was just asking if you

3  could walk us through the connections between these

4  three individuals and the other members of the online

5  auction fraud network.

6      A.      Okay.  Well, I'll start to the very right

7  of Dimitrious Brown is Benjamin Ologeanu; that's

8  correct, that's him.  And then there were bitcoin

9  transactions between Mr. Brown and Mr. Ologeanu.

10          The same can be said -- there were also

11  transactions between Mr. Ologeanu and the two

12  individuals seated immediately below him, or placed

13  below him.  That would be Bogdan Popescu and Alexandru

14  Calin.

15          And I'll start on the third row from the top.

16  The first individual is Stefan Paiusi. He had both a

17  working relationship as well as transactions with

18  Filip above him.

19          And then again, there were also bitcoin

20  transactions with Alin Badea, who was to the right of

21  Mr. Paiusi.  And those transactions involved Filip,

22  Nedelcu.

23          And then also on the second row -- back to

24  the second row is Vlad Nistor.  Mr. Nistor was an

25  individual who owned and operated a large online

1  exchange, cryptocurrency exchange in Romania, and

2  served as a cash-out where he would exchange fiat

3  currency for bitcoin.

4          And so all of the connections between him and

5  the other individuals depicted in the chart,

6  Mr. Nistor was serving as providing fiat currency for

7  tainted bitcoin.

8      Q.     Okay.  And so, Sergeant Moore, the

9  remainder of these connections, are they sort of in

10 line with what've you just testified to?

11     A.     That's exactly right.

12     Q.     And are all the figures on this, this

13 exhibit members of the Alexandria Online Auction Fraud

14 Network --

15     A.     Yes, ma'am.

16     Q.     -- as we -- and that's a title we have

17 given to this?

18     A.     Ones that we have identified, yes.

19     Q.     Were there any other indications that the

20 defendant made to this confidential witness that he

21 was working with others as part of this scheme?

22     A.     I'm sorry, did you say the cooperating

23 witness or Mr. Mitan had made the statements?

24     Q.     That Mr. Mitan provided to the cooperating

25 witness.

1        A.      Yes, yes, he had made statements.

2            MS. ANDERSON:  Okay.  And let's pull up

3   Exhibit 1L, please.

4        Q.      What is this exhibit?

5        A.      It's another snapshot of another Jabber

6   communication between the defendant and our

7   cooperating witness.  The defendant was utilizing the

8   0 Jabber handle that took place on January 12, 2016.

9            MS. ANDERSON:  Okay.  And if again, you'll

10  read into the record for 0, I will read into the

11  record for the confidential sourse.

12            THE WITNESS:  Okay.

13            "0:  hello aaaa

14            CONFIDENTIAL WITNESS:  Hello

15            0:  see that you want to buy green dot on

16  localbitcoins sorry ... you need .. still there?

17            CONFIDENTIAL WITNESS:  hm, you may have seen

18  the wrong ad but I deal with visa gift, onevanilla, mc

19  gift But I redeem about 20-30K daily Work with a lot

20  of guys from eastern europe like Romania, Bulgaria,

21  Ukraine, etc.

22            0:  no problem cool I can buy anythink :)"

23        Q.      Sergeant Moore, is this one of the initial

24  conversations between the defendant and the

25  confidential source?

1      A.      That's correct.

2              MS. ANDERSON:  Okay.  I'll continue.

3              "CONFIDENTIAL WITNESS:  I already know the

4      biz brother.  What volume can you bring?  We redeem

5      quick.

6              0:  I don't know tell me what do you want me

7      to provide you first and I will try sound's good ?

8      still there my friend ?

9              CONFIDENTIAL WITNESS:  Oops yeah sorry

10             0:  :) no problem ;)

11             CONFIDENTIAL WITNESS:  Give me a gmail

12     address We work using spreadsheets live spreadsheets

13     As you post cards / codes / depositS to the sheet, we

14     run them thru in order and payout to address you put

15     on the sheet Works really, really well"

16              0 then provides the email address

17     daucufurker@gmail.com.

18             "CONFIDENTIAL WITNESS:  because problem with

19     using jabber and otr is we lose track of shit

20             0:  okay

21             CONFIDENTIAL WITNESS:  okay, check it out  I

22     shared sheet, check your gmail or "

23             And the confidential witness provides him a

24     link to the shared sheet.

25              "0:  perfect

1          CONFIDENTIAL WITNESS:  orange column is for

2   me don't pay attention to it

3          0:  yes yes no problem.

4          CONFIDENTIAL WITNESS:  The Front/Back is in

5   case you hvae receipts, just upload to anonfiles or

6   imgur and post it there not necessary though make sure

7   to put the card # all together without spaces

8          0:  From where to buy them :)

9          CONFIDENTIAL WITNESS:  Anywhere they sell

10  Greendots or anything.  Grocery Stores, Walmart, DRug

11  stores, and gas stations.

12         0:  online, it's not good right ?

13         CONFIDENTIAL WITNESS:  Yeah, can't find them

14  online.

15         0:  what I can buy online for you?  I can buy

16  green dot ... if helps :)

17         CONFIDENTIAL WITNESS:  Greendot sucks to

18  redeem bro we take the visa gifts and onevanilla and

19  re-encode with MSR and swipe at POS

20         0:  and it's working with 13 zeros ?  I used

21  to do the mastercard algo for a lot of banks :)

22         CONFIDENTIAL WITNESS:  Yeah, we have a

23  working template for the dumps and just edit them for

24  each card."

25         THE WITNESS:  0 then provides what appears to

1  be essentially a track number for a card.  And then

2  says, "debit only :)

3          CONFIDENTIAL WITNESS:  Yeah, we don't need to

4  alter our discretionary data, use same on each card

5          0:  I don't know if you follow me.

6          CONFIDENTIAL WITNESS:  yes, I do.

7          0:  cool... for me it's more easy to spam

8  :))) if you have msr :) haha

9          CONFIDENTIAL WITNESS:  Yeah, I work with a

10 few guys who have call center with 40+ workers and

11 posters

12         0:  I use automated voice message for phone

13 asterisk linux

14         CONFIDENTIAL WITNESS:  Hm, that sounds pretty

15 cool.  You know anybody working out of Romania or

16 Bulgaria?  That's where most of my guys work from.

17 Some in Moldova

18         0:  :)  maybe .... I like to be low  profile

19 ... under the radar

20         CONFIDENTIAL WITNESS:  That's the best way to

21 do it

22         0:  more friends more problems

23         CONFIDENTIAL WITNESS:  haha, yes

24         0:  :)

25         CONFIDENTIAL WITNESS:  So you handle all the

1  work yourself

2       0:  so only vanilla cards .... in person

3  right you use .... we can recharge them ?  like was

4  visa travel some time ago :)

5       CONFIDENTIAL WITNESS:  Let me send you a

6  picture of the cards I'm talking about, but no, you

7  can't reload them they are "gift" debits.  You do not

8  have to register them.

9       0:  yes I understand.

10      CONFIDENTIAL WITNESS:  They are working well

11 for everyone.  It's even better than MoneyPak was

12      0:  yes I understand so .... how to buy them

13 ?"

14      THE WITNESS:  The confidential informant

15 provides a link and says:

16      CONFIDENTIAL WITNESS:  $500 ones"

17      THE WITNESS:  And then provides another link.

18      0:  yes, yes ... I understand this guy's

19 doing ebay, craiglist, etc... and they put the people

20 to buy this cards for payments.  I know the deal  I

21 was thinking that maybe we can work something alse...

22 to buy online or something like that."

23      MS. ANDERSON:  It provides a link.  He says:

24      "CONFIDENTIAL WITNESS:  oh, okay yeah that's

25 the deal

1          0:  I'm too old for this :)) so nothing that
2   I can buy online that you need?:)"

3          MS. ANDERSON.  And let's skip over to the
4   last page.

5          ":  what can I buy :) do you know ? ....  I
6   have a lot of them  still there?

7          CONFIDENTIAL WITNESS:  Yes, we have some
8   methods you can do I think.  I have some boys with a
9   lot of prepaid debit cards and you can fund them via
10  ACH transfer

11         0:  I think I can send money to mexico, india
12  and philippines --" with link of remitly.com.  "I can
13  do 100K at day :)  Amount Sent
14  $980.00Fee$3.99FeeWaived($3.99) SubmittedJanuary 12,
15  2016 tadaa Daily Limit $2,999 remaining, $2,019  ok
16  so leet me know when we can start working :) ;)"

17     Q.     Is it common for the confidential
18  informant to note -- put the people he was talking to
19  on notice that he was working with larger -- a larger
20  scheme?

21     A.     Yes, absolutely.

22     Q.     Were you present during the trial against
23  co-defendant Rossen Iossifov?

24     A.     Yes, ma'am.

25     Q.     Did you observe the victim witness

1  testimony?

2      A.      I did.

3      Q.      Were there any victims that testified

4  during this trial that were victims of Adrian Mitan's

5  online auction fraud scheme?

6      A.      Yes.

7      Q.      And what -- which witness was that?

8      A.      Jesus Frutose.

9          MS. ANDERSON:  Okay.  And if you can pull up

10 Exhibit 1J.

11     Q.      Sergeant Moore, what is this exhibit?

12     A.      It's another Jabber snapshot between the

13 cooperating witness and the defendant using the abdc0

14 Jabber handle or xmpp handle that took place on July

15 1, 2016.

16     Q.      And do you -- can you identify on this

17 paper a reference to that witness you just mentioned?

18     A.      Yes, ma'am.  About a little above halfway

19 down, you can see 0 provides payment information,

20 indicates a $9,882 appears to be a wire was getting

21 sent by Jesus Frutose from San Jacinto, California,

22 and that was going to be sent to -- wired to the BB&T

23 account in the name of Jacqueline Coney.

24     Q.      And if you could, remind the Court the

25 nature of Mr. Frutos's testimony.  What happened to

1  him?

2      A.     The Court may recall, Mr. Frutose was

3  involved in the trucking and delivery business and had

4  been experiencing a little success, to the extent he

5  was ready to reinvest in his business and buy another

6  truck to help, you know, increase his, his

7  capabilities and delivering capabilities.  And so that

8  payment was for what he thought would be a delivery

9  truck for that business.

10          MS. ANDERSON:  Thank you.

11          At this point, Your Honor, I'd like to move

12  to introduce the exhibits in the 1 Series; that would

13  be Exhibit 1A, 1B, 1D, 1E-1, 1E-2, 1F, 1G, 1H, 1J, and

14  1K-1, and 1K-2, as well as 1L.

15          THE COURT:  Thank you.

16          And, Mr. Coffey, since the rules of evidence

17  don't apply, what I'm doing is I'm just appending or

18  including materials referenced at the hearing as, you

19  know, items submitted and for consideration as part of

20  the record.  Any objection to that?

21          MR. COFFEY:  I think that's completely

22  appropriate.  Thank you.

23          THE COURT:  Okay.  All of those will be in

24  the record as tendered by the government during the

25  hearing.

1          MS. ANDERSON:  Thank you, Your Honor.

2      Q.      Were you also part of an investigation
3  into what we've titled the Brute Force Case against
4  Adrian Mitan?

5          THE COURT:  Before you jump to that, all of
6  those have been given to the clerk, or will you give
7  them to the clerk?  I just want to make sure how we're
8  going to get them.

9          I mean, I've got this notebook, but what's
10 your intention?

11         MS. ANDERSON:  Our intention is to give her
12 at the end of the day a copy of all of the exhibits.

13         THE COURT:  Electronic or ...

14         MS. ANDERSON:  I have them in electronic
15 format and also the -- the -- a binder, paper.

16         THE COURT:  Okay.  We'd probably prefer
17 electronic.

18         Madam Clerk, do you agree with that?

19         COURTROOM DEPUTY:  Yes, Your Honor.

20         THE COURT:  Okay. Let's do that
21 electronically.  Thank you.

22         MS. ANDERSON:  No problem, Your Honor.  Thank
23 you.

24     Q.     Could you provide an overview of the
25 conduct investigated in the brute force scheme.

1      A.      All right.  So the brute force attack is

2   essentially an attack upon the structural integrity of

3   the track 2 of a bank card or a debit card.  It

4   presumes that before the brute force attack actually

5   takes place, you need to be in possession of a few

6   things, notably, the card number, the expiration date,

7   and depending upon what you intend to utilize the card

8   for, the PIN number perhaps if you wanted to withdraw

9   from an ATM.

10          And so once you have those three things,

11   which are in most cases, obtained through various

12   iterations of a phishing or a smishing attack, once

13   that is obtained by an individual, the only other

14   thing they need would be a merchant account.

15          And so once they can gain access to a

16   merchant account, which can be done in a variety of

17   different methods, they will then initial -- or

18   initialize a script that will then attack the final

19   piece of information they would need to ultimately

20   clone that card would be a three-digit value, the CVV

21   code or the CVC card -- or code.

22          And then -- so essentially, there's a

23   thousand basic code, you know, code numbers that it

24   could be.  But then that script will -- using the

25   merchant account, that script will run that card

however many times; it can be sometimes in upwards of 80 times a second, to ultimately determine what that CVV code is.

Once it obtains that -- and that is the actually brute force, you know, that it's -- in the name.

And so then once that CVV code is determined, at that point, you can use that data to re-create that code and send that to anyone.

Q.     And once you have all of those card codes, are you able to withdraw funds from those cards?

A.     In theory, yes, or use them for purchases at retail stores or online, anything.

Q.     And how did -- how did the investigation into the brute force case even start?

A.     So actually a lot of things were happening kind of contemporaneously.  You know, the conversation with the defendant had begun, and he had indicated that he was involved in those types of fraud and that type of attack.

And at the same time, there was a Romanian National that had happened to be arrested in Portland, Oregon, or in the Portland area for -- with being involved in that.  He was actually caught taking out money.

1          We had already established communications
2  with the Bucharest office of the Secret Service
3  knowing a Romanian National had been picked up that
4  rack at the time.  The supervisor contacted our office
5  just to inquire if we were aware of it.
6          And so when we were advised of that arrest,
7  we began to explore a little bit to see if there were
8  any connections, and ultimately were able to determine
9  that when Mr. Mitan began communicating with us, that
10 he was in fact involved with, you know, the brute
11 force attack that led to that Romanian's arrest in
12 Portland.
13      Q.      Okay.  And did the defendant engage the
14 confidential informant to launder some of the proceeds
15 from that kind of conduct?
16      A.      Yes, that's correct.
17      Q.      Let's start with Exhibit 3C-1.  What is
18 this?
19      A.      This is another Jabber communication
20 between the defendant and the cooperating witness.
21          MS. ANDERSON:  If you'll read for the
22 defendant, I will read for the cooperating witness.
23 Please begin.
24          "O:  no sms :) and people ... they put the
25 card by the touchpad key on they phone  cool no ?

1          CONFIDENTIAL WITNESS:  lol  So they send a
2    picture of the card
3          0:  omg no bor
4          CONFIDENTIAL WITNESS:  or they are hitting
5    numbers on the keypad
6          0:  no bro so you verify the pin they just
7    call to am number toll free number and they activate
8    the card :))) and they think that they call at the
9    bank
10          CONFIDENTIAL WITNESS:  lol
11          0:  :) is the same like the bank.
12          CONFIDENTIAL WITNESS:  yes sounds really --
13    or sounds great really.
14          0:  Please enter your 16 digits card number
15    followed by the pound key :) trust me there ar alot of
16    people stupid on us
17          CONFIDENTIAL WITNESS:  oh bro i know  All guy
18    sfrom RO + BG I work with got rich from selling cars
19    sold more cars than ford, chevy, toyota and honda
20    combine lol
21          0:  :)))))))))))))) I don't do that fuck that
22    for me that is a wasted of time :) trust me :)  they
23    are like 20 people
24          CONFIDENTIAL WITNESS:  well they do not have
25    your skills.

1         O:   working and they make 1K each.

2         CONFIDENTIAL WITNESS:   yes, I know they have

3   large call centers, mostly stupid guys

4         O:   one good day and I can make 200K in one

5   day ;) I just need 200 cards :) I spam chase I got 900

6   cards to bad that they only pay 100 dollars per

7   transaction fuck that.

8         CONFIDENTIAL WITNESS:   Where are you getting

9   the number list to spam?

10         O:   ))) :) bro ... come on

11         CONFIDENTIAL WITNESS:   lol

12         O:   I'm a hacker to you think that I buy some

13   shit on the internet ?  the only think that I spend

14   money is the VPN :)

15         CONFIDENTIAL WITNESS:   no bro I know you

16   don't buy it lmao i did figure you hacked it but I was

17   just wondering because you target specific banks and

18   customers

19         O:   in 3 days I got like 8K cardss :)))

20         CONFIDENTIAL WITNESS:   which vpn you think is

21   best to use

22         O:   :) russian vpn the best ;)

23         CONFIDENTIAL WITNESS:   What do you think

24   about vip72

25         O:   they don't give shit to the fbi or secret

1  service bro ....

2        CONFIDENTIAL WITNESS:  I know vip72 is just

3  botnet

4        0:  I'am sorry but like I sayd before I have

5  a fresh bank and I do not have time to chat right now

6  :)"

7     Q.    Sergeant Moore, what, what is a VPN and

8  why is that significant?

9     A.    It's a -- stands for a virtual private

10  network.  It's a, an ability and it's a common tool

11  that's utilized by people to mask their IP addresses

12  and ultimately their location to obfuscate that from

13  law enforcement.

14     Q.    In this chat the defendant states that he

15  does not mess with the online auction fraud.  What is

16  the date of this conversation?

17     A.    February 20, 2016.

18     Q.    And when did we start getting cards from

19  the defendant related to online auction fraud?

20     A.    It was definitely subsequent to that time.

21        MS. ANDERSON:  Okay.  Let's pull up Exhibit

22  3C-2.

23     Q.    What is this?

24     A.    It's another Jabber conversation between

25  the defendant and the cooperating witness.

1          MS. ANDERSON:  If you will read for 0, I will
2   read for the cooperating witness.

3          THE WITNESS:  All right.

4          "0:  so ... again .... I make the cards I can
5   make the original track original track 2 you
6   understand what I'm doing?

7          CONFIDENTIAL WITNESS:  yes you are wanting to
8   create your own dumps for the cc's you have the pins
9   to

10          0:  bro I spam with asteric only CC EXP and
11  PIN and I make them to work at ATM simple like that:)
12  you follow me now ?

13          CONFIDENTIAL WITNESS:  yes

14          0:  cool I have a bank that .... afther I
15  make the track she will stay valid only 5 minutes and
16  have the limit 1,000-1,500$ have to encode the cards
17  on the car  stil there ?

18          CONFIDENTIAL WITNESS:  Okay, yes I understand
19  what you are saying.  Have you tested yet to see if
20  your dumps are working at ATM or is that what we are
21  going to do

22          0:  I do this from 2007 what do you think ...
23  a made a lot of money i know what I am talking about
24  :) :) i want to know .... if you ar the guy who is
25  encode the cards and if you ar on US :) because my

1  stuff works only on US

2       CONFIDENTIAL WITNESS:  Yes, but we mainly do

3  Onevanilla's.  We haven't tried something like this,

4  but if it works then it works.

5       0:  Of course they work : )))))  you know

6  what? ... nevermind ... have a good day.

7       CONFIDENTIAL WITNESS:  Bro, I don't play"

8    Q.     The portion of this conversation where

9  they discuss the encoding the cards, can you explain

10  what happens in that phase of this scheme.

11    A.     Right.  So once as I determine the brute

12  force attack had taken place and they're able to

13  determine the track, the proper track codes that allow

14  that -- or attach to the stolen or the phished card,

15  that information can then be sent digitally, and then

16  with an MSR, it can be encoded on any magnetic strip

17  card.

18       So once you have a card, you can encode the

19  stolen card's data onto it, and essentially you have

20  cloned or re-created the stolen card.

21    Q.     And there is a mention here as there was

22  in 3C-1 of "asterisks."  What is that?

23    A.     So asterisks is a -- it's an open-source

24  platform that essentially is a -- provides the

25  framework for creating custom telecommunication

1  service.

2         Essentially it is -- it is a program that

3  allows you to kind of customize and handle the way

4  phone calls are made, how they are received, and how

5  they are processed.

6         So it would be something that would be most

7  likely utilized in a, you know, phishing attack of

8  sorts as was described where people would call in and

9  be asked to provide account numbers, things of that

10  nature, and then it would process that data and

11  deliver it in however it was intended.

12     Q.    Did you find remnants of the asterisk

13  scripts on the defendant's devices when they were

14  searched?

15     A.    Yes, we did.

16     Q.    Okay.  Did the defendant also walk the

17  confidential informant through certain aspects of his

18  scheme?

19     A.    Yes.

20     Q.    And did he do this over a program called

21  Team View?

22     A.    That is correct.

23     Q.    What is Team View?

24     A.    So Team View is a program that allows

25  people to kind of collaborate on their own screen so

1  you can send an invite to an individual, and even in

2  certain circumstances, you can give them access and

3  control over your screen.  So you can send someone a

4  link and then they can view your screen realtime as

5  you're looking at it.

6       Q.      Have you reviewed what the United States

7  has previously marked as Exhibit 3A?

8       A.      Yes.

9       Q.      And what is 3A?

10      A.      So this is a video whereby the defendant

11 had invited the cooperating witness to view his

12 screen.

13      Q.      And is that video approximately an hour

14 long?

15      A.      It is.

16      Q.      So have you reviewed that video to pull

17 out two pertinent clips to show at sentencing today?

18      A.      Yes, I have.

19      MS. ANDERSON:  Your Honor, we're going to

20 move to admit the full video, but also the two clips

21 we're just going to show in the court today.

22      THE COURT:  Very well.

23      MS. ANDERSON:  Okay.  If we could pull up

24 Exhibit 3A-1, and if you could press play and just

25 start -- freeze the initial frame.

1    Q.    Okay.  Sergeant Moore, explain to the
2  Court what he is seeing on 3A-1.
3    A.    So right now this would be the screen
4  of -- Mr. Mitan's computer screen when he granted
5  access for the cooperating witness to view it with
6  him.
7    Q.    Okay.  And what is the -- what is
8  displayed on the defendant's desktop at this time?
9    A.    So you can see a number of programs that
10  he was utilizing on the bottom and that he had
11  activated and which would be obviously he was using
12  Google Chrome to get on the SunTrust Bank account.
13  But you can also see other programs and files they had
14  open, including Putty, and again, you know, another
15  Firefox where he was on the trust.  And the Dan is the
16  Jabber chat where he was communicating with the
17  cooperating witness.
18    Q.    Okay.  And then the SunTrust page that's
19  present, what is this page trying to access?
20    A.    So this -- leading up to this or what
21  Mr. Mitan is doing is he had a batch file or text file
22  that had a number of debit cards and information that
23  coincided with those cards that he had obtained and
24  then was utilizing that to attempt to access their
25  online banking accounts.

1      Q.      And so this clip starts at 43:55.  For the

2   proceeding 43 minutes and 54 seconds, what is the

3   contents, just generally speaking, of this video?

4      A.      Somewhat similar to what we're about to

5   watch.  He was attempting to access other online

6   accounts or had accessed other online accounts, and

7   was also attempting to utilize those cards

8   subsequently to make purchases and test the validity

9   of those cards.

10          And generally he did so in this circumstance

11   going to Mozilla and just making a donation and

12   testing the card's authenticity, I guess, or whether

13   he had the proper information by making a donation

14   from that card.

15          He would also change the password.  So once

16   he -- there was a -- there's a portion on the SunTrust

17   website where you can say, "I don't have -- I've

18   forgotten my username and my password."  And when you

19   click on that, you are then directed to this current

20   screen where they require the last four of your

21   Social, your debit card number, and a PIN.  And then

22   they will use that to essentially reset both your user

23   ID and the password to gain access to the account.

24          So he would use that method to ultimately

25   reset their password and gain access to their online

1   banking account.

2        Or if one had not been created, he would then

3   create one, which I believe he's going to do in this

4   circumstance.

5        MS. ANDERSON:  Okay.  And I'll ask that this

6   be played, and we pause at the 26 second marker.

7        [PLAYING VIDEO RECORDING]

8   Q.      Sergeant Moore, the person manipulating

9   the mouse on this is who?

10  A.      The defendant.

11       [PLAYING VIDEO RECORDING]

12  Q.      Sergeant Moore, what is this screen

13  showing?

14  A.      So this is what I referred to earlier

15  where there is that -- a large text file that has all

16  of the card numbers, and then their respective

17  information, the expiration dates, the CVV, the Social

18  Security and the DOBs of the individuals that were in

19  possession of those cards at some point.

20  Q.      And what has the defendant just done in

21  the last 26 seconds with that information?

22  A.      So he's picked out a particular card.  And

23  then as I've kind of mentioned earlier, in order to

24  access, or in this point, create an online banking

25  account with SunTrust, he had entered in the debit

1  card and the PIN number and the last four of their

2  Social in order to create an account.

3          MS. ANDERSON:  Okay.  Please continue.

4          [PLAYING VIDEO RECORDING]

5      Q.      Sergeant Moore, what have we just

6  witnessed in this Team View clip?

7      A.      So at this point, Mr. Mitan had utilized

8  the debit cards and its respective information to

9  essentially create an online account to access that

10 bank account.  And now that he has access to that

11 SunTrust account, we can see in their savings both

12 their history of the purchases they've made and also

13 the current amount, which is $101.53.

14         MS. ANDERSON:  Okay.  And if you can play

15 clip 2, which starts at the 47:15 marker on the full

16 video.

17         [PLAYING VIDEO RECORDING]

18         MS. ANDERSON:  And, Sergeant Moore, please

19 feel free to explain what we're observing in realtime,

20 and if you  would pause at the one minute, four second

21 marker.

22         [PLAYING VIDEO RECORDING]

23     A.      Okay.  So now he's -- after the account

24 has been accessed through SunTrust, he has that

25 information already pasted, and so now he's going to

1  Mozilla and going to make an $80 donation and electing

2  to do so via the debit card.  And the communication

3  window is with the cooperating witness.

4       Now he's utilizing the same debit card

5  information, putting in the, you know, respective

6  data.

7       And now it's confirmed that there has been an

8  $80 payment.

9       And then once you refresh, that $80 payment

10 should be reflected, and you can see it pending now on

11 Mozilla.

12      So now you know that the card has essentially

13 been confirmed that it can be utilized online.

14 Q.     Okay.  And while he is doing this, is the

15 defendant talking to the cooperating witness?

16 A.     He is.

17 Q.     Okay.  And at this juncture, how much

18 money does this -- the person who owns this bank

19 account, do they have left this that account?

20 A.     $21.53.

21      MS. ANDERSON:  Okay.  Please play forward.

22      [PLAYING VIDEO RECORDING]

23 Q.     Sergeant Moore, what happens with the next

24 segment of this clip?

25 A.     So now that he's confirmed that's

1   reflecting on the bank account, he's going back one

2   more time and now has elected to make a $20 payment

3   and is going to re-enter the same information again.

4          And then now you can see that that $20 is

5   also reflected on the account, and it leaves a balance

6   of $1.53.

7      Q.     Did you catch in the chat with the

8   confidential informant what the defendant said about

9   this guy's money?

10     A.     Yes.

11     Q.     What did he say?

12     A.     He says, "Now the mother fucker has no

13  money."

14     Q.     Did you investigate some of the identities

15  of the cardholders that you found from this Team

16  Viewer video?

17     A.     Yes.

18     Q.     And what did you find with respect to

19  that, that part of the investigation?

20     A.     There were some identities that we did see

21  that weren't shown in -- specifically in this one, but

22  were part of this -- the overall video.  This one here

23  was a Donna Nemeth.  And I did make contact with her

24  and speak with her, and she was able to confirm that

25  they were the victim of unauthorized purchases of

1   their card.

2       Q.      Did you investigate how many credit card

3   codes the defendant was able to obtain on his devices?

4       A.      Yes.

5           MS. ANDERSON:  If we could pull up Exhibit

6   2A, please.

7           And if you could please turn the screen off.

8   That will permit us to scroll through a different

9   program on our laptop.

10      Q.      Sergeant Moore, did we obtain devices

11  belonging to the defendant as part of this case?

12      A.      Yes, ma'am.

13      Q.      And how was that -- how were those

14  obtained?

15      A.      Through the MLAT process they were

16  obtained by -- in working in conjunction with Romanian

17  authorities at the time of his arrest.

18          MS. ANDERSON:  Okay.  And we are ready to

19  present Exhibit 2A.

20      Q.      Sergeant Moore, what is depicted here at

21  Exhibit 2A?

22      A.      So this was a file that was located on a

23  particular hard drive that was originally collected by

24  Romanian authorities at the time of Mr. Mitan's

25  arrest.

1    Q.    And what does the file show; what kind of
2 information is in this file?

3    A.    It's got literally thousands of entries,
4 but exactly what you see here indicating individuals'
5 names, addresses, and also card numbers.

6    Q.    Again, this was found on the defendant's
7 device?

8    A.    It was.

9    Q.    And did -- is this the only database of
10 credit card information or debit card information
11 found on the defendant's devices?

12    A.    No, ma'am.  There was approximately, I
13 believe, 13 total files that in -- had various forms
14 of bulk and batch card numbers and information such as
15 this.

16    Q.    And did the amount of credit card or debit
17 cards found on these devices exceed 18,000?

18    A.    Yes.

19    Q.    Did you further investigate whether any of
20 these card codes were used to fraudulently withdraw
21 funds?

22    A.    Yes, ma'am.

23    MS. ANDERSON:  Okay.  Could you please pull
24 up Exhibit 2C.

25    Q.    Sergeant Moore, what is depicted at

1  Exhibit 2C?

2     A.     This was a spreadsheet provided by

3  individuals working for the First Tech Federal Credit

4  Union.

5     Q.     Okay.  And can you explain what these --

6  what this shows, what the records that made -- went in

7  to making this showed.

8     A.     Yes.  We knew at some point in working

9  with Mr. Mitan that he was involved in a phishing or

10  smishing in a brute force attack on cards that were

11  targeting BINs from First Tech Federal Credit Union.

12        And so subsequently, we reached out to them

13  and inquired as to the overall attack and the losses,

14  the amount of individuals involved.  And this was, I

15  guess, kind of the summary document that they provided

16  to us whereby they identified 94 individuals whose

17  cards had all been taken right around the same time in

18  the same manner.

19        And then, of course, you can see their

20  respective amounts of loss for each card.

21     Q.     So are these 94 victims attributable to

22  the defendant?

23     A.     That's correct.

24     Q.     Okay.  And what was the total amount of

25  loss occasioned by this, this brute force attack?

1       A.      $60,672.98.

2       Q.      Okay.  And what is the average per card

3  loss as a result of this intrusion?

4       A.      It was in excess of $600.

5          MS. ANDERSON:  If we could pull up Exhibit

6  2D, please.

7       Q.      What does this exhibit show?

8       A.      This is a chart from U.S. Bank that was

9  documenting card numbers that were found to be on

10 Mr. Mitan's devices, and then the corresponding loss

11 amounts attributed to those specific cards.

12      Q.      Okay.  And are -- is this brute force

13 attack, the card numbers, were those associated with

14 the defendant's devices?

15      A.      Yes.

16      Q.      Okay.  And on page 2 of this exhibit, how

17 much money was defrauded out of these U.S. Bank

18 customers?

19      A.      $12,371.48.

20      Q.      And for those cards that had an amount

21 withdrawn from them that were reported to us, what was

22 the average per card?

23      A.      It was in excess of $500.

24      Q.      Now, did U.S. Bank and First Tech Federal

25 Credit Union repay these victims?

1      A.      Yes.

2      Q.      So the two entities that had lost money as

3  a result of these two attacks were the financial

4  institutions?

5      A.      Yes, ma'am, that's my understanding.

6      Q.      Now, in our calculations of the

7  defendant's loss, did we -- as it regards to the brute

8  force case, did we account for a number of potential

9  invalid card codes?

10      A.      That's correct.

11      Q.      And why would the defendant possess

12  invalid card codes?

13      A.      There could be a number of explanations as

14  to why some of those cards were what they were.

15          You know, notably what comes to mind is, you

16  know, a lot of these, as I've testified to earlier,

17  are -- were obtained by way of phishing or smishing

18  attacks.  And so it's entirely possible that when

19  individuals responded to these calls and these text

20  messages, they may have inadvertently entered the

21  wrong number, they may have intentionally entered the

22  wrong number in certain circumstances if they were

23  aware of it.  And so that's certainly, I think, a good

24  possibility that would explain a number of these

25  cards.

1          There's also a possibility that it may have

2 happened in the past and those cards were ultimately

3 terminated by the company and they just have no record

4 of them anymore.

5          But that would be probably a few possible

6 reasons as to explain why some of the card numbers

7 weren't valid cards.

8     Q.     Did you also locate on the defendant's

9 devices some victims here in Lexington?

10    A.     Yes.

11    Q.     Can you explain what happened with those

12 victims.

13    A.     Yes.  As you can see in some of the

14 earlier files that we've looked at, there were

15 corresponding names and addresses attached to

16 particular cards.

17          And so in reviewing that data, we did locate

18 a number that happened to purport to be in Lexington.

19 And when we followed up on that, we determined that

20 there was actually four specific individuals that were

21 in Lexington that all happened to be professors at the

22 University of Kentucky, and the cards that had been

23 compromised were their pro cards, or their procurement

24 cards.

25          And so then we did establish contact with UK

1  and then speak to, you know, members of their team,

2  and they did confirm and did also supply us with some

3  documentation confirming that those cards had

4  subsequently been utilized for unauthorized purchases.

5         MS. ANDERSON:  Let's pull up Exhibit 2E,

6  please.

7         Q.     Is this one of the documents provided by

8  the University of Kentucky related to this intrusion?

9         A.     Yes.

10        Q.     Okay.  And what do we see here in this

11 box; what information is conveyed?

12        A.     They've signed it, but they've claimed

13 that a purchase to Javita, Inc. for 1,8 -- a little

14 over $1,800 was not authorized, and was fraudulent.

15        Q.     So in the course of your investigation,

16 you specifically identified three institutions that

17 had been victimized by the defendant's attacks,

18 correct?

19        A.     That's right.

20        MS. ANDERSON:  Okay.  If you could pull up

21 Exhibit 2G, please.

22        Q.     And what is here on 2G?

23        A.     Just demonstrates those three institutions

24 that we talked about, and their respective losses, and

25 then the average per card.

Q.     And as to the University of Kentucky, what
was their total loss that you were able to find?

A.     $2,176.05, which came to approximately a
$544 average loss per card.

Q.     Is this all of the victims or financial
institutions that were impacted by the data found on
the defendant's hard drives?

A.     No, ma'am.

MS. ANDERSON:  Okay.  Could we pull up
Exhibit 2H, please.

I'm sorry, we took that one out.

Q.     As regards to this brute force attack, how
was the confidential informant involved in this
part -- this scheme?

A.     There were portions of it that he would
receive the cards and the corresponding track data,
and then he would -- much in line with what he was
operating and the manner in which he operated with the
online auction fraud -- he would coordinate with the
domestic processor, who would then take that data,
re-encode the track, and clone the cards that were
stolen, in a sense, and then utilize them to either
make purchases or withdraw money, and then send that
bitcoin, you know, minus their fee back to the
informant.

1          MS. ANDERSON:  Would you please pull up
2    Exhibit 3B.
3          Q.     What is this exhibit?
4          A.     It's just the diagram of the chart that
5    lays out probably just a little more specifically to
6    what I just testified to as to the actual process of
7    the flow of proceeds.
8          Q.     And so is the -- this part of the brute
9    force scheme, is it nearly identical to what was going
10   on on the online auction fraud case?
11         A.     Absolutely.
12         Q.     Did the defendant work with other
13   individuals in executing the brute force scheme?
14         A.     Yes.
15         Q.     And how do you know that?
16         A.     Well, he would explain to us that he had
17   other individuals working with him in an execution of
18   it.
19         MS. ANDERSON:  Okay.  Let's pull up Exhibit
20   4A-1, please.
21         Q.     What is this record?
22         A.     It's another Jabber communication between
23   the defendant and a cooperating witness.
24         Q.     If you'll read for the defendant, I will
25   read for the cooperating witness.

1        "CONFIDENTIAL WITNESS:  I know but these
2   onevanilla are gift, no matter what, they will never
3   work at atm"

4        THE WITNESS:  0 then provides a long list of
5   what appears to be cards with track data, and then
6   what seems to be checking account balances.

7        "You see what I DO  cool no?

8        CONFIDENTIAL WITNESS:  So what are you doing
9   How are you getting the info

10       0:  With bank merchant  i brute force them
11   from 000 to 999 ;)  you follow me ?  mine work at atm
12   and pos  I told you ... I'm not a noob

13       CONFIDENTIAL WITNESS:  i'm asking you how you
14   are getting the card data

15       0:  pishing :)

16       CONFIDENTIAL WITNESS:  Phishing customers or
17   the merchants?

18       0:  stupid fucks.

19       CONFIDENTIAL WITNESS:  oh wait i see fishing
20   stupid people and they enter their data lol

21       0:  Yes :)))

22       CONFIDENTIAL WITNESS:  Do you have a website
23   / portal set up or just spam email?

24       0:  telephone spam i directly call not me my
25   *PBX. ;)

1          CONFIDENTIAL WITNESS:  Are you sure you're

2   not from ro or bg lol

3          0:  Bro I'm from Romania but my cusin is here

4   in us ;)

5          CONFIDENTIAL WITNESS:  I work with many

6   people from Romania.  I see.

7          0:  and he is my boy and he have the msr

8          CONFIDENTIAL WITNESS:  So you bruteforce the

9   CVV

10          0:  that one is not the cvv  look like CVV

11   but is not :)  You understand?  some banks are like

12   this track2" and then it provides a example of track 2

13   or --

14          "CONFIDENTIAL WITNESS:  Yes, I know it is

15   some code

16          0:  and I brute."

17     Q.     So in order for the defendants who

18   withdraw funds from the card codes that he gains

19   possession of, what has to happen?

20     A.     They have to have that three-digit code

21   that's kind of delineated by the XXX in those tracked

22   data before those cards would work.

23     Q.     And then what happens after they have all

24   of the codes?

25     A.     Once they have all those codes, then they

1 can use an MSR, a magnetic stripe reader, and they can

2 encode that data on any plastic device with a magnetic

3 stripe in it, and then essentially you've created that

4 card.  And then you can utilize it at a POS, which is

5 a point of sale to make a purchase, or you can utilize

6 it as you would a debit card.

7    Q.    And geographically, where does that use

8 need to take place?

9    A.    In the U.S.

10    Q.    And where is the defendant saying he is?

11    A.    The defendant identifies himself as being

12 in Romania.

13    Q.    So -- and then does he speak to the people

14 he is providing this information to?

15    A.    Yes.

16         MS. ANDERSON:  Okay.  Let's pull up Exhibit

17 2 -- or, I mean 4A-2.

18    Q.    Oh, sorry.  Did you investigate whether

19 the defendant had a cousin in the United States?

20    A.    Yes.

21    Q.    And what, what did that investigation

22 reveal?

23    A.    Well, we attempted to see if there was a

24 way we could establish the familial relationship.

25 Obviously, once you start getting into cousins, it can

1  be quite difficult, but we worked with Romana.

2        So we were unable to determine a familial

3  relationship.  However, we were able to use evidence

4  and confirm that the individual that was arrested that

5  I alluded to earlier, that Romanian National in

6  Portland, was in fact working directly with Mr. Mitan.

7        Q.     And did you identify payment transactions

8  from the Oregon-based individual to the defendant?

9        A.     That's correct.  We were able to find that

10  where bitcoin was being sent directly to a bitcoin

11  address, that was -- that 0, Mr. Mitan had provided

12  us.

13        Q.     Okay.  Let's go to 4A-2.  What is this?

14        A.     This is another snapshot of a Jabber

15  conversation between the defendant and the cooperating

16  witness.

17        MS. ANDERSON:  Okay.  I will read for the

18  cooperating witness, if you will read for the

19  defendant.

20        "CONFIDENTIAL WITNESS:  The guy is a ripper,

21  threatened some people I work with as well.  Going to

22  have the guy dealt with, but first I must identify his

23  ID in real life.  I've asked around and some people

24  acted like they may know, but no real proof yet.  I

25  know all about the guy, where he works, et cetera.  He

1  works in same biz, just he is a shit head.

2          O:  okay ... tell me more about this dude ...

3  what do you know and what do you want me to do if I

4  find him ?

5          CONFIDENTIAL WITNESS:  Frank23, Johnla73,

6  Stewiegriffinuey, Hellcat.  You do not need to do

7  anything, just give me his real ID and I pay you lots

8  of bitcoin.

9          O:  Do you want me to put him in the trunk of

10  my car?  bro, for you.

11          CONFIDENTIAL WITNESS:  no need bro, I will

12  send the Russians for him.

13          O:  I will cut a hand for you and send it to

14  usa :))

15          CONFIDENTIAL WITNESS:  He works fraud in

16  Romania.  Some people said that it might be 'Giani

17  from Zimnicea,' but, I mean i can't do shit with that

18  info

19          O:  he is romanian?

20          CONFIDENTIAL WITNESS:  Some said he may be

21  'Cartof' from Romania as well, but I do not know.  I'd

22  have to see a facebook profile, etc to know if is him

23          O:  I will find out who the fuck is he

24          CONFIDENTIAL WITNESS:  He is older guy,

25  possibly early 40s, late 30s.  Right now he has been

1  working in and out of Mexico, running skimmers,

2  cashing the cards out of Chicago

3        0:  where you know is now ? because I know

4  people on Zimnicea

5        CONFIDENTIAL WITNESS:  Well, he has worked

6  fraud for a long time, so I'm sure that someone knows

7  him.  Supposedly he owned a SKyline GTR Black Edition

8  (2011)  and also Suzuki GSXR but he also said years

9  ago, maybe five-six years ago, he bought himself out

10  of jail in Romania prosecuted him for same shit.

11        0:  bro here in romania are not alot of

12  Skyline GTR  I have a friend of mine that works at SRI

13  ( like FBI ) here in Romania  I will find out next

14  week to see wtf have Skyline GTR here probably is not

15  in his name but I will find out 100% car and bike,

16  that all I need to know and what do you need?"

17        MS. ANDERSON:  Okay.  Let's skip to the last

18  page.  And if you could please pick up for the

19  defendant.

20        "0:  to be surre that is our guy did you

21  check the suntrust account my friend ?

22        CONFIDENTIAL WITNESS:  Guy went to ATM it's

23  there

24        0:  Oho cool that mean that you will send me

25  the btc today right ?  weekend is comming and I need

1  $$$  I have to go to chisinau moldova to train my boys
2  there :) Helo :)
3        CONFIDENTIAL WITNESS:  okay yes.
4        0:  bro, when I will be back from moldova, I
5  will go to find that dude you need his real name and
6  picture right ?
7        CONFIDENTIAL WITNESS:  it's sent yes.
8        0:  yes thank you."
9     Q.      And geographically speaking, is Muldova a
10  neighboring country to Romania?
11     A.      That's correct, it is.
12        MS. ANDERSON:  Okay.  Let's go to 4A-3,
13  please.
14     Q.      What is this document?
15     A.      It's another snapshot of the Jabber
16  conversation between the defendant and Mr. -- or the
17  informant.
18        MS. ANDERSON:  Okay.  And if you could read
19  for the defendant, I will read for the confidential
20  witness.
21        "0:  yep thatt is correct I already told I
22  already told you why I want to work with you because
23  you will give me BTC ... and is no head eek for me for
24  example now I have to get 17k from usa  so I need to
25  spend 12 hours from my life in 12 hours I can make 50K

```
 1            CONFIDENTIAL WITNESS:  Have your state boys
 2   connect with me
 3            0: :))))
 4            CONFIDENTIAL WITNESS:  I will handle your USD
 5   problems, this is what I do.
 6            0:  they are retards trust me .... I told
 7   them and they are scared for them is wired to meet
 8   somebody that they don't know
 9            CONFIDENTIAL WITNESS:  lol.  They don't even
10   have to meet me, that's fine, we can use cash by mail
11   and localbitcoins with escrow
12            Abcd0:  and I work with them from 2009 trust
13   me one dude have now 36 trucks.
14            CONFIDENTIAL WITNESS:  Thirty-six (36) trucks
15   ?
16            0:  They are three dudes.
17            CONFIDENTIAL WITNESS:  Why so many trucks?
18            0:  yep he do distribution fuck him i don't
19   give a fuck oh yea and still ask me for pins  ha ha
20            CONFIDENTIAL WITNESS:  Okay, lol We just need
21   to set up good schedule and rhythm / system here
22            0:  yep that why I told you .... leets take
23   it slow ..."
24       Q.    When the confidential informant referenced
25   "your state boys," what does that mean?
```

1      A.      He's referring to the individuals that
2  were working in coordination cashing out and encoding
3  the brute force codes -- or the brute force cards.
4          MS. ANDERSON:  Okay.  Could you please pull
5  up Exhibit 4A-4.
6      Q.      And what is this document?
7      A.      That's another Jabber communication
8  between the defendant and the cooperating witness.
9          MS. ANDERSON:  Okay.  If you'll read for the
10  defendant, I'll read for the cooperating witness.
11          "0:  you know how I'am doing ... with my
12  guys... I get random cards.  I try to make the track2
13  and the banks they are working I'm spam that bank and
14  I get afther that only that bin ;)
15          CONFIDENTIAL WITNESS:  yes, perfect idea your
16  method sounds strong
17          0:  did your guy cashout ?
18          CONFIDENTIAL WITNESS:  I've sent them the
19  information but I don't know if they are ready right
20  that second.  Got off the phone with my other guy.  Do
21  you think that card will last two hours?  My other guy
22  had to go pick up his MSR from the house.  He will
23  have it in one hour.
24          0:  Oh... that why I ask you because ...
25  afther I brute force them, i have a good chance to die

1  .. some of them.

2       CONFIDENTIAL WITNESS:  I know my guys have

3  been fucking bad at timing I'm going to make them

4  sleep in atm parking lot.

5       Abcd0:  I all ready told you ... I have some

6  cards that they pay $1,000 or --" I'm assuming --

7  1,500 -- " -- but they die in 10 minutes  I can give

8  you 200 every day haha

9       CONFIDENTIAL WITNESS:  Let me get my guy

10  right there at the atm I'm moving him there now.

11       0:  oK

12       CONFIDENTIAL WITNESS:  So you are working all

13  day everyday?  I want to know so I can make sure that

14  I have the guy literally available all the time.  I

15  will make a guy work on this and only this

16       0:  bro I have a lot of people that they are

17  working for me, but .... you know what is the problem

18  ?  the problem is that they are fucking stupid and

19  retards ... and they are so stupid that are unable to

20  buy bitcoin and fuck western union and moneygram when

21  I have to receive 40 to 60k."

22       Q.      Sergeant Moore, in the course of your

23  investigation, was it evident that there were multiple

24  moving parts to the brute force scheme?

25       A.      Yes, ma'am.

1      Q.      And does that require constant
2 communication between the elements?
3      A.      Yes.
4      Q.      And does it require at least one element
5 to direct another element in order to withdraw the
6 funds from those cards?
7      A.      Yes, ma'am.
8           MS. ANDERSON:  I have no further questions at
9 this time.
10           THE COURT:  We've been going almost two
11 hours.  It might be helpful to take 10 or 15 minutes
12 and come back and pick up with the cross-examination.
13           So we'll try to -- let's make it 10 to 15,
14 and get back together as close to 15 minutes as we
15 can.
16           We'll be in recess until then.  Thank you.
17           [RECESS - 10:50 - 11:07 a.m.]
18           [IN OPEN COURT]
19           THE COURT:  Okay.  We're back on the record
20 with all counsel and the defendant present.
21           And, Ms. Anderson, we will consider all of
22 those exhibits that Sergeant Moore testified after
23 that first group as exhibits to the hearing.  If
24 you'll just make sure those get tendered to the clerk,
25 they'll all be part of the hearing record.

1          Mr. Coffey, you can begin your

2   cross-examination.

3          MR. COFFEY:  Thank you.

4                       CROSS-EXAMINATION

5      BY:  MR. COFFEY:

6      Q.     Officer Moore, if I say something that's

7   not clear, you just tell me; I'll do my best to repeat

8   it.

9      A.     Yes, sir.  Thank you.

10     Q.     All right.  First of all, there's a lot of

11  Jabber chats that you talked about.  There are some

12  Jabber chats, though, that indicate Mitan quit the

13  18-81 RICO conspiracy, correct?

14     A.     I'm not aware of what those would be.

15     Q.     Okay.  And in these Jabber chats from

16  Mitan's side, there are some exaggerations, correct?

17     A.     I don't know.  You'd have to give me an

18  example of that.

19     Q.     Well, I saw a lot of, a lot of big

20  figures, you know, he's -- let me finish.  He's going

21  through a lot of cards in a day, he's got to making

22  tons of money -- my words -- tons of money in a day;

23  some of that I suspect is exaggeration?

24     A.     Well, I would also submit, Mr. Coffey,

25  though, that there were a number of big numbers that

1   were thrown out that were actually verified

2   subsequently.

3           For example, he did say he was in possession

4   of tens of thousands of cards.  And then, you know,

5   the evidence that we examined after his arrest

6   actually verified a number of those.

7           So, you know, I think there would need to be

8   probably some direct evidence that would -- most of

9   what he said actually was proven true, I felt, in some

10  of those respects, so if -- you know, there would need

11  to be evidence to verify otherwise, I would think.

12       Q.     So you think he did or did not exaggerate

13  in his Jabber chats?

14       A.     Like I said, from the evidence that we had

15  that we reviewed, most everything that he had stated

16  and he had been involved in, the amount of cards that

17  he claimed to be in possession of was later verified

18  by, you know, alternative data, so, you know, I would

19  say most of it appeared to be true.

20           MR. COFFEY:  Okay.  If you'd pull up Exhibit

21  1A, please.

22       Q.     This is a list of not all the

23  co-defendants, but some of the co-defendants in 18-81,

24  correct?

25       A.     Yes, sir.

1     Q.     And as far as the total success, when we
2  look down that column, Mr. Mitan has the lowest figure
3  of the group, correct?
4     A.     Yes, that's correct.
5     Q.     And then when we look through the final
6  column, which is bitcoin sent through the Eastern
7  District of Kentucky, again, Mitan has the lowest
8  figure of the group, correct?
9     A.     Yes, sir.
10     Q.     So at least based on this chart, he was
11  the lowest level player in this group?
12     A.     Based upon the parameters that this was
13  only the amounts that were sent directly through our
14  cooperating witness in the Eastern District of
15  Kentucky, yes.
16     Q.     All right.  Thank you.  And then would you
17  agree with me that he was recruited and supervised in
18  18-81 by Nedelcu?
19     A.     No, I don't know that I would agree with
20  that.  I can't substantiate whether that happened or
21  not.
22     Q.     Okay.  You don't know if he was recruited
23  by Nedelcu?
24     A.     I knew I worked with him directly, but to
25  the extent of if he was recruited or, you know, what

1  their positions were next to each other, I can't speak

2  to that.

3       Q.     Okay.  Now, Officer, do you know which

4  exhibit -- do you know which one that is?

5       A.     I believe that may have been part of the

6  1B that we had spoken about, the individual loss

7  presentation.

8            MR. COFFEY:  Can you pull that up, ma'am.

9            THE WITNESS:  Is that it?

10           MR. COFFEY:  I did not number them.  I'm

11 sorry.

12      Q.     Do you see the box that's highlighted, the

13 direct -- the account -- tell me what's highlighted in

14 yellow.

15      A.     So that would be -- well, there's --

16 demonstrates the three bitcoin addresses, and the one

17 highlighted would be the 34NE address.

18      Q.     Okay.  And do you know whether the one

19 that's highlighted is a bitcoin address for Mitan or

20 Nedelcu?

21      A.     It would have been one associated with one

22 that -- you know, like I said, at times, they were

23 working so direct hand-in-hand, it would be difficult

24 to kind of tell which one, but certainly one that's

25 attributed or associated with him, with Mr. Mitan.

97

1      Q.      So your testimony today is that you view

2  Mitan or Mitan and Nedelcu as co-equals?

3      A.      They were certainly both individuals

4  working together at some point, and then also kind of

5  working autonomously, you know, depending upon the

6  time period.

7      Q.      All right.  And then again, on this

8  highlighted, this highlighted box, whose account that

9  is, you don't know whether it's Nedelcu's or Mitan's?

10      A.      It would be associated with Mr. Mitan, I

11  would assume, just based on the fact that it's

12  included in his, his chart.

13      Q.      And going over to 1D, Mr. Mitan's

14  connection to Filip is 1H; is that right?  If you can

15  pull up 1H.

16          THE WITNESS:  If you could pull up 1H.

17          If it's the one I'm thinking of, yes, sir,

18  that's correct.

19      Q.      Okay.  So in 1H I see one -- at the bottom

20  one, two, three, four, five -- I see five $275

21  transactions?

22      A.      Yes, sir.

23      Q.      Is that what -- is that the total of their

24  relationship?

25      A.      No, sir.  That snip was put on there just

1   to present that was the evidence by which we were

2   relying on the fact that the bitcoin address, the

3   1FAQ, that was the -- an address that we knew was

4   associated and utilized by Filip.

5        MR. COFFEY:  I see.

6        A.      So the amounts really don't have an impact

7   on the association that we're speaking of with the

8   defendant.  It's more or less, this was just presented

9   as what evidence we relied upon to demonstrate that

10  1FAQ was indeed a bitcoin address utilized by

11  Mr. Filip.

12       Q.      Okay.  So that helps me.  So what is the

13  connection again between Mitan and Filip?

14            THE WITNESS:  If you could go to the next

15  page.

16       A.      So the 1FAQ actually was a sending address

17  that sent bitcoin to -- let me look and see if I can

18  find it -- the 1MC6, the 1MC6 address that we knew to

19  be utilized by Mr. Mitan.

20            So there was a bitcoin transaction between

21  those two addresses demonstrating a financial

22  relationship of sorts.

23       Q.      And who is sending money to whom?

24       A.      It was going in the direction from

25  Mr. Filip to Mr. Mitan.

Q.      So from Filip to Mitan bitcoin, and how much?

A.      Approximately $100 USD, at the time.

Q.      So going back to 1D, the connection between Mitan and Filip is $100?

A.      That was the -- once that we had -- that's at least just the one transaction that we were able to isolate and locate, yes.

        MR. COFFEY:  All right.  If you would go to 1F.

Q.      Do you see this bitcoin address?

A.      Yes, sir.

Q.      Looks like it's the same one every time?

A.      Uh-huh (affirmatively).

Q.      Is this a bitcoin address for Nedelcu?

A.      I'd have to see a little bit more.  If it's -- if this is the chart I believe it is, no, this would have been an address associated with Mr. Mitan.

Q.      These are those ten -- these are the ten OneVanilla cards that pop up throughout the case?

A.      Right.

Q.      You don't think be that money ended up going to Nedelcu?

A.      Well, I know that was the address that it was sent to, and if memory serves, I believe all of

1  those OneVanilla codes were provided in Jabber by

2  Mr. Mitan.

3     Q.     All right.  Let's see if we get the right

4  one here.  I didn't understand this.  Let's just go to

5  1B, and I think it's page 8.  And I know -- yeah,

6  that's it -- I know it makes perfect sense to you, but

7  if this total bitcoin address has received $81,000, I

8  didn't understand how the total loss would exceed the

9  total amount received in his bitcoin account.  So just

10  dummy that down, dummy that down and explain that.

11     A.     Yes, sir.  It's probably my fault.  I

12  didn't explain it clearly enough.

13        Yes, so what we had isolated in the bitcoin

14  addresses that we had identified for Mr. Mitan,

15  ultimately, there was $81,376 worth of bitcoin that

16  was sent to those addresses.

17        MR. COFFEY:  I got that part.

18     A.     Okay.  And so what we utilized is the

19  instances that we had detailed previously where we

20  were sending bitcoin addresses to him.  We were

21  sending approximately -- I believe it was 62 percent

22  of what the original theft amount would be.

23        So if, you know, a $1,000 car was purchased

24  in gift codes totaling $1,000 were provided to

25  Mr. Mitan, ultimately, he would receive about $600 in

1  bitcoin once the entire process had taken place.

2       And so utilizing that, that logic and that

3  number, if $81,376 had been sent to bitcoin, then, you

4  know, the remainder, you know, you would divide that

5  by .6 essentially, but that is going to be 60 percent

6  of what was originally stolen.

7       MR. COFFEY:  I see.

8  A.      So $130,000 would the amounts that were

9  technically stolen, or what was sent by victims.  And

10  then $81,000 would be the resulting proceeds after

11  they had been processed through.

12  Q.      Yeah.  Okay.  Thank you.  So I'm going to

13  say it this way:

14       The 131 figure is gross, and the 81 in some

15  ways is net that got to Mitan's account?

16  A.      That's exactly right.

17       MR. COFFEY:  Okay.  I appreciate that.

18  A.      Yes, sir.

19  Q.      All right.  And I didn't understand this

20  one.  1B, I think it's page 7.

21       Now, this has got a figure at the bottom of

22  $12,000.  And later in the 18-05 case, you said

23  something about a $12,000 figure.  Is that the same

24  $12,000 figure, or are we talking about two different

25  ...

1      A.     I believe so.  I believe that that

2 represents the total proceeds that were sent, $12,322

3 that was probably sent to Mr. Mitan.

4      Q.     Okay.  So this is the same figure that

5 comes under 18-05, the brute force attack case?

6      A.     I believe the brute -- this is separate

7 from the brute force.

8            THE COURT:  So slow down and get -- clarify

9 this, okay?

10           MR. COFFEY:  Yes.

11     Q.     All right.  So we'll start again.  Just

12 tell us what -- tell us about 1B, page seven.

13     A.     So we had separated the online auction

14 fraud theft --

15           MR. COFFEY:  Okay.

16     A.     -- from the brute force theft -- or brute

17 force numbers.  And so I believe that this number

18 represents -- that does not include the brute force.

19 This was simply online auction fraud, the proceeds.

20     Q.     Okay.  So you think that is part of the

21 online auction fraud amount of loss that's connected

22 to Mitan in some way?

23     A.     Yes, sir.

24     Q.     Okay.  All right.  Now, if you'd pull up

25 3C-1.  Would there be any chance you reviewed Mitan's

1  plea agreement before the Court?

2      A.    Yes, sir.

3      Q.    You did?

4      A.    I have seen it, yes.

5      Q.    Okay.  Great.  On the brute force case,

6  it -- which is what we're switching to now, 18-05, it

7  really identifies the criminal activity in February

8  2016, and I just want to confirm that the date of this

9  line of chats is February 2016.

10     A.    That's correct.

11     Q.    And as a matter of fact, it looks to me

12 like it's exactly what we talked about in the plea

13 agreement, February 20, 2016?

14     A.    Yes, sir.

15         MR. COFFEY:  All right.  And then there's --

16 if you'll pull up 3C, page 2.  Mine just say says

17 "3C-2."

18         THE COURT:  3C-2, is that what it is?

19         PARALEGAL:  Yes, sir.

20     Q.    And I can't read that, but the date there

21 looks to me to be January 29, '16?

22     A.    That's correct.

23     Q.    All right.  So right there in that same

24 February window?

25     A.    Yes, sir.

1    Q.    Okay.  All right.  And then if you'd go to

2    2C.  In the plea agreement it points out -- and I'll

3    just read it.  "For example, on February 21, 2016,

4    co-conspirators withdrew approximately $61,000 from 75

5    debit cards cloned from FTFCU customers."  I'll just

6    stop there.

7         So this figure on this chart comes to just a

8    little bit less than $61,000.  So this, too, I think

9    is just a reflection of what's in the plea agreement?

10   A.    Yes, sir.

11   Q.    All right.  Now, I also see two additional

12   amounts of loss that you pointed out to me today.  One

13   is 2E, and this is the UK loss, and I wrote down real

14   quickly $2,176; is that what you said?

15   A.    I believe that sounds about right for the

16   total.  Well, that was just representative of just the

17   UK individual professors.

18   Q.    Okay.  But what I'm trying to nail down

19   today is what you've verified, and I think that's what

20   you verified?

21   A.    Yes, sir, that's right.

22   Q.    Okay.  All right.  Then 2D.

23        All right.  So here's the other $12,000

24   figure, and they are different.

25        So this is the amount of loss from U.S. Bank,

1  and this would be connected to 18-05, the brute force

2  case?

3       A.     Yes.

4       Q.     Is that right?

5       A.     These are representative of -- so what

6  this is an example of is the credit cards that were

7  located or card numbers that were located on one of

8  the hard drives at the time of his arrest.

9            And so naturally, there were some tens of

10 thousands of them.  You know, what we try to do is

11 find a representative sample just based off of

12 resources.  And so what you have here is the results

13 of, we found a BIN -- one of the largest groupings was

14 a BIN belonged to U.S. Bank.  And so then we extracted

15 all of those BINs and those card numbers, provided

16 them to U.S. Bank, and then what you see is the

17 results of what they provided us relative to which of

18 those cards, if any, they could identify as having

19 fraudulent activity on them that had been previously

20 reported.

21      Q.     All right.  And so, and so when did this

22 fraud occur?

23      A.     I'd have to look at the dates of when,

24 based upon the -- there was -- part of their response

25 also had the dates that those charges occurred, so I'd

1 have to review those to, to know when that was.

2     Q.     But you don't have a ballpark of that?

3     A.     I don't recall, sir, no.  I'm sorry.

4     Q.     Okay.  And is this fraud that Mitan

5 committed, or is this something that some other

6 fraudster in, you know, Europe who also had the same

7 cards committed the fraud?

8     A.     I can't speak directly as to who committed

9 or who was involved, other than he was the one that

10 was found to be in possession of those cards on his

11 hard drive.

12     Q.     I mean -- right.  What I'm thinking is,

13 this is a -- these are, you know, pots of data, if you

14 will, and if you are a fraudster and you have access

15 for a few hundred dollars, you might be able to obtain

16 this same pot of data, and there might be many people

17 who have, who have these credit cards, this piece of

18 information -- these pieces of information on their

19 computers, and you happen to find one of those

20 individuals?

21     A.     I can't say as to who all would be in

22 possession of those cards.

23     Q.     Right.  Right.  But again, whether -- as

24 far as this figure here, $12,371.48, whether Mitan had

25 anything to do with that amount of loss or not, you

1  don't know?

2      A.     No, no, sir, only he was in possession of

3  the cards.

4           MR. COFFEY:  Okay.

5           THE WITNESS:  Mr. Coffey, if we could, could

6  we bring up the bitcoin address?  I think -- I've been

7  jogging my mind since we were bouncing back -- I think

8  I have a clarification on what that was.  And I hate

9  to bounce around on you, but I want to be clear in my

10 testimony obviously.

11          MR. COFFEY:  Yeah.

12          THE COURT:  Which one, which one do you need?

13          MR. COFFEY:  I was going to say.

14          THE WITNESS:  That's a great question.  It

15 would have been the one with the $12,000 figure on the

16 bottom.

17          MR. COFFEY:  The first one?

18          THE WITNESS:  Yes, sir, that's it.  That's

19 the one.

20          THE COURT:  Part of 1B, right?

21          MR. COFFEY:  Yeah.  Pull up 1B, page 7.

22          THE WITNESS:  And I apologize to bounce

23 around, but I think I've went out of order.

24          But I think what this represents is this was

25 just a snapshot of an example of, you know, when we

1 had that final $81,000 of bitcoin that was sent.

2        So what we did was we tabulated -- we

3 isolated the addresses that we knew to be associated

4 with the defendant, and then what we did was tabulate

5 total amount of monies in bitcoin that was sent to

6 those specific addresses.  And then those totals were

7 all cumulative to determine that $81,000 figure.

8        And so what I think you're looking at here is

9 just a screenshot example of what we did, and more

10 just a demonstration of this was how that process laid

11 out, not that it specifically is tied to Mr. Mitan,

12 but that was how we just tabulated the amount of

13 bitcoin that was sent to each address that we knew to

14 be affiliated with that individual, and then totaled

15 that amount to determine how much bitcoin was sent to

16 it.  So I think that's what this is an example of,

17 just a snapshot of that process.

18        THE COURT:  That, that's as to one address

19 then, that total?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Okay.

22        THE WITNESS:  So looking at the title, it

23 would appear that this is all the incoming bitcoin to

24 an address using the 34NERZ.  So the 34NE address.

25        MR. COFFEY:  All right.  And that makes

1  sense.  I'm going to slow down, or try.

2       So go back up to 1B, page 8.

3     Q.     And there again, is your $81,000 figure?

4     A.     Correct.

5     Q.     And then when you go to the page before

6  it, which would be 1B, page 7, you're saying this is

7  part of the process, this --

8     A.     Right.  That $81,000 figure represents the

9  cumulative total of all the bitcoin addresses and the

10  bitcoin that was received by all the addresses, one of

11  which was the 34NE address.

12      And so this is just screenshot example of how

13  we totaled the incoming bitcoin that was sent to the

14  34NE address.

15     Q.     All right.  And now, as far as, as far as

16  the $81,376 that is part of the tainted bitcoin

17  addresses, is it your position that every penny in

18  those accounts come from fraudulent activity, or, or

19  is that more of an extrapolation that you don't know

20  for sure?

21     A.     Well, it's certainly -- I think our

22  position would be that it's extremely likely.

23  Particularly in Mr. Mitan's case, we had no indication

24  that he was involved or had made no mention that I can

25  recall of being involved in any type of legitimate

bitcoin trading, and so that was all bitcoin addresses
that we knew we had sent tainted bitcoin and
fraudulent bitcoin.  So I think it would be our
position that, you know, given that there's no other
circumstances that would suggest legitimate bitcoin
trading, that it would be illegitimate bitcoin.

Q.    But as far as tracing it, no?

A.    As far as tracing it, I'm sorry?

Q.    As far as an ad placed on Craigslist,
someone buying a fictitious vehicle for -- we'll make
it simple -- $10,000.  After it goes through the money
exchanger, it's $5,000, gets over to his account, and
then $5,000 plus "X" plus "X" plus "X" gets us to
$81,000?

A.    No.  From this position, that would not be
a -- you would not be able to make those kind of
conclusions --

MR. COFFEY:  That's right.  Okay.

A.    -- without this, yeah.

Q.    So there's some assumption or
extrapolation on the part of the government to get to
the $81,000 being -- coming from fraud?

A.    That's correct, but found it again in our
personal interactions with those addresses.  But yes.

MR. COFFEY:  Okay.  Judge, Mr. Mitan's been

trying to tell me a few things.  If you'll give me just a couple minutes, I'll see what he wants and we'll go from there.

THE COURT:  Absolutely.  We'll turn the sound up for you.

[DEFENDANT AND COUNSEL CONFERRING]

Q.     Sergeant Moore, I forgot to ask you about the credit cards.  I heard your testimony, 13 files exceeding 18,000 cards that were on Mr. Mitan's devices?

A.     Yes, sir.

Q.     So when I read his plea agreement, it talks about 16,000 cards in 18-05, and 2,000-and-some-odd number of cards in the 20-04 case.

So when you -- when you come up with 18,000, is that how you're getting the 18,000, 16,000 plus 2,000, or are you getting there some other way?

A.     I think that that is representative of that total.  But I do know also, I believe, that we also tried to be -- there may be some miscommunication in terms of -- I know we took away a number of cards because as we had -- I had testified earlier with the U.S. Bank batch, there was a number and a percentage that were ultimately determined to not be valid cards or were not be correct user accounts.

1              And so, you know, I think maybe we,

2      acknowledging that, may have kind of provided that

3      percentage and taken that percentage off to land on a

4      smaller number.  So that may be where that number's

5      reflected, the differences may be.

6          Q.      When you say "number," you mean number of

7      cards or ...

8          A.      Total number of cards, yes, sir.

9          Q.      Okay.  So, so the number I've got in my

10     head is 18,000 cards that come -- again, 16,000 and

11     2,000.  Is that -- are you saying you think the

12     number's greater than that or less than that?

13         A.      No, sir, no, I don't think it's greater

14     than that.

15         Q.      It may be less than that?

16         A.      Correct.

17         Q.      And that's because you would take off

18     these U.S. Bank cards?

19         A.      Well, you would take off a certain

20     percentage -- you know, as we said before, there were

21     maybe human error in where they were entering it, and

22     so obviously, we didn't have the resources to check

23     every individual card to determine whether it was

24     authentic and a valid card.  So assuming, you know,

25     with the small representative sample that we did

```
 1  check, we did find that there were a percentage --
 2          MR. COFFEY:  I see.
 3      A.      -- that were in fact.  And so we applied
 4  that to the total group to get the lesser number.
 5      Q.      Okay.  That's helpful.  So let's take a
 6  little bit more time here, go a little bit deeper.
 7          So what we thought -- well, we'll just go
 8  with -- because I've kind of learned this case through
 9  --
10          [DEFENDANT AND COUNSEL CONFERRING]
11      Q.      All right.  We're going to jump out of
12  sequence because this is really important to
13  Mr. Mitan.
14      A.      Okay.
15      Q.      Are all of these credit cards from
16  Canadians?
17      A.      No.
18      Q.      Are most of these credit cards from
19  Canadians?
20      A.      There was a large group that we did
21  determine were lifted from a website named PC-Canada
22  that did appear to have Canadian origins.
23          MR. COFFEY:  Okay.  All right.  Thank you.
24      Q.      Now, we started off thinking there was, in
25  the plea agreement, 16,000 in 18-05; 2,138, I believe,
```

1  in 20-04.  What do you think the new card numbers

2  were?

3      A.     So I'd have to look at what our most

4  recent document is.  I think another issue with that

5  may have been is that those numbers may have been a

6  little bit premature.  Obviously there is a ton of

7  data representative of this case.  And so certainly,

8  as hearings become closer and issues get, you know,

9  brought up, we will revisit and re-examine files.  And

10 so that may be another indicator as to why there is

11 maybe a little bit of a difference between a number

12 provided back then, as to what we're landing on now.

13     Q.     I'm not assigning blame in any way.

14     A.     Sure.  Yeah, I understand.  I'm just

15 trying to explain why there may be some different

16 numbers floating around.

17     Q.     And, and I'm trying to get to that.  What

18 is that number?

19     A.     I'd have to -- we have it written down.  I

20 believe that there's a -- whatever was provided to the

21 Courts most recently, I believe this week.  I had a

22 number, and -- but I think the --

23     Q.     The latest report from Agent Ayance has

24 got that number in it?

25     A.     Not necessarily.  I think we had filed a

1 motion that we had worked with DOJ that landed on the

2 number and the loss amount.

3       THE COURT:  Just a sentencing memo, is that

4 what he's talking about?

5       MS. ANDERSON:  Your Honor, I think he's

6 trying to reference the 25 percent credit we gave.  He

7 doesn't know the precise figure that got us down to.

8 I think it was in excess of 13,000 cards as a result

9 of that 25 percent discount.

10       THE WITNESS:  Yes.

11       MS. ANDERSON:  I believe that's what he's

12 trying to get at.

13       THE COURT:  Okay.

14       THE WITNESS:  I apologize, that wouldn't be

15 the proper nomenclature, but yes, there was -- I know

16 there was a memo or document that we had worked on and

17 landed on the number, and that would be the number I

18 think is most reflective and accurate.

19     Q.    All right.  I gotcha'.  And is that -- do

20 you know the breakdown on that between 20-04, which is

21 the North Carolina case, and the 18-05, which is the

22 Ashland case?

23     A.    I don't know what -- how that would be

24 impacted, no, sir.

25     Q.    All right.  Well, I'm going to ask you

1  these questions.  I don't know if you can answer 'em

2  or not.  How did Mitan obtain those cards -- those

3  card numbers?

4       A.     I can't say.  I do not know.

5       Q.     When did he obtain those cards?

6       A.     I do not know.  There was some -- we know

7  that they were accessed around 2015, I believe there

8  were some dates in there indicative of that time

9  period.  But how they were obtained and utilized since

10 then, I can't speak to.

11      Q.     And how many others in Europe or other

12 places would have those card numbers?

13      A.     I don't know.

14      Q.     Okay.  And whether Mitan personally used

15 those card numbers, do you know?

16      A.     I do believe we did have some instances

17 where some of those card numbers were either provided

18 or were on his -- I don't know that they were provided

19 to us, but they were certainly utilized, and I know he

20 had utilized that hard drive.  But no, I don't know

21 that for sure.

22      Q.     All right.  Do you know of any great

23 criminal activity that Adrian Mitan did that's not

24 reflected in the plea agreement?

25      A.     I'm sorry, repeat the question again.

1    Q.    Do you know-- I said "great," but I say

2    "substantial."  Do you know of any substantial

3    criminal activity that Adrian Mitan has done that's

4    not reflected in the plea agreement?

5    A.    No.  There would certainly be everything

6    that we are aware that he was involved in, the types

7    of crimes he was involved in are all discussed.

8         Now, what may not be in there would be the

9    time periods of his involvement within those.  But I

10   think as far as the brute force and those types of

11   crimes and those activities, they're all displayed, or

12   at least acknowledged in the plea agreement.

13        MR. COFFEY:  All right.  Let me see if

14   Mr. Mitan has anything else, and that may cover all of

15   my questions.

16        THE COURT:  Of course.

17        [DEFENDANT AND COUNSEL CONFERRING]

18   Q.    Mr. Moore, Officer Moore, this may be our

19   last question.

20   A.    Okay.

21   Q.    Is it true that this database or cards,

22   which is roughly now around 13,000, that that goes --

23   those cards go some -- some of those go all the way

24   back to 1999; some are very old, in other words?

25   A.    With that many cards, I couldn't say.  I

1  don't know how far back they go.

2      Q.      All right.  So the time period covered

3  with those cards, you wouldn't know that?

4      A.      Again, I know that there were some

5  transactions -- there were cards that were utilized in

6  those transactions in 2015; I know that, but, you

7  know, to the extent those cards were originated --

8  and, I mean, if those cards -- they were unaware if

9  they had been -- that they had been compromised, I

10 mean, whether they were created in 1985, it doesn't

11 matter.  It's going to remain.  They're just going to

12 redo the expiration date so those card numbers would

13 probably still be just as, you know, valid as they

14 would have been back then.  But I don't know if that

15 answers your question or not.

16     Q.      Well, that's an -- I mean, that's an

17 assumption, mine personally, the numbers changed?

18     A.      Some do, yes, that's correct, some do.

19 But mine don't unfortunately.  I need to change banks

20 maybe.

21         MR. COFFEY:  I think that's all we have.

22 Thank you.

23         THE COURT:  Thank you.

24         Let me ask one question or one area before

25 you redirect.

1          So, Sergeant Moore, is it true that on the

2   vishing conviction, the North Carolina conviction, we

3   know that there were ten banks who had some losses,

4   but we don't have any specific dollar amounts in the

5   record about the scope of those losses; is that right?

6          THE WITNESS:  Your Honor, I really don't have

7   a lot of knowledge.  You know, we've -- very somewhat

8   spoken to -- I know it was Agent Kakowski that -- and

9   for the FBI that worked that case, but as far as the

10  specifics, I couldn't begin to tell you, sir.  I'm

11  sorry.

12         THE COURT:  So whatever is in the plea

13  agreement is what you'd stand on today?

14         THE WITNESS:  Correct.  Yes, sir.

15         THE COURT:  Okay.  Thank you.  Ms. Anderson?

16         MS. ANDERSON:  Thank you, Your Honor.  I have

17  a few points of clarification and two unanticipated

18  exhibits.  They were in discovery, but they're just

19  giving the dates and stuff that Mr. Willis was

20  inquiring about.

21         THE COURT:  Okay.  Would you take your mask

22  down during your -- thank you.  That's going to help

23  me.

24         MS. ANDERSON:  Sorry.

25                 REDIRECT EXAMINATION

BY:  MS. ANDERSON:

Q.      So, Sergeant Moore, Exhibit 1, page 3 there was a bitcoin address that we were -- there was a bitcoin address that the defense was asking you questions about, and what are the first four digits of that address?

A.      34NE.

MS. ANDERSON:  34NE.  Okay.  And what I'd like to show you here is coming from my computer, so we're just going to switch the plug-in.

Q.      Did we subpoena as part of this case, records from Bitstamp related to the defendant?

A.      That's correct.

Q.      And in fact, did these records help us to identify who was behind 0?

A.      That's correct.

Q.      Okay.  And so on this, is this some of the records we received back from Bitstamp?

A.      Yes, ma'am.

Q.      And do you see the deposit address right there.  What is that address?

A.      The 34NE.

Q.      Okay.  And who was this address registered to, first and last name?

A.      Adrian Mitan.

1      Q.      Okay.  And do you recognize that email

2  address and the city and country of origin to be the

3  defendant's?

4      A.      Yes.  The address is in Craiova, Romania.

5  The email address is one that we knew to be associated

6  with him, and also associated with registering his

7  Facebook account.

8      Q.      Okay.  And also as a point of

9  clarification, the snips from the PowerPoint were just

10  snips taken from different elements of the

11  investigation and put up for descriptive purposes

12  only, correct?

13      A.      That's correct.

14      Q.      And that enabled us to explain to the

15  defense, this is what our spreadsheet looks like?

16      A.      That's right.

17      Q.      Okay.  And so it's only the figures on the

18  final page?

19      A.      Right.  And part of that is my fault.

20  There's -- it was just happenstance that that 12,000

21  number was very close to another number we had

22  discussed with the wire, and that's kind of what threw

23  me off initially.

24          But again, I think I ultimately realized it

25  as we were -- the testimony continued.  But yes, it

1 was there just for an example just to demonstrate how

2 the number was reached.

3 　　　　　MS. ANDERSON:  Thank you.  And I will -- we

4 will mark this as an Exhibit 1M and send it to the

5 Court at -- after the trial, or the hearing is

6 commenced.

7 　　　　　And, Mr. Willis, this was provide in

8 discovery.

9 　　　　　THE COURT:  Very well.

10 　　Q.　　　The second item, you were asked about the

11 date of the intrusion for the U.S. Bank accounts --

12 the U.S. Bank intrusion by the defense?

13 　　A.　　　Yes, sir -- or, ma'am.  Sorry.

14 　　Q.　　　It's okay.  Did we receive records from

15 U.S. Bank related to individual instances of fraud?

16 　　A.　　　We did.

17 　　Q.　　　And this was under a trial subpoena?

18 　　A.　　　That's correct.

19 　　Q.　　　Okay.  And what we're looking at here --

20 or could you describe what we're looking at here.

21 　　A.　　　Yes.  So this is an example when we had

22 isolated the U.S. Bank BIN codes and provided those to

23 U.S. Bank and requested records that were indicative

24 of any fraud reports associated with those

25 specifically identified accounts, this was some of the

1    documentation that they provided us.

2         So in this example, a procurement card that

3    was assigned to an Alana Ritchie, and it indicates the

4    amount of loss amount and the loss dates.

5    Q.    Okay.  And so it's asking for a signature

6    on the form around February 2016.  Is it fair to say

7    that the intrusion would have occurred before that

8    date?

9    A.    Yes.

10   Q.    Okay.  And again, do you recall reviewing

11   some of these records and your understanding is that

12   the date of intrusion was sometime in 2015?

13   A.    It would seem so, yes.

14        MS. ANDERSON:  Okay.  Your Honor, I will --

15   we'll mark this Exhibit as 2D-1.  This exhibit is full

16   of victim identifying information, so we can either

17   redact or ask that it be filed under seal, whatever

18   Your Honor prefers.

19        THE COURT:  I don't know the extent of the

20   identification.  Why don't we have you tender it under

21   seal for now, and I'll look at it.  And if I feel like

22   we ought to supplement with the public version that's

23   redacted, I'll order that.

24        Any objection to that, Mr. Coffey?

25        MR. COFFEY:  No, no, sir.

 1          THE COURT:  Okay.  Thank you.

 2          MS. ANDERSON:  Okay.

 3     Q.     So, Sergeant Moore, did the defendant

 4  explain to the confidential informant how to perform

 5  brute force attacks?

 6     A.     He did describe how he was involved in it,

 7  yes.

 8     Q.     Did he proclaim to be a hacker?

 9     A.     Yes.

10     Q.     Did he state that he brute force attacks?

11     A.     Yes.

12     Q.     And if there are data sets found on the

13  defendant's computer that are found elsewhere as well,

14  is it likely that the defendant hacked those accounts

15  and distributed them elsewhere?

16     A.     Yes.

17     Q.     In fact, did he sell us some Craigslist

18  accounts in this case?

19     A.     Yes, he did.

20     Q.     And did he -- do you recall from your

21  prior testimony about the time that the defendant

22  conceded he had been hacking, how long he'd been

23  hacking?

24     A.     I believe there was a reference, either

25  '02 or '07, I believe he said he had been involved in.

1           MS. ANDERSON:  If we could pull up Exhibit
2  3C-2.
3      Q.     About halfway down this exhibit, what year
4  does he say that he has been doing this from?
5      A.     2007.
6      Q.     And across the data set at Exhibit 2A plus
7  the additional 13 you testified to, did you guys
8  identify 16,000 unique credit card numbers with PINs
9  and other data?
10      A.     Yes, ma'am.
11      Q.     And so the -- your testimony about a
12  smaller number of card codes is your math, deducting
13  some of those that may have been invalid?
14      A.     That's correct.
15      Q.     Okay.  And that's how we arrived at that
16  13,000 figure?
17      A.     Yes, ma'am.
18           MS. ANDERSON:  I have no further questions.
19           THE COURT:  Okay.  Any recross for this
20  witness?
21           MR. COFFEY:  No, no, sir.  Thank you so much.
22           THE COURT:  Okay.  Thank you, sir.  You may
23  step down.
24           THE WITNESS:  Thank you.
25           THE COURT:  All right.  Mr. Taylor, you

1  soft-tossin' over there ready to step in, if needed?

2          MR. TAYLOR:  You gotta reach out and tag me.

3          THE COURT:  All right.  Ms. Anderson, your

4  next witness?

5          MS. ANDERSON:  Your Honor, that's the only

6  witness we intend to call.

7          THE COURT:  Okay.  Any proof for the defense,

8  Mr. Coffey?

9          MR. COFFEY:  Judge, what we are going to do

10 -- do you need me to stand up or --

11         THE COURT:  Whatever you're comfortable with.

12 I'm hearing you better seated.

13         MR. COFFEY:  Okay.  Our plan is we put

14 together a PowerPoint presentation, and it's about 70

15 slides, and we're ready to present that at this time.

16         THE COURT:  Would -- is it a, is it a

17 coherent argument that covers all the objections?

18         MR. COFFEY:  It is.

19         THE COURT:  So --

20         MR. COFFEY:  I'm going to take issue with the

21 word "coherent."

22         THE COURT:  I'll reserve on, I'll reserve on

23 coherence.

24         MR. COFFEY:  I was going to say, I'll let you

25 make the decision on that.

```
 1            THE COURT:  So if the pr -- so you're -- what
 2   you're going to be doing is synthesizing part of the
 3   record into your argument, but not offering separate
 4   proof, right?
 5            So does it make the most sense to just now
 6   just go into argument on the objections, and I'd be
 7   glad to let you go first, you make the presentation,
 8   and then the government can respond to that?
 9            MR. COFFEY:  That makes a ton of sense.
10            I'll tell you what we've done.  This has been
11   a remarkable case or cases because of the amount of
12   discovery, and so I was trying to decide how best to
13   present our case to you.  That's how I've got here.
14            So I think at the end of the day, we have
15   nine or ten documents that are going to be part of
16   this PowerPoint.  They all come from discovery,
17   pleading -- discovery or pleadings, or the PSR.
18            So, so what I have on these disks are the
19   complete documents that make up the PowerPoint because
20   I want the Court of Appeals, if necessary, and you,
21   too, to have a complete record of the full document.
22            I did not put the PSR on the disk, but
23   everything else that's in the PowerPoint is on the
24   disk.
25            THE COURT:  Okay.
```

1          MR. COFFEY:  So I want to present the
2  PowerPoint, but my exhibit to the hearing actually is
3  going to be the disk that has the complete documents
4  that are referenced in the PowerPoint.
5          THE COURT:  Okay.
6          MR. COFFEY:  If you think there needs to be a
7  copy of the PowerPoint to put in the record, then
8  we'll do that as well, but that was not my intention.
9  But I'll defer that to you.
10          THE COURT:  Probably we'd be good to have
11  that as well --
12          MR. COFFEY:  Okay.
13          THE COURT:  -- precisely what got presented
14  in the hearing, so you can tender that after.
15          MR. COFFEY:  Yeah.  Now I've got that, and,
16  of course, I've got hard copies for everybody.
17          So -- and I have a hard copy for the clerk.
18  But we can make that, too --  but couldn't do it
19  today -- but we could transform this to electronic
20  form, and then file that after, after today's hearing
21  --
22          THE COURT:  That's fine.
23          MR. COFFEY:  -- when Mr. Mitan gets back to
24  Philadelphia --
25          THE COURT:  Okay.

```
 1          MR. COFFEY:  -- or not Mitan, but Palento.
 2          THE COURT:  That'd be, that'd be helpful.
 3          MR. COFFEY:  So we'll submit that
 4   electronically later, and I will submit the disk
 5   today.
 6          THE COURT:  Any objection to that,
 7   Ms. Anderson?
 8          MS. ANDERSON:  Yes.  Your Honor, I have -- my
 9   only concern is that presenting documents in the form
10   of a PowerPoint without having any context or
11   testimony about them, I'm just not sure what is in
12   this.
13          So I may need to interject in case there's
14   interpretations of records that didn't have any
15   context provided about them.  I just -- I'm not really
16   sure what to expect here, so ...
17          THE COURT:  Hard for me to know, so let's --
18          MS. ANDERSON:  Yes.
19          MR. COFFEY:  Fair enough.
20          THE COURT:  -- so let's see it and hear it.
21   And then if the government has objections on the, you
22   know, aspects of the record, then we'll -- I'll take
23   those up as needed.
24          MR. COFFEY:  All right.  Let me just pass out
25   everything at this time.
```

1           THE COURT:  Okay.  Sure.

2           MR. COFFEY:  Judge, I've got one for you.

3  Can I just walk up there?

4           THE COURT:  Yeah, just pass it up.

5           MR. COFFEY:  And one for the clerk.  Here's

6  your copy.

7           COURTROOM DEPUTY:  Thank you.

8           MR. COFFEY:  Judge, are you ready for us to

9  proceed?

10          THE COURT:  I'm ready.

11          MR. COFFEY:  All right.  Mr. Palento, if

12 you'll pull up the PowerPoint.

13          All right.  So, of course, that's just the

14 cover page for the hearing today.

15          Next slide.

16          So, judge, we have three, we have three

17 objections to the PSR.  The first one we're covering

18 is the amount of loss.

19          And the way I have broken this down is the

20 amount of loss in each one of the three cases, 18-81,

21 18-05 and 20-04, which, of course, is 17-17 out of the

22 Western District of North Carolina.

23          THE COURT:  Okay.

24          MR. COFFEY:  All right.  Next slide.

25          So we're beginning with 18-81, which is the

1  RICO case, online auction fraud.

2        Next slide.

3        So, judge, other than -- in my experience --

4  other than the Eric Conn case, I thought this was the

5  most detailed factual basis that I have seen -- I've

6  seen, and largely, we agree with the plea agreement.

7  I don't know that there's any substantive disagreement

8  that we have with the plea agreement, and I think it

9  resolves all of our issues.

10        And so, so with each of these three cases, I

11  point out what, what the parties agreed to in the plea

12  agreement.  And then in -- so beginning with this one,

13  18-81, the highlighted parts are what I think are the

14  most important parts regarding this part of it.  And

15  that was that regarding the online fraud case, he

16  worked with Nedelcu and Brown.  And you'll notice

17  Filip is not listed, which came up today.

18        And then in the second paragraph, and I think

19  this is remarkably telling, the parties agreed the

20  defendant engaged in this scheme from at least May 11,

21  2016, until at least July 2016.

22        So -- now I wasn't the attorney that

23  negotiated this, but I don't understand why the U.S.

24  expands the period of his activity if they thought it

25  was before May '16, and thought it was after July '16;

1   I don't understand why the parties agreed to put this

2   line in there.  But the parties agreed to it.

3           I think it's largely correct.  When you, when

4   you look at his activity, most of it falls -- other

5   than that January Jabber chat that went to the CI,

6   everything else mainly falls between May and July '16,

7   based on my review of the case.

8           Next slide.

9           This is just in for completeness.  This is

10  the last paragraph of the factual basis that's in the

11  plea agreement, so I don't have anything to add on

12  that one.

13          Next slide.

14          Now, judge, I'm going to spend most of the

15  time talking about this document.  And I don't know if

16  you've seen this or not --

17          MS. ANDERSON:  Your Honor, this is something

18  that I would object to.  This is work product of an

19  investigator on our team provided to me to help with

20  creating an indictment.

21          I then turned it over in discovery both as

22  *Jencks* and as a helpful and informative piece of

23  information to identify for the defendant's counsel

24  why we attributed these people to this address.  It is

25  limited in the sense that it is only for indictment

1  preparation purposes.  It is not comprehensive as of

2  this defendant's conduct.

3        I have said this several times specifically

4  related to this case, that this is a very narrowly

5  tailored memorandum, and with that context and just

6  relying on it for this argument, to me, is -- it's

7  simply reading more into something that was designed

8  to be a very limited primer on what we had prior to

9  the indictment.

10        THE COURT:  Okay.  Thank you.  You've given

11  that context.  I'll keep that in mind as I consider

12  the information.  You can proceed.

13        MR. COFFEY:  Fair.  Thank you, judge.

14        So, judge, I point out again, this document

15  is just simply remarkable.  And the first thing I

16  would show you is the case -- or not the case number,

17  but the file number on this document.  So when you get

18  to the Mitan material, this is the very first document

19  that --

20        MS. ANDERSON:  Your Honor, that is because we

21  were not able to get discovery out in the most

22  efficient manner.  We did have this present.  I asked

23  for our paralegal to Bate stamp it so I could get it

24  to them the day that they entered their

25  representation.  It is not prim -- number 01 because

it's primary amongst our evidence, which is I had it
in hand and I was able to give it to defense counsel
the day that they entered court.

THE COURT:  Ms. Anderson, I know that you
trust that I'm going to give the government its full
say, and I'm going to let you respond, say anything
you want as part of your argument, but I'd appreciate
you not just continually interrupting Mr. Coffey's
argument.  I wouldn't let him do that to you, and so
reserve those points for your argument.  Okay.

MR. COFFEY:  Yes, judge.  Thank you much.
And we're going to go through -- and again, the
complete document's on the disk.

But this document again, is remarkable and it
in my mind fully details his conduct in 18-81 and
18-05.

To be candid with you, I'm disappointed you
hadn't seen it before because at the end, this agent
totals up his fraud in each of the two cases, and it
comes to about $26,000 when we get there.  So we'll
get there, but I want to take it piece by piece.

So the next slide.

So this is the -- again, this is the Secret
Service memorandum prepared by one of their agents.
It's dated May 22, 2018, and the subject matter is

1  Mitan 0.

2         Next page.

3         This just shows the beginning of the

4  narrative that on January 12, 2016, the CI was

5  contacted by an individual using the name 0, which is

6  Mitan, inquiring about converting various fraudulent

7  payment methods to bitcoin.  Again, this is a January

8  date.

9         All right.  Next page.

10        Now, judge, this memorandum again, talks

11 about -- even though I put it under 18-81 -- it talks

12 about both the brute force attack, which in our

13 numbering is 18-05 and 18-81.  And the way this agent

14 drafts the memo, he talks about the brute force attack

15 first.  Okay.  So that's why, that's why I have it

16 here at the beginning.

17        So you can see the highlighted parts that are

18 referring to a brute force gang that Tom Trusty of

19 Chase Bank has brought to their attention.

20        In the second paragraph this group is based

21 out of Constanta, Romania.

22        Okay.  Next slide.

23        Judge, just take a second and read all this.

24 I won't read it aloud.  But this at the end references

25 just exactly what's in the plea agreement.  The

criminal activity is February 20 through 22, 2016.  It
references the First Tech Federal Credit Union, which
the government's talked about today.  There were 12
fraudulent cards that were processed one day, and from
that, Mitan got $6,000.

And I'll just wait until you're ready.

THE COURT:  I read it.

MR. COFFEY:  Okay.

Then the next slide.

So this is one of his totals, and this agent
totals -- when he gets a total in a section, he puts
it in bold, and that's what he's done here.

Again, this figure exactly mirrors the plea
agreement.  The middle sentence from February 21,
2016, to February 22, 2016, I'll use the word "Mitan"
instead of "0," provided the CI with 37 cards, 21 were
valid, and resulted in a fraud loss of $9,480.

Next slide.

Judge, here on this one we are switching over
to 18-81, and you can see that he is working with
IDL100, and that's Nedelcu.

So -- and this is -- this goes back to what
Agent Moore was -- or Officer Moore was talking about
just a few minutes ago, those figures -- they were
highlighted in green, the OneVanilla transactions.

And that -- I think the math is right on that.  I
think they were ten $500 -- yeah, they were ten $500
cards, and that's how they get to the $5,000 figure.

Okay.  So this Agent, when he calculates
Mitan's involvement in 18-81, he comes up with two
transactions here, the $9,882 -- and you'll see there
he says, "This wire is sent from a victim in
California for a fictitious vehicle purchase."  I'm
sorry.

All right.  And then he comes up -- he points
out another wire transfer of $2,500.  So he comes up
with $12,382, two transactions.

All right.  Next slide.

Judge, I wanted to point this out for a later
argument in the presentation that I'll be talking
about when Mitan quit the conspiracy.  But it points
out here that the CI had no contact with Mitan prior
to his cooperation with the Secret Service.

All right.  So then the next page.

So, judge, there's a couple of documents,
this being one of them.  And then the next one is this
affidavit in support of the preliminary order of
forfeiture that I view as powerful.  And this slide is
one of the pages from that first document, the Secret
Service memo.  It totals Mitan's loss.  And again,

1 this was done February -- or May 22, 2018.

2 　　　　The plea agreement largely mirrors this same

3 language, and from the brute force attack, this Agent

4 found him to be responsible for $9,480.  The

5 OneVanilla cards, which is tied to 18-81, $5,000, and

6 then the wire transfers that involve one fictitious

7 automobile transaction, $12,382, for a total of

8 $26,862.

9 　　　　So, you know, at the end of the day, you have

10 to sentence Mr. Mitan for his conduct.  And just seems

11 outrageous to me that probation and the government

12 seeks an amount of loss figure that's somewhere around

13 $8 or 9 million when we have a Secret Service memo,

14 and then an affidavit by Officer Moore here that I'm

15 going to discuss next, that really holds his amount of

16 loss to somewhere between $26,000 and $16,000.

17 　　　　And, you know, you got to get it right, and

18 that's not easy, but this is a remarkable -- these are

19 two remarkable documents that are coming up, this one

20 and the next one.

21 　　　　It doesn't address the credit cards, you

22 know, the big chunk of credit cards that were found,

23 and I concede that.

24 　　　　But as far as, as far as what he did, as far

25 as what he actually did in terms of dollars and cents,

1  these figures are pretty accurate.

2        And then the only other figure that's out

3  there, and I'm going to show you that here in a minute

4  with some more government documents, is the 81 or

5  $91,000 that ultimately went into those bitcoin

6  accounts.  But that's the high end document.

7        So you're going to have really three figures.

8  You're going to have this total figure here of

9  $26,862.

10        You're going to have what's in Officer

11  Moore's affidavit that I'm going to next.

12        And then at the end of the presentation,

13  you're going to see a figure of $91,000 that they

14  attribute to his bitcoin accounts.

15        I don't know of anything more than that.  And

16  at the end of the day, as my mom used to say, Right's

17  right and wrong is wrong, that's where this judgment,

18  his punishment needs to fall, is my opinion.

19        All right.  So we'll go to the next slide.

20  And then the next slide.

21        So all this is, judge, is just a summary

22  sheet.  It just shows how the officer again got to

23  these three figures.

24        The first paragraph is 18-05, $9,480; $5,000

25  in 18-81; and $12,382 in 18-01 [sic].

1       And Adrian will tell you that much of this
2 money went to Nedelcu, you know, even this low figure.
3 And I basically told him, I said, Man, you know, we're
4 fighting over millions here.  We're really getting
5 down in the weeds talking about where the $26,000
6 ended up, but much of it went to Nedelcu and didn't go
7 to Adrian.
8       All right.  Next slide.
9       And now, judge, we're going into the next
10 document, and this is the one I've referenced in other
11 pleadings.  And this is the government's motion for a
12 preliminary forfeiture for forfeiture money judgment.
13       And the first thing I'd point out in this one
14 is the caption.  It catches all three cases.  And you
15 asked the officer about this.  I don't know, judge,
16 and I'm going to have some document here to show you.
17 I don't -- even though he agreed in his plea agreement
18 that there were, you know, pecuniary losses to those
19 ten banks, I don't, I don't know of a dime that was
20 stolen.  And you'll see some of that coming up here in
21 a minute.
22       But I do point out that this agent, when he
23 did this document -- this affidavit that supports his
24 document, he references all three -- you know, the
25 caption references all three cases, and he doesn't put

any loss either on 20-04.  And so you start adding up
how many different ways.  I'm going to show you that
here over the course of this presentation.  I'm not
sure there was any loss out of North Carolina.

All right.  So the next slide.

So this is the affidavit by Officer Moore.
He comes -- that the defendant obtained $16,431.88 in
proceeds as a result of the offenses to which he pled
guilty.  Again, that's all three offenses.

There's the prayer at the bottom; they're
seeking a judgment of $16,431.  Then actually here
comes the affidavit next.

MR. TAYLOR:  Your Honor, I'm having trouble
hearing Mr. Coffey.  My hearing aid batteries ran out,
and if he would just speak directly into that
microphone.

MR. COFFEY:  You know my problem, I got a
short cord over here.  Have I got room on that side to
get --

MR. TAYLOR:  I don't think you can move that
any further.

MR. COFFEY:  You slide that way a little bit.

Ken, how about this?

MR. TAYLOR:  That sounds good.

MR. COFFEY:  Okay.  All right -- or

 1  Mr. Taylor, I'm sorry.

 2          All right.  Judge, so here's the affidavit.

 3  Yeah, you can slide that way.

 4          All right.  And so a very clear affidavit.

 5  He points out -- next slide, I'm sorry.

 6          Officer points out that based on his review

 7  of these spreadsheets, the confidential source in a

 8  total of 10,820 bucks to bitcoin to Mitan as the

 9  proceeds of the online fraud auction -- or auction

10  fraud.  And again, the times there are May to July.

11  So $10,800 in 18-81.

12          If you flip over to the next page, now we've

13  flipped over to 18-05, the brute force attack, and he

14  come up with a loss of $5,611.

15          And, judge, if you look at those dates, those

16  are exactly the dates in the plea agreement.  So these

17  two documents, in my mind, this affidavit and the

18  Secret Service memo, are exactly consistent, other

19  than the Secret Service memo includes that one extra

20  $9,000 figure, but everything else matches up with the

21  plea agreement.  So you got the plea agreement, you

22  got this affidavit, and you got the Secret Service

23  memorandum that are consistent on these figures.

24          All right.  Next page.

25          Now, so, judge, I guess this is going to be a

real matter of contention.  I think this helps prove

that Adrian Mitan quit the conspiracy.  In

Ms. Anderson's pleadings, she talked about that -- and

I've butchered the name, and I'm sorry -- Ybarra case,

and you made a ruling that there was no -- actually no

ending date, I guess.  You'd know better than I would,

but I think this is about as clear as I'm going to

have to show you that he did quit the conspiracy.

        And our argument on when he withdrew would be

three points, one, the time periods in the plea

agreement; two, the lack of activity outside of those

time periods; and then three, is this Jabber chat that

I'm getting ready to show you.

        And so this -- and go ahead and flip over --

so this is a chat, judge, between Nedelcu and the CI.

And so I'm impressed, and I'll bet you are, too, with

this CI.

        And so his questions are on point, and he is

an operative of the government when he's at work here.

I mean, when you go back to the Secret Service memo,

that's why I highlighted that slide, that said they

had no, no communication before he started working

with the government.

        So I think in other words, when he is talking

to Mitan here in January '17, no question he's working

1  as a member -- as an operative for the government.  So

2  again, this is --

3            THE COURT:  Talking with Nedelcu?

4            MR. COFFEY:  Yeah, yeah, Nedelcu.  I'm sorry.

5  So this is a conversation between Nedelcu and the CI.

6            THE COURT:  Okay.

7            MR. COFFEY:  All right.  And I'm just going

8  to read the whole thing into the record.  And I'm

9  going to -- judge, you may have to read it two or

10 three times, then it kind of falls into place what

11 they're saying.

12            MS. ANDERSON:  Your Honor, I'd just like to

13 ask that he not use the username of the confidential

14 informant, which is just pasted onto here, so I'd ask

15 that it not be put into the record when you read into

16 the record what's going on.

17            MR. COFFEY:  Okay.  I'll just -- okay.

18            THE COURT:  That's fair.

19            MR. COFFEY:  Yeah.  All right.  All right.

20            So the CI:  "You still working with Mitan?

21            -- " -- I won't use the rough parts.

22            "CONFIDENTIAL INFORMANT:  You still working

23 with Mitan?

24            0:  no eff him last year is when I worked

25 with him."

1          MR. COFFEY:  So there he's saying, "No, last

2    year, judge, was the last time I worked with him."

3          Then the CI:

4          "CONFIDENTIAL INFORMANT:  well what happened"

5    All right.  Then, then he explains what happened.

6    It's a very good explanation.

7          "i had a nice trick CL -- " CL'd be

8    craigslist -- " -- i had a nice trick for craigslist

9    to post really nice he sold it to people for money and

10   the trick died and he gave me nothing."

11         Okay.  Next.  Probing question by the CI:

12         "CONFIDENTIAL INFORMANT:  How much did he

13   sell it for?  So you boys ain't talking."  And look at

14   this.  Nedelcu goes, "He sold it for $6,000, 6K."  And

15   then he goes, "nope, he went dead after he took the

16   money"

17         And then -- so the CI's, you know, checking

18   on Mitan.  We know -- what's Mitan doing?  I haven't

19   heard from Mitan.  Is he still in the game?

20         And Nedelcu's going, "nope he went dead after

21   he took the money."  Then, then the CI goes, "wow,

22   that's pretty crappy guy.  6K for a trick that makes

23   millions."

24         And then Nedelcu goes on, "he's not answering

25   anymore?  Is he -- he is not answering anymore?  Yes."

1        And then the CI says, "Is he even making

2   money with any other work?"

3        So again, a real excellent question, you

4   know, that the CI's asking here, "What other criminal

5   activity's he doing?"  And look at the answer, "Nope.

6   He sold it, and that was all."

7        So I can't tell you exactly when he quit, but

8   he quit sometime in 2016.  And I'm going to suggest

9   that's exactly consistent with the plea agreement.

10  You know, the plea agreement, the parties agreed on

11  this time period, and then here you got this that the

12  guy who brought him in to the -- to the 18-81 case,

13  the RICO, the guy I suggest to you was working under

14  in the RICO case is telling the CI, Hey, man, he quit.

15  Last year he sold his trick for $6,000.  He went dead.

16  He's done nothing else.  He won't return calls, and

17  he's angry over Mitan quitting.

18       So -- and these types of cases realistically,

19  you know, you're not going to have a sworn affidavit

20  saying, "I hereby withdraw from the criminal

21  activity."  But this in fraudster's lingo I'm going to

22  tell you is tantamount to that affidavit.

23       I really think I have, you know, stronger

24  evidence based on these three points that he withdrew

25  from the conspiracy than you can make the argument

1 that he didn't withdraw from the conspiracy.

2        Again, the time period agreed upon by the

3 parties, no more activity that was outside that time

4 period.  And then, and then this Jabber chat with his

5 boss, or at least his recruiter.

6        All right.  Next slide.

7        So this is a -- I don't know if this is

8 exactly the same document the government showed.  This

9 is the similar one that's in discovery.  This talks

10 about the loss amount from each one, and I won't say

11 much about this 'cause we kind of covered it.

12        Go ahead, the next slide.

13        This one is -- I'm not sure the same thing.

14 I think another one -- there was some that was

15 redacted or marked out.  This one's -- but the figures

16 are the same.  Something that's already covered under

17 the testimony of Agent Moore.

18        I'd just point this out, that Mitan's success

19 and the amount of money sent to Mitan is substantially

20 less than anybody else involved in 18-81.  That's on

21 this chart, and the judgment ought to reflect that.

22        Next slide.

23        Judge, there's a couple of these documents in

24 discovery.  This one has an $81,000 figure that they

25 used the -- you know, the term "tainted bitcoin

address."  Again, the government can't trace and say for sure that all $81,000 come from fraudulent activity.  Clearly, some of it did.  There's a figure at the end in another one of these type documents that shows that being $91,000.  So I'm not, I'm not exactly sure why there's a $10,000 difference, but anyway, it's something.  That's the two figures I've seen for those bitcoin accounts.  This one says $81,000.  The other one says $91,000.

And you can see here, even though the other figures aren't highlighted, his is substantially less than everybody else involved.  Again, it's 18-81.

All right.  Next slide.

All right.  So that's my presentation on the 18-81, 18-85 -- or 18-05.  A lot of it was covered in that Secret Service memo, so there's not a lot to add on the 18-05, but still here's the additional part.

Next slide.

So this is the plea agreement.  This is what the parties agree to under the brute force attack, which is 18-05.

Next slide.

And these are what I think were the important parts.  Again, they're consistent with what we've talked about.  The parties agreed that in February 20

1  and 21, there was about $61,000 taken from FTFCU.
2  And, judge, almost to the penny, the government's
3  verified that with the $60,000 and some odd dollars,
4  so I agree with that.
5          $9,840 as indicated in the Secret Service
6  memorandum that went through Mitan.  The other parts
7  did not go to Mitan of the $61,000.
8          And then I think in terms of the 16,000
9  credit cards, you know, I thought it was pretty
10 remarkable that no amount of loss is stipulated here
11 'cause I don't think there was much loss, or they had
12 a hard time tracing any loss on those cards.
13         All right.  The next slide.
14         Then we slip over to the third case, which is
15 20-04, the case out of North Carolina.
16         Next slide.
17         Here again is the plea agreement what the
18 parties agreed upon.
19         Next slide.
20         And here's the two parts that I thought were
21 important.  The parties agreed that there were 2,130
22 debit cards compromised in some way.  And that ten
23 federally insured financial institutions suffered some
24 pecuniary harm from the conspiracy.
25         All right.  Next slide.

1           All right.  So, judge, this is where I think
2    it gets interesting.  I went back and checked.  And so
3    if you remember, Mitan or -- yeah, Mitan's case out of
4    North Carolina is 17-17.  So look at this.  This is
5    17-16.  It's another Romanian on Preda, exact same
6    charge, bank fraud conspiracy, 18:1349, date of the
7    offense is exactly the same as Mitan's, October 2010.
8           So this is clearly a related case, a
9    defendant really involved in the same criminal
10   activity, but he's not named in Mitan's indictment,
11   again, which is the next one, case number 17-17, but a
12   related case, participant just like Mitan in the same
13   conduct.
14          Next slide.
15          So here's his judgment -- or the imprisonment
16   part of his judgment.
17          Next slide.
18          I magnified it for you.  So he got time
19   served was the sentence that the judge out of North
20   Carolina handed downed for his role in the same thing
21   that Mitan did.
22          Next slide.
23          Now, judge, if I'm wrong about this, I'm sure
24   the government will tell me, but here are nine banks
25   that are identified.  And I figure these were nine of

1  the same ten banks that is agreed to in Adrian Mitan's

2  plea agreement.  And so we see that restitution's to

3  be determined.

4          All right.  Next slide.

5          Here comes the restitution order.

6          All right.  Next slide.

7          Victims were identified on the judgment, and

8  that goes back to the nine banks.  However, a final

9  loss amount was never determined.

10          Next slide.

11          Restitution is determined to be zero.

12          So your counterpart in North Carolina

13  considering Preda's involvement in the same criminal

14  activity as Adrian Mitan reached two conclusions, one,

15  time served, adequately punished him, adequately

16  addressed 3553(a), and no restitution.

17          So, you know, based -- that's why I'm not

18  aware of any loss, even though the plea agreement --

19  and, you know, you make some common sense, there would

20  have to be some loss, but I don't know what it is

21  specifically in terms of dollars and cents when it

22  comes to 20-04.

23          All right.  Next slide.

24          All right.  Judge, so that's my presentation

25  on the amount of loss.  Next we go over to the two

1   levels for leadership aggravating role.

2          Next slide.

3          And probation is here.  If I got this wrong,

4   I sure apologize.  I tried to get everything the best

5   I could.

6          But this slide, I believe, is their basis for

7   assessing the two-level increase.  After retrieving

8   the cash from ATMs, the defendant's co-conspirators

9   converted the money to bitcoin or otherwise -- and I

10  think this is the key part -- and at the direction of

11  the defendant, transferred the money overseas where

12  the defendant resided.

13         So what I understand is the two levels got

14  assessed for this conduct in 18-05, not the other two

15  cases.

16         THE COURT:  And I believe that's the

17  government's position, right; it's not in 18-81,

18  correct, Ms. Anderson?

19         MS. ANDERSON:  Yep.

20         THE COURT:  Okay.

21         MR. COFFEY:  And that's what -- I got from

22  the probation officer's response.  I believe that this

23  is what they're talking about.

24         All right.  Then the next slide.

25         This will be our response to that, and that

is his activity in 18-05 was largely over two days.
It involved, you know, 37 cards, 21 that turned out to
be valid, for no more than $9,480.

Mitan had supervisors.  He wasn't the one in
Constanta running this operation.

And another thing, judge, I'd point out,
everybody had a role.  I don't know who assigned the
roles.  I'm not here to tell you Adrian Mitan assigned
the roles, but I think the government would agree that
he's not the leader of 18-05.  There's others over
him.

So this happened, you know, happened, so --
you know, such a limited amount of times, that it
didn't seem to me that it would be proper to assess a
two-level increase when this is really what we're
talking about, just a, primarily a two-day period of
time substantively.

All right.  Next slide.

The third objection, which is the objection
to sophisticated laundering, two-level increase.

Next slide.

I didn't highlight it, but the third
paragraph down is the -- I believe is the government's
basis, which is -- goes into the layering for the
sophisticated laundering, namely the United States

1  co-conspirators converted the money stolen from
2  victims into bitcoin to transfer to Mitan.  Mitan
3  posted the Google Sheet spreadsheets to the bitcoin
4  address to which he wanted the bitcoin sent.  The
5  co-conspirator then sent the bitcoin he converted for
6  Mitan to the bitcoin addresses Mitan had provided.
7  And Mitan then transferred his bitcoin to another
8  co-conspirator located outside the United States, and
9  then that co-conspirator would exchange the bitcoin
10 into fiat currency.
11        So since this thing has multiple layers, this
12 scheme, they've assessed a two-level increase for
13 sophisticated laundering.
14        Next slide.
15        So I'd point out here again what you've
16 already seen is that Mitan's role was limited,
17 substantively I've seen was following in these dates
18 in May and July of 2016.
19        Next slide.
20        Here back to the Secret Service memo, two
21 wires have been identified that were sent, but ended
22 up with Mitan.
23        THE COURT:  Now, are those, are those, are
24 those 18-81 facts or 18 -- those are 18-81 facts.
25        MR. COFFEY:  These are 18-81 facts.

1           THE COURT:  Okay.  Yeah.

2           MR. COFFEY:  Yeah, you can tell by the

3  fictitious vehicle reference.

4           THE COURT:  Yeah.

5           MR. COFFEY:  And then the other thing I'd

6  point out, there is a little bit, I'd argue,

7  double-counting here, or at least overlap.  He got a

8  two-level increase for a substantial part of the fraud

9  occurring outside the United States.

10          And then, then probation points out that this

11 layering involved activity that for one of the layers

12 was outside the United States.

13          So that factor in part has cost him four

14 points where it probably ought to cost him two.  But

15 the main argument is how little he did it, and that

16 again, these roles were devised by somebody other than

17 Adrian Mitan.

18          All right.  So, judge, that is the objections

19 next slide.  That is our response in support of the

20 objections to the PSR.

21          These last set of slides I guess really are

22 more of a variance in terms of what the final judgment

23 should be, and it's really a comparison of what he did

24 compared to the other defendants.

25          THE COURT:  And if you want, you can make

that now if it makes sense if that's all you have on
the objections 'cause I'm sort of staggering the
hearing.  I'm trying to get all the objection argument
made.  We're going to take a break.  I'm going to rule
on those.  And then we'll come back and go through the
balance of the sentencing, including consideration of
any variance.

So happy if you're rollin' and you want to
keep going now, that's fine.  If you want to wait and,
you know, kind of see where the post-objection things
are, then you can pick back up, that's fine, too; it's
up to you.

MR. COFFEY:  I'd want to use the PowerPoint
if we come back.

THE COURT:  Sure.

MR. COFFEY:  What's your preference?

THE COURT:  It's your presentation.  I just
want to give you the option.

MR. COFFEY:  Okay.  We're about finished.
I'll just go ahead and go on.

THE COURT:  Okay.  Very well.

MR. COFFEY:  Okay.  So the next slide.

This is paragraph 17 from the PSR.  Again,
this is not on the disk.  And we added the last
column.  So the categories for columns of the

1  defendant, offense dates, loss and restitution all

2  come straight from the PSR.  Then the column that says

3  "sentence" is what we were able to determine when we

4  put this together.

5         So you see Nedelcu got a sentence of 82

6  months, Cernak got 50, Paiusi got 31, Badea got 40

7  months.  The rest are pending on this page.

8         Next slide.

9         And I draw your attention -- some of those

10 that I already named off had pretty sizable loss

11 amounts, but on this slide, Arvat and Dobrica had the

12 exact amount of loss that Mitan has, and that's 30 --

13 and Arvat got a sentence of 30 months, Dobrica got a

14 sentence of 37 months.

15        I don't know a lot about their cases, but I

16 couldn't imagine that they did less than Adrian Mitan

17 did in 18-81, at least those other charts always

18 showed him being the lowest player.

19        Even Ybarra there at the bottom of the page

20 got a sentence of 45 months for his role.

21        Next document -- or next slide.

22        So, judge, this is the last document.

23 There's several slides.  So what this is, is a DOJ

24 document to their counterpart over in Romania where

25 they're wanting assistance in executing some seizure

warrants, and they go through and they describe the
amount of money that went through each defendant's
bitcoin account.

        And you'll see Mitan's again is substantially
less than all the other defendants named in this
document, and I would suggest his judgment should
reflect that.

        Next slide.

        This just identifies the individuals that are
part of this document that they're wanting the
warrants served on.  We highlighted Mitan in green so
he'd be easy to spot.

        Next document.

        All this comes out under a heading called
"Additional Facts" where they go through what each --
the bitcoin accounts of each defendant basically.

        Next slide.

        And so I've highlighted in yellow, judge --
because we can do this quickly -- I've highlighted in
yellow two -- the two dollar figures, the two amounts
for each one of these defendants.  The first figure
was what was processed through the CI in Mitan's case
personally.  That's roughly $27,000; it's $26,862.

        Then here you see the figures, that $91,000 I
was talking about.  In that other chart it showed it

1  at $81,000.

2          So everything that went to his account,

3  everything that went through his bitcoin addresses

4  comes to $91,877, so we'll round that off at $92,000.

5  And everything that went through the confidential

6  source here is $27,000.

7          Now, again, this is just some comparison of

8  what he -- you know, what the U.S. put together

9  pertaining to Mitan versus all the other defendants.

10          Next slide.

11          And I'm not familiar with these Romanian

12  names, so I'll probably butcher them.

13          But Stoica, everything that went through his

14  account is almost $7 million.  The amount processed by

15  the confidential source was $827,000.

16          Next slide.

17          Grama.  What was processed by the

18  confidential source was $638,000.  Everything that

19  went through his account, slightly over a million.

20          Next slide.

21          Dobrica.  Again, who we would say was the

22  recruiter and supervisor of Mitan.  $26,000 processed

23  through the confidential source.  $328,000 through his

24  bitcoin addresses in total.

25          Next slide.

 1          Ciabanu.  Confidential source processed
 2  $34,000 and total for his bitcoin addresses was
 3  $525,000.
 4          Next slide.
 5          Cernat.  Confidential source processed
 6  $139,000.  And then in total from all his accounts,
 7  $351,000.
 8          Next slide.
 9          Ion.  Confidential source processed $218,000,
10  and then in his total amount in his bitcoin address is
11  $735,000.
12          Paiusi.  Confidential source processed 151,
13  almost $152,000, and then everything in his bitcoin
14  address was $759,000.
15          Next slide.
16          Badea.  The confidential source processed
17  $92,000.  Everything that went through his account
18  totaled almost $1.7 million.
19          Next slide.
20          Oltaneu.  Confidential source processed
21  $58,000.  Everything that went through his account,
22  $208,000.
23          Ologeanu.  Next slide.  $267,000 went through
24  the confidential source.  $4,666,000 in total went
25  through his account.

1    Popescu.  A total of 12 million -- over $12.5
2 million went through his account.
3         Next slide.
4         Arvat.  Again, Arvat is the one who got a
5 sentence in the 30-month range.  $334,000 went through
6 an account.
7         Next slide.
8         Calin, $855,000 went through his bitcoin
9 addresses.
10        And Nistor.  And I wasn't sure if this was a
11 typo or not, $53 million; was that right?  I don't
12 know.
13        THE COURT:  He was an exchanger.  I don't
14 know.
15        MR. COFFEY:  Okay.  $53 million, it says, and
16 then they identify two specific addresses for
17 $560,000.
18        And then the last slide of the presentation,
19 and we highlighted it there in green, judge.  I don't
20 think there's any way you slice it, particularly on
21 18-81, Mitan had a very limited role, really would be
22 arguably entitled a two-level reduction for a minor
23 role, compared to what everybody else did, but he
24 didn't negotiate that in his plea agreement so I don't
25 guess I can ask for it.

1        But I thought this chart again, put together

2   by the U.S. is pretty telling when it comes to his

3   amount of fraud and this case, it is very little

4   compared to the others, and that's why I say it was a

5   sentence of 36 months is the right sentence.

6        THE COURT:  All right.  Thank you.  Anything

7   else on the objections?

8        MR. COFFEY:  No, sir.

9        THE COURT:  All right.  Ms. Anderson, or,

10  Mr. Taylor --

11       MS. ANDERSON:  Thank you, Your Honor.

12       THE COURT:  Just on the objections.

13       MS. ANDERSON:  Just on the objections.

14       I'd just like to run through this PowerPoint

15  and explain to you why these are -- these slides are

16  misrepresenting the facts.

17       Again, the -- well, first, talking about the

18  plea agreement, the dates of the plea agreement list

19  from at least May 11, 2016, until at least July 2016.

20  Those were specifically chosen to allow for the United

21  States to put on evidence that this defendant's

22  activity was outside of those dates.  Those dates were

23  specifically chosen because that was the conduct with

24  EDKY, and as all presentation of evidence made clear,

25  the defendant's conduct was broader than that.

1          So if we're going to highlight the language

2    of the plea agreement, it's important to also focus on

3    the fact that those dates were not limited.

4          As I stated earlier, the Secret Service

5    memorandum was specifically put together for my

6    benefit for my ability to write up an indictment.  It

7    was handed over to defense as a bit of a primer on

8    what they were getting into.  It was available before

9    the rest of discovery, which is why it was

10   sequentially noted as 01.

11         To rely on something like that, it would be

12   like to rely on the preamble to a book, especially

13   considering that at the time that that was written, we

14   had not done a deep dive into Adrian Mitan's conduct

15   further than necessary.

16         And secondly, we didn't have any of the

17   devices that are at issue with the brute force attack.

18   We knew he conducted these two 'cause -- the two

19   attacks because he talked about them.  We knew that he

20   did this routinely because he Team Viewed with us

21   about all of his abilities to manipulate the cards.

22   But it wasn't until we got his devices, which happened

23   later, that we were able to get a better sense of the

24   scope of his brute force attack.

25         What's more, this Agent who wrote this is no

1  longer in this office and no longer connected to the

2  investigation.  He was not part of any supplemental

3  investigation in this defendant, and so to not -- to

4  rely on this is really to, to just stop looking at the

5  evidence as of the date of indictment.

6          And, of course, we gathered so much more

7  during the search of the defendant's residence and the

8  accumulation of his electronic devices.

9          The defense attorney quotes from the

10 affidavit in support of a preliminary judgment of

11 forfeiture.  He states that $10,820 was the loss.

12 That was not the loss.  That was just what he -- the

13 defendant recouped.  The loss was obviously much

14 bigger because the victims paid more and a cut was

15 paid out.

16          He also repeated the same claim as to the

17 next paragraph, the $5,611 worth of bitcoin sent to

18 the defendant.  Of course, that's not the loss; that's

19 what the defendant earned off of it.  The loss was at

20 least $61,000, so those are inaccurate representations

21 about what the affidavit states.

22          This conversation with IDL100 that the

23 defense poses as a representation that the defendant

24 has withdrawn from the conspiracy is incredibly

25 skewed.  The defendant --

 1              THE COURT:  Well, where are you?  Which --
 2    this is a --
 3              MS. ANDERSON:  I don't know.  There's no page
 4    numbers on them, so I cannot tell you that, but it's a
 5    Jabber chat where he proclaims this is the point of
 6    withdrawal from the conspiracy because IDL has said
 7    that they've gone silent.
 8              THE COURT:  Yeah, I remember.  I just want to
 9    find it before you talk about it.
10              Can you pull that one up, Mr. Coffey, or ...
11    It would have been helpful to have page numbers.
12              Okay.  I've got it.
13              MS. ANDERSON:  Okay.  Thank you.
14              THE COURT:  Go ahead.
15              MS. ANDERSON:  And so if you -- the defendant
16    and IDL100 had a substantial falling-out.  This is not
17    a fact of dispute.  The falling-out is what led to the
18    IDL saying, "He has gone silent."  And if they fell
19    out and the defendant is no longer talking with
20    Nedelcu, how would Nedelcu know if he was continuing
21    on with the online auction fraud?
22              Well, we know that he was because as we
23    showed in Exhibit 1K-2, he's still trying to get us to
24    work with him on online auction fraud that took place
25    three months after this conversation.  It's just not

1   happening with Nedelcu, which also undercuts the

2   defendant's argument that Nedelcu was somehow his

3   supervisor because clearly, he was able to operate

4   without Nedelcu's oversight.

5           So this, this conversation taken out of

6   context misrepresents what was actually going on with

7   the relationship between Mr. Mitan and Mr. Nedelcu.

8           The defendant -- the defense attorney also

9   makes an argument that the additional money through

10  the defendant's tainted bitcoin accounts could not be

11  traced to fraud.

12          The charge against the defendant includes a

13  money laundering charge, and this item that is the

14  bitcoin address was used as a facilitating property of

15  the money laundering.

16          So while the testimony today from Sergeant

17  Moore was that this money was almost certainly from

18  fraud, even if it wasn't, his commingling legitimate

19  with illegitimate bitcoin is an element of money

20  laundering.  It is something that defendants use

21  frequently in order to obfuscate the source of funds;

22  that's concealment.

23          So even taking that argument as being true,

24  which we don't believe it is, it still shows that the

25  amount of loss through that tainted bitcoin address

should be included in the loss amount, his individual

loss amounts.

The defense also put forth an argument that
the plea agreement factual recitation was detailed and
we did not stipulate a loss amount and -- as to the
individual cards.  That is because at the time this
plea agreement was entered, we believed the commentary
to the guidelines to be operative.

According to our perception at the time, the
loss amount was baked into this plea agreement at
16,000 times $500 per card.  There was no need to
stipulate further how much money was -- would be at
stake and the loss amount here.

That is also the case with the Western
District of North Carolina case who is -- and, of
course, they are not bound by the *Ricardi* case out of
the Sixth Circuit case, so that would still apply to
their investigation.  It's in the Sixth Circuit; I'm
not arguing against that.  I'm just explaining for
Your Honor's benefit why the loss was not baked into
this factual recitation.  It was just an unnecessary
endeavor.

It became necessary prior to this sentencing
hearing, at which time we sent out trial subpoenas in
order to get more data to show that not only that he

possessed 16,000 credit card codes, but that a lot of them were used to steal money from victims.  There is evidence of that that we put on today based on a sampling that we were able to connect to specific financial institutions.

The use of the Ion Preda matter as an exemplar for how this Court should sentence is incredibly misleading.  There are certain facts about that case that made the judgment the way that it is. Those facts have not been put into the record here today, and I can, I can explain a little bit more at the bench if Your Honor would like, but this is not in any way an analogous similarly-situated defendant to Mr. Mitan, and therefore, is irrelevant to when we're talking about comparative culpability.

What's more, that defendant, if connected to Adrian Mitan, only relates to the Western District of North Carolina case, not to the other two cases that are before Your Honor.

The defendant's leadership role is not constrained to just his role in directing domestic processors, which he did do and is sufficient.  There is also evidence that he had individuals -- well, it is that, but the testimony of Sergeant Moore was also that there was an individual out in Oregon who the

defendant referenced in chats who was arrested for --

at an ATM.  So there's a specific investigation

connecting the defendant to somebody who worked for

him, and ended up sending the proceeds back to the

defendant to his bitcoin address.

Again, this is some more evidence of

fraudulent money going to the defendant's bitcoin

address outside of the Eastern District of Kentucky.

The defense attorney also put on the argument

that the defendant's brute force conduct is limited to

the two instances mentioned in the investigative memo

that was prepared for me in preparation for the

indictment.

The evidence today was very clear that the

defendant's history of intrusion dates back well

before this, as early as 2007.  The evidence

specifically to individuals who lost money, it's --

the evidence today was that it was from 2015, which

is, of course, outside of these dates, so there is

substantial evidence that the defendant's conduct is

not limited to these two intrusions.

The defendant -- the defense attorney has put

forth this argument that the laundering is not

sophisticated -- or that the factor of sophisticated

laundering that concentrates on offshore transfers is

1  double-counting.  That's sort of misrepresenting what

2  the offshore element -- how it applies to the

3  guideline.  The guideline for sophisticated laundering

4  is simpler.  There was sophisticated conduct that

5  then, you know -- I think it was sophisticated as to

6  the concealment, then you add a two-point enhancement.

7          The commentary gives a list of factors that

8  should be considered when the Court is determining

9  whether it's sophisticated.  That some of the layers

10 occurred offshore in no way double-counts from the

11 fact of the enhancement on the 2B1.1 side, which is,

12 you know, a substantial portion of the conduct takes

13 place offshore.  It's simply something mentioned in

14 the commentary.  If Your Honor felt like it was

15 double-counting, you could certainly rely on the

16 multiple layers of laundering activity to justify that

17 enhancement.

18         THE COURT:  If the, if the only basis for

19 sophistication finding was the extra-territorial

20 nature, that might be problematic; you agree with

21 that?

22         MS. ANDERSON:  Your Honor, I believe that the

23 PSR lays out a lot more details about the --

24         THE COURT:  I said "if;" I said "if that were

25 the only basis."

1          MS. ANDERSON:  Oh.  If it was the sole basis

2     that money was sent offshore?

3          THE COURT:  Yeah.

4          MS. ANDERSON:  That -- maybe.  But that

5     isn't -- first of all, it's not the case here.

6          THE COURT:  I understand your argument.  I

7     understand.

8          MS. ANDERSON:  The comparative analysis

9     provided as to the other defendants, what is

10    interestingly missing from here is the guidelines

11    calculations for these defendants, as well as their

12    criminal histories.  This defendant stands alone in

13    having a United States criminal history, which makes

14    the, you know, the comparative sentences a little

15    misleading.

16         Additionally, there was sort of a statement

17    that he could -- that the defense attorney could not

18    imagine that Dobrica and Arvat did less than this

19    defendant.  They were money mules, essentially

20    butlers, the lowest on the totem pole, so that

21    statement is inaccurate.  The relevant culpability of

22    Mr. Mitan would be substantially higher than Mr. Arvat

23    and Mr. Dobrica.

24         The use of our INLAT request is also

25    premature.  We -- that INLAT request was made before

we had the defendant's devices and had a chance to
take a deep dive in those and use that as evidence to
limit the loss again is like relying on the preamble
to a book and creating your outcome.

I think that, Your Honor, is all that I have
in the commentary to the defendant's arguments.

Our position on loss amount, while
complicated, ends up in the same place as the PSR's,
and that is that the defendant should be apportioned a
loss amount starting at $45,000 a month starting from
the month that he joined the conspiracy, and lasting
for the duration.

As we pointed out, the conduct -- this
defendant has not -- or never exhibited a withdrawal
from the conspiracy.

Secondly, we would add to that the amount of
money that flowed through his tainted bitcoin
addresses.

And thirdly, add to that an approximation, a
generous approximation of $500 per card for the credit
cards found on his devices.

The problem in *Ricardi* is that the
prosecution failed to put on its evidence to support
that money had actually been taken out, and that the
money -- that $500 was a reasonable estimate.  And

1    here we've done that.  We put on that we got trial

2    subpoenas to -- of a sampling of the cards found in

3    the defendant's possession, and found that a $500

4    average is actually generous.  It actually should be

5    higher.

6            So that the guideline commentary, I think,

7    should be used to -- for Your Honor as a sort of sense

8    of what the Sentencing Commission was thinking about

9    access devices and how there should be an

10   apportionment loss, but should rely on the evidence

11   presented today to go ahead and apply a $500 per card

12   assessment.

13           And we have even pointed out in our

14   sentencing memo that giving the defendant credit for

15   maybe some of those cards being invalid, we still get

16   to that point.  Giving him credit that more than half

17   of those card numbers were invalid, you still get to

18   the loss amount that requires an 18-level increase,

19   and that is without the online auction fraud total

20   losses.

21           As to the sophisticated means enhancement,

22   Your Honor, the money laundering conduct as to the

23   brute force attack was layer after layer after layer

24   of activity that required a very connected group of

25   individuals coordinating their activities down to the

 1  minute.  I mean, you saw in those -- the chats how

 2  vital the quick communication, coordination and

 3  direction that needed to take place in order to get

 4  money off of those cards.

 5       THE COURT:  Can you count the layers for me?

 6  On a typical transaction, how would you itemize each

 7  transaction that would be a layer?

 8       MS. ANDERSON:  If Your Honor would permit, I

 9  can put -- pull back up Exhibit 3B and use that as a

10  guide to go through that argument.

11       THE COURT:  Okay.  All right.

12       MS. ANDERSON:  3B was prepared by the

13  testifying witness.

14       And essentially after the brute force attack

15  takes place --

16       THE COURT:  Hang on.  Wait for the shared

17  cord.

18       MS. ANDERSON:  It's okay.

19       THE COURT:  Sorry.  It's a time of scarcity

20  in the federal court, so one HDMI cable's all we could

21  afford.

22       And it's sophistication in the laundering or

23  execution?

24       MS. ANDERSON:  Yes, correct, Your Honor.  And

25  it's not limited to just the defendant's conduct, but

1  to the conduct of the operation.

2        So if you look at Exhibit 3B --

3        THE COURT:  Sorry, execution or concealment.

4  Go ahead.

5        MS. ANDERSON:  Yes, that's correct.

6        If you start off after the bank card codes

7  had been sufficiently phished so that there's enough

8  to create debit card clones, the defendant had to send

9  the track data to a cooperating witness who had to set

10  up in place in the United States individuals who could

11  take those card numbers, use an MSR to re-encode dummy

12  cards.  Those people then had to --

13        THE COURT:  MSR stands for ...

14        MS. ANDERSON:  Magnetic strike reader.

15        THE COURT:  And so it says "reader," but it's

16  actually --

17        MS. ANDERSON:  You can actually write with it

18  as well.

19        THE COURT:  Okay.  All right.  Go ahead.

20        MS. ANDERSON:  And so they re-encode a new

21  card.  Then they go to ATMs and they have to use that

22  card and know the PIN in order to withdraw funds.

23  They then withdraw the funds.

24        THE COURT:  Is that, is that a layer or that

25  just part of the crime?

1          MS. ANDERSON:  Oh, no, no, no.  The crime has
2   ended once they have procured all of the track data
3   necessary to re-encode cards.
4          THE COURT:  Okay.
5          MS. ANDERSON:  So we are at a subsequent step
6   in the process.
7          So they -- re-encoding takes place.  The
8   defendant -- or somebody that's working at the lowest
9   level uses the ATM card, so they have to insert the
10  ATM card, request an amount, put in the PIN, get that
11  money.
12         THE COURT:  Okay.
13         MS. ANDERSON:  They then take out cash and
14  convert it to something like a money order or gift
15  card, something like that so it's converted into
16  another format.  That money -- or, or it remains in
17  cash, so it's a number of different things that can
18  happen at that point.
19         But those, those funds, in whatever form that
20  they are, are then sent back to the confidential
21  informant.  The confidential informant then uses that
22  money to convert -- to purchase bitcoin, and then the
23  bitcoin that is the resulting proceeds are then --
24  have -- are then required to be transferred over to
25  Romania where the defendant is residing.

1          At that point, he can either use, you know,
2    the cryptocurrency at a retail outlet where they
3    accept it, but more often than not, it is then pushed
4    through some sort of exchange, or a money transmitter
5    in order to turn that back into fiat currency.
6          So we have -- in this entire scheme you have
7    money changing forms, changing methods of payment on
8    numerous occasions, and there are also layers and the
9    number of people required to accomplish the whole
10   scheme.
11          THE COURT:  Okay.
12          MS. ANDERSON:  Okay.  And then finally the
13   leadership role.  Obviously, the defendant told the
14   confidential informant that he had teams working for
15   him, so we have his own statements.
16          I think that the defense has sort of alluded
17   that at times he's boasting, and that we can't have --
18   we did not have eyes inside of his operation to know
19   how many people were working for him.  What we did
20   have eyes into was how many people it takes to
21   accomplish this money laundering scheme, and each one
22   of those people has to be directed by the person above
23   them.  You don't get debit card codes unless the
24   defendant has sent them to you.  And then you are
25   required to go to certain ATMs in certain locations

1  using information provided by him, and then you get

2  the proceeds back to him in a certain format to a

3  certain location as he directed.

4          So the -- it is almost necessary for -- in

5  order for this scheme -- it is necessary for this

6  scheme to work to have people working for the

7  defendant at his direction in order to get the money

8  back.

9          THE COURT:  Now, who, who in 18-81 has gotten

10 a role adjustment up, just Ybarra?

11         MS. ANDERSON:  No, I don't think that's

12 correct, Your Honor, and I think that there are some

13 that are on deck that have --

14         THE COURT:  Up to now I mean?

15         MS. ANDERSON:  I do not know who all.  I

16 don't know that answer.

17         THE COURT:  Nedelcu did not?

18         MS. ANDERSON:  Nedelcu did not.

19         THE COURT:  Brown did not, right?  Is that

20 right, Callie?  I'm asking.

21         MS. ANDERSON:  You're telling me that.  I

22 don't -- I believe you if it's coming out of your

23 mouth.

24         THE COURT:  Well, I'm half-telling,

25 half-asking.

1         So I guess my question is this:  The U.S., in
2  response to the objection, Ms. Mersch said, "We agree;
3  it doesn't apply in 18-81."  He said this stuff about
4  having 10 or 15 people working, but he was, you know,
5  puffing to make himself look good, make himself look
6  more serious, so it doesn't apply.  But, but it
7  clearly applies in 18-5.  And you said, you know,
8  logic says that and -- but, but never really detailed
9  who is he, who is he make -- who does he have
10  decision-making power over, who is it, and how do you
11  distinguish what he was doing in 18-81 in this area
12  from what he was doing in 18-5?
13         MS. ANDERSON:  Titus Priden is a very real
14  example.  Titus Priden is the individual out in Oregon
15  was arrested for withdrawing funds from stolen cards.
16  He works, as the testimony talked about today, he --
17  we -- there was evidence linking the two.  I don't
18  think the defense is stating that it doesn't, and the
19  arrest of Titus Priden and the review of his devices
20  all show that he was working for and at the direction
21  of Adrian Mitan.  That was in a brute force attack
22  case.
23         The way that the Portland PD -- the Beaverton
24  PD even came upon that case is they were watching
25  these withdrawals from an intrusion, and they then

1  went to the ATMs where they were located and saw Titus

2  Priden got his devices, and the devices connected him

3  to Adrian Mitan.  I'm sure that he's working for him.

4          So Titus Priden was -- your question was who

5  was working for him.  There's a name for you.  But

6  there were a lot of others as indicated in the Jabber

7  chats, and as represented by the confidential

8  informant and Dimitrious Brown, who the defendant

9  admitted to working with in his plea agreement.

10          Titus Priden was also arrested alongside

11  another Romanian gentleman who was also involved in

12  pulling out ATM withdrawals based on an intrusion

13  linked to the defendant.

14          THE COURT:  Okay.

15          MR. ANDERSON:  So the two-point leadership

16  enhancement is the lowest level of the three levels

17  that are applicable, and it certainly fits the

18  circumstance for 18-5, which is where we are relying

19  on our argument, is on 18-5.

20          THE COURT:  All right.  What else,

21  Ms. Anderson?

22          MS. ANDERSON:  Your Honor, I think that's

23  everything.

24          THE COURT:  Now, are you, are you going to

25  leave after this point?

1          Here's why I'm asking.  In your memo -- I
2  just want to be sure I understand your position.
3  You'll get to make your argument on the specific, or
4  Mr. Taylor can, but at various points in that memo you
5  say "low end," you say "middle end," you change the
6  guideline calculation; it's different at the end than
7  it was about at the beginning.  I just want to give
8  you a chance to say your kind of coherent posture on
9  where ...
10          MS. ANDERSON:  Yes, Your Honor.  That was a
11  typo.  I have written 22 sentencing memoranda in the
12  last month, and so that was a typo.
13          Our position is as it's stated in the opening
14  paragraph, a level 34, Category III, guidelines range
15  188 to 235, and it's our position that he should be
16  given a low end, but guideline sentence.
17          THE COURT:  Okay.  All right.  Thank you.
18          Mr. Coffey, anything else you want to say on
19  the objections?
20          MR. COFFEY:  No, sir.  Thank you.
21          THE COURT:  All right.  So we've been going
22  another two hours.  I know everybody could use a
23  break.  And it's going to take me a longer time now to
24  go through and formulate my rulings on the various
25  objections.

1          So why don't we break until 2:30.  Come back
2   then, I'll announce my rulings, and then we'll take up
3   the balance of the sentencing at that point.
4          So we'll be in recess until 2:30.  Thank you.
5          [RECESS — 1:07 — 2:30 p.m.]
6          [IN OPEN COURT]
7          THE COURT:  The only thing better than
8   carrying a bunch of things to a hearing is being given
9   two other big things at the hearing.
10          The defendant's not in yet?
11          COURTROOM DEPUTY:  I called the marshal;
12   they're supposed to be bringing him in.
13          MR. TAYLOR:  Your Honor, before we begin, I'd
14   like to move the Court to redact or seal --
15          THE COURT:  Will you just wait till
16   Mr. Mitan's in here.  I don't want to do anything ...
17          MR. TAYLOR:  Oh, I'm sorry.  I didn't realize
18   he wasn't in here.
19          THE COURT:  All right.  Thank you.  We waited
20   for you, of course, Mr. Mitan.
21          We're back on the record following the break
22   for the Court to consider the objections.  And all
23   counsel are present, Mr. Mitan is present.  Mr. Taylor
24   is taking over with Ms. Anderson now gone.
25          Did you want to raise something, Mr. Taylor?

1           MR. TAYLOR:  Yes, Your Honor.  It's been
2   brought to my attention that the PowerPoint used by
3   Mr. Coffey contains identifiers that would identify
4   the confidential source in this case, and it either
5   needs to be under seal or sufficiently redacted.
6           THE COURT:  That, that makes sense to me,
7   Mr. Coffey, that the public version should be redacted
8   to protect the identity of the CS.  Do you have any
9   objection to that?
10          MR. COFFEY:  No, sir.  Are we just talking
11  about the one address that's --
12          THE COURT:  The Jabber chat address.  Is that
13  the only place, Mr. Taylor?
14          MR. TAYLOR:  And there's also in the Secret
15  Service report a CI number.
16          THE COURT:  Okay.  Can -- I do think that
17  should happen.  I wonder if the parties can confer
18  post-hearing and make sure you've identified
19  everything the government has a concern about, and
20  then you can tender that redacted version.
21          Mr. Coffey, I've got the complete version
22  that the clerk has, and we'll treat that as the sealed
23  version for purposes of completeness, but then I'll
24  have you tender electronically, I'd prefer, if you can
25  do it, a redacted version that we'll make the public

1 version.

2          MR. COFFEY:  Let me suggest this:  I will --

3 we'll take the best shot at redacting everything we

4 think we should -- we can find.  I'll send that over

5 to either Mr. Taylor or Ms. Anderson, and they can see

6 if we missed anything.

7          THE COURT:  Okay.

8          MR. COFFEY:  And then once I get their okay

9 and it's clear, then I'll file it in the record.

10          THE COURT:  That'd be great.

11          MR. COFFEY:  Does that sound okay?

12          THE COURT:  Yeah.  Let's say 30 days from

13 today --

14          MR. COFFEY:  Yeah.

15          THE COURT:  -- just to give you guys plenty

16 of time.

17          All right.  Anything else, Mr. Taylor?

18          MR. TAYLOR:  No, Your Honor.

19          THE COURT:  Okay.

20          MR. TAYLOR:  Oh, I don't know if this is the

21 appropriate time, but we would move for the third

22 level for acceptance of responsibility.

23          THE COURT:  Let's wait on that.  If I forget

24 to circle back to it, I'll certainly grant that, but

25 let me, let me deal with the objections now.

1          And I appreciate the good advocacy by both
2  sides, both sides very thorough and thoughtful and
3  perceptive in the points made.
4          As I said, at a sentencing hearing under the
5  federal system, rules of evidence don't apply.  I'm
6  ruling based on reliable information.  The burden is
7  on the U.S. on the various application questions by
8  and large.
9          And so I've heard the proof, and certainly
10  considered carefully everything that's been tendered
11  today.  It's -- each of these, each of these bitcoin
12  sentencings is like, you know, the people who try to
13  go around the globe and climb all of the seven highest
14  peaks, whatever.  Each one is like another, you know,
15  K2 coming up.  And Mr. Mitan probably gets the Everest
16  designation because he's three and one, so everyone's
17  a heavy lift, and I appreciate the good organization
18  by both sides.
19          On the, you know, framework I set up at the
20  beginning is how I'm looking at it, and that is there
21  are three, three separate convictions, really three
22  areas of distinct criminal conduct.  But for guideline
23  purposes, I'm grouping that all together because each
24  of them at its heart is, is a fraud-based act,
25  generally, generally wire fraud or bank fraud, a

1  fraud—based act designed to generate money.  And so

2  the guidelines tell me really in that circumstance

3  closely related for the type of harm at issue tells me

4  to put them all together, measure the whole of the

5  conduct really here, I mean, the whole of the loss.

6  And so they're kind of three, three hoses pouring into

7  one bucket to, to measure the ultimate loss.

8          And I would just note in the guidelines, the

9  2B1.1, of course, is getting most of the attention.

10 That's the one that applies.  2S1.1's really the

11 beginning point because of the, because of the brute

12 force crime being the driver on the calculation, and

13 so the money laundering there 'cause it's rooted in

14 fraud, points us back to 2B1.1.

15         So under that guideline, I just want to note

16 because it's really important the way the commentary

17 tells the Court to approach this idea of loss, and I'm

18 looking at Application Note 3.  It says, "This

19 application note applies to the determination of loss

20 under subsection (b)(1), general rules subject to

21 exclusions, loss is the greater of actual loss or

22 intended loss.  And actual loss is the foreseeable,

23 reasonably foreseeable pecuniary harm that resulted

24 from the offense, the actual loss resulting.

25         Intended loss means the pecuniary harm that

1  the defendant purposefully sought to inflict and

2  includes intended pecuniary harm that would have been

3  impossible or unlikely to occur.

4       Why's that important?  It's important because

5  the measure is the greater of these two, and it's not,

6  it's not what was, what was the real harm done.  That,

7  that's one path.

8       But the other path is what, what did the

9  defendant intend?  What was the defendant's intended

10 harm here?  And that doesn't have to be possible harm.

11 It doesn't have to be likely harm.  It's what the

12 defendant intended in terms of harm.

13      Now, loss is no easy thing, and the courts

14 recognize that, and they task this Court, the trial

15 court, with making a reasonable calculation of what

16 the loss figure is.  And the guideline says –– the

17 commentary says, "The Court need only make a

18 reasonable estimate of the loss.  The sentencing judge

19 is in a unique position to assess the evidence and

20 estimate the loss based upon that evidence."  Factors

21 include, again in that commentary, the approximate

22 number of victims multiplied by the average loss to

23 each victim.

24      And, you know, we talked about the *Ricardi*

25 case and what that did to the, to the credit card,

sort of automatic calculation rule that, that
everybody thought had been in place.

I would just say incidentally, the *Ricardi*
analysis doesn't –– to me, doesn't impact at all the
rules I've just laid out on how the Court measures
loss and the approach to take.  I think the idea of
loss itself is ambiguous, and so I think the
commentary there just gives the Court guidance on how
to apply a term that has debatable meaning.  It's
debatable because, you know, a fraud effort that is
unsuccessful and causes no loss –– in theory, if loss
just means the harm actually done, then the defendant
would probably get a windfall there without any actual
loss, if that were the measure.

So I think it's reasonable for the guidelines
to say, Look, we're going to account for harm done,
we're going to account for harm that was intended to
be done as, you know, both fair ways to help measure
how loss should be defined.

So that's important here because what I've
heard Mr. Coffey do quite skillfully is really try to
kind of draw the Court away from a broad evaluation of
the conduct at issue and just get me to focus on what
Mr. Mitan himself actually did, you know, his actual
role, his actual period of activity, the measurable

harms and financial consequences of his actual behavior.

And, you know, Mr. Coffey wants me not to look at, you know, what could have been or -- some theoretical or hypothetical calculation, but what, what really happened.  And I certainly understand that, but I think the guidelines in two really important ways tell me not to get drawn into that thinking.

One is the loss that I've talked about, how loss is calculated, and two, very critically in this case, every crime Mr. Mitan's convicted of is a conspiracy conviction.  The RICO is a conspiracy.  The bank fraud is a conspiracy.  The vishing case is a conspiracy.  And so conspiracy has potentially a much broader scope than the individual actor's specific behavior, and I'm going to talk about that more in just a moment.

So on the loss buckets, here is what I would say:

Of course, under 1B1.3, which defines relevant conduct, the defendant's going to be sentenced based on the acts and omissions he committed, that he himself committed, counseled, aided, abetted, procured.  So his, his behavior is

going to be a basis for sentencing, of course; that's
always included under 1B1.3(A)(1)(a).  But (A)(1)(b)
in 1B1.3 is where the conspiracy has a dramatic effect
on the way the Court has to sentence in this case.
That guideline makes and includes within relevant
conduct in the case of jointly undertaken criminal
activity, all acts and omissions, all acts and
omissions of others that were one, within the scope of
the jointly undertaken criminal activity, in
furtherance of that criminal activity, and reasonably
foreseeable in connection with that activity.  All of
that that occurred during the commission of the
offense of conviction is included as basis for the
guideline calculation.

          So here under 18-81, of course, that's a
RICO, that's a RICO conviction, and I've said at other
points in this case, the RICO conspiracy is sort of a
super-conspiracy because of the way the law defines
"enterprise."  You know, association in fact of the
defendant, of course, has to have been convicted of
being a participant in or affiliated with that
enterprise.  He's conceded that in the plea agreement.
And a RICO conspiracy means there's an enterprise
that's running in a conspiracy based on an intended
pattern of racketeering activity, and the defendant

has conceded all of that beyond a reasonable doubt.

So that, undoubtedly, has an impact on the way I look at defining jointly undertaken criminal activity for this purpose.

Now, it's not -- a jointly undertaken criminal activity is not under *Donadeo* coterminous with the scope of conspiracy.  I have to be careful on defining the scope correctly, but the *Donadeo* case has set forth a number of things that I should consider in that record.  And Mr. Coffey's right to point to the plea agreement.  I've, I've read it so many times, I feel like I almost know it by heart.

But in the plea agreement, it's just notable to me repeatedly, and the intro says, you know, these are the facts that the defendant concedes could be proven beyond a reasonable doubt, but, but these aren't all the facts in the case.  He does concede these that could be proven at trial, repeatedly references in plural to his association with others, the involvement of others.  He worked in conjunction with others.  He posted advertisements.  He sold -- he posted for sale on websites, including Craigslist.  He took over multiple Craigslist accounts to use to post advertisements.  He and his co-conspirators, plural, convinced victims to provide payment for falsely

1  advertised goods.  He talks about laundering through

2  the CS and others in the U.S.  He provided money

3  laundering services similar to that of the CS.

4          Again, this is all language of breadth, more

5  than just my silo in the activity, it's acknowledgment

6  of the breadth of the associations, multiple people

7  involved, multiple people doing the same thing.

8  That's the nature of this enterprise that is in issue

9  in 18-81.

10         Importantly, the defendant was on both sides.

11  He was on the fraud side as a poster.  He was running

12  accounts and victimizing people directly.  He was on

13  the laundering side dealing with the CS getting money

14  washed and converted to bitcoin.

15         So looking at the *Donadeo* factors and the

16  scope definition, what am I looking at?  Well, I'm

17  looking at, you know, whether there was a singular

18  goal in the conspiracy that the defendant signed off

19  on.  Undoubtedly, with him being on both sides of it,

20  he was wholeheartedly embracing the goal of making

21  money by operation of the enterprise; that's exactly

22  what was going on.

23         Similarity in modus operandi.  They were all,

24  throughout the course of it, although it varied, you

25  know, in some of the particulars, the basic idea was

the same, you know, to advertise for goods that didn't
exist and convince somebody to buy, to see a good
deal, and say, Man, that's too good to pass up, and
send off the money, only to be disappointed later with
no, no good being delivered.  So he did that.  He was
a poster.  He was involved in Craigslist.  We've got
specific examples of him defrauding.  So certainly,
the MO on the fraud and the laundering side was very
consistent.

Coordination of activity among
co-conspirators.  There's certainly record evidence
that he was specifically involved with Nedelcu and
Brown, evidence today that he had involvement with
Filip as well.

And the Nedelcu link is important because
that did introduce the defendant to the spreadsheets.
And the spreadsheets, you know, sort of this critical
hub resource for conspirators, an easy way to track
money, to keep everybody abreast in realtime, to know
where a transaction was along the path, and the
defendant obviously jumped into that with Nedelcu and
was sharing the Google Sheets, at least for time.

That's again, part of pooling of resources
which *Donadeo* says to look at, the sheets, the network
of activities, the distinct behavior through the

1  different contacts that have been talked about on the

2  record today.

3      The defendant's scope or knowledge of scope

4  is really important.  And, you know, I don't think

5  most of the defendants, Mr. Mitan included, I wouldn't

6  say have detailed knowledge of the entire range of

7  what was going on in the conspiracy, but they all knew

8  and he knew that there were many more people doing it

9  than just himself, that they were doing the same

10 thing.  You could see from the chats that he knew

11 others were doing it.  He wanted to be involved.  He

12 talked about the roles different people had over the

13 course of time.

14      And so, you know, he wasn't in at the

15 beginning and so he's not chargeable under the

16 guidelines with things that happened before he joined,

17 but he undoubtedly knew it had a significant scope.

18 He knew the money was being generated fraudulently and

19 washed, and ultimately converted back to Europe in the

20 form of bitcoin, so he had significant knowledge, I

21 think, chargeable to him about the scope of the RICO

22 conspiracy.

23      Length and degree of his participation.

24 Mr. Coffey does a good job really hammering on that

25 and trying to really shrink Mr. Mitan's involvement.

And I think it's certainly right to point to the plea
agreement and say that's a really good source to look
to.  And I agree, I've read it carefully and
repeatedly.

It is fair to say Mitan had a temporally
smaller, shorter role than some others had.  But I
also think I have to be careful on defining that
temporal too rigidly because here -- certainly, the
plea agreement says, you know, at least by this date,
he was in, at least by this date he continued.  But
the, the Jabber traffic undoubtedly shows that he was
trying to get in in early '16.  I mean, you can't read
that Jabber chat any other way than he's trying to
figure out how do I get in on this, and he's knocking
on the door for entry in January.  Obviously in
mid-'16, he's heavily involved in it.  No question
about that.

So, you know, what's, what's the end point;
is there an end point?  And Mr. Coffey pointed to the
Nedelcu Jabber chat from '17 to say, Well, obviously
he's out because Nedelcu says he's gone dark and he's
not doing anything else.

That, that certainly is contradicted by the
spring 2017, the spring 2017 exchanges where Mitan is
specifically looking with this CI's looking for

accounts for the purpose of selling cars.  That tells
me he is actively working at that point.

Now, we don't have much else, but it's not
consistent to say he closed up shop in late '16 or
early '17, but then in the spring, he's badgering the
CI to help him with the same kind of activity.

Withdrawal from a conspiracy, you know, takes
more than just becoming quiet.  It takes -- under the
*Lash* case it takes, you know, an affirmative act to
disavow the conspiracy to stop the purpose of the
conspiracy, something, you know, concrete to indicate
that, and nothing approaching that in my view.

So I think that it's certainly fair to say
that he, he entered in early 2016.  And part of the
reason I think it's right to treat him as being
involved in it until the end, again, is the language
of the plea agreement.  This is a defendant beyond a
reasonable doubt saying the following:

"The defendant worked with European-based
members in the network, including Nedelcu, in
furtherance of the scheme, together from a period of
May 2016, until the date of the indictment for Case
18-81, which I believe was late 2018, December.
Nedelcu and the defendant are responsible for a
substantial loss for their participation in the money

laundering conspiracy related to the online auction
fraud."

So that -- in that, the defendant is
acknowledging that his responsibility, you know, runs
from that mid-2016 date till the end, I think, I think
rightly so, and so I do believe that temporal scope
covers that entire period.

Now, was, was the conduct of all of the
participants within, within the scope?  Well, I think
fairly, fairly so for the period of his involvement.
All of those there's a big integrated, coordinated set
of activities and transactions happening across the
enterprise.  They're centered on the laundering in the
Eastern District as supported in the record of this
case with the $2.7 million total amount for the known
period of conspiracy relative to this district.

So I certainly think the acts of others were
in furtherance and appropriately chargeable to the
defendant.  I also think they're reasonably
foreseeable.

Again, knowledge of other people doing the
same thing, the age of the conspiracy the defendant
was aware of, the multiple options and persons
actively involved the defendant showed knowledge of
Nedelcu.

1        Either Mitan had 20 people working for him,

2   or Nedelcu did.  And either one isn't helpful to Mitan

3   because it's a conspiracy.  And if Nedelcu did and he

4   knew about it, that just sort of gives more heft to

5   the idea that Mitan should be held responsible for the

6   acts reasonably foreseeable by co-conspirators.

7        So I'm not willing to sentence in a way that

8   ignores the fact that this is a conspiracy case in

9   18-81.

10        How to, you know, fairly calculate the

11   loss -- and I've done this before because I've already

12   said, I think the defendant is fairly chargeable for

13   participation from his entry until the end.  That

14   would be essentially how I look at it, is if you look

15   at the total $2.7 million loss, you conservatively say

16   okay, that's the total within the district

17   attributable to the full conspiracy, a 60-month

18   conspiracy, that comes out to about $4.5 -- I'm sorry,

19   45K per month as loss relating to the conspiracy.

20        So if the defendant is in for a period of

21   what essentially ends up being -- being 30, 35 months,

22   that would come out to $1.75 million.

23        If he's only in for 31 months, that would

24   come out to $1.395 million.  That'd be from the May

25   date.  I think January is certainly when he entered,

but even the more conservative May date would take him to almost $1.4.

I also think it's fair to include the tainted bitcoin.  Those bitcoin accounts were vessels for fraud proceeds that -- they haven't been shown to be anything else.  That's -- that was their use.

There's no indication that Mr. Mitan had any legitimate activity that would be the basis for his involvement with those bitcoin accounts.  Nothing suggests to me he was working doing anything other than sitting at his computer, thinking about how to defraud people all day long.

So the government, you know, did an extrapolation on that based on a, you know, a profit percentage that certainly seems reasonable to me.

So I would include the 130 from the tainted bitcoin accounts, and some of that's, that's the whole of his accounts known to have dealt in fraud proceeds.

That, that takes his total under the 18-81 to, you know, something like $1.525 at the bottom to $1.7 at the top.

Now, that helpfully, in my mind, lines up very well with the loss figures from Nedelcu and Dimitrious Brown, the two that the defendant's most closely associated with.  That's not a reason for the

1  calculation, but it is confirmation on that

2  calculation.  So that's going to be my treatment of

3  18-81.

4  Now, on the brute force, that -- so that

5  calculation in my mind -- and again, Mr. Coffey did a

6  good job of trying to shrink that down to the actual

7  known losses attributable to the cloned cards.

8  But again, I think the guidelines don't

9  operate that way.  I think they look at what is the

10  greater actual loss or intended pecuniary loss.

11  Here we have specific examples of what the

12  defendant was doing.  And the plea, the plea expressly

13  acknowledges that the defendant was engaging in these

14  activities with multiple banks.  And the First Tech

15  example is just one example, and the plea agreement

16  says, "one such institution" where the defendant

17  phished, and then made the brute force attack.  One

18  such interest is the First Tech Bank.  That gives us

19  some data on the financial scope of it and the per

20  card harm inflicted.

21  In the plea agreement, it's 75 cards,

22  $61,000.  In the sentencing materials today, 94 cards,

23  so that's a little bit more in defendant's benefit.

24  That'd be $648 per card.

25  The U.S. Bank example, same time period --

the U.S. Bank example comes out to a little over $500
per card undocumented losses.

       The University of Kentucky pro card element,
a pretty small sample, but consistent, over $500 per
card.

       Who knows on SunTrust?  I mean, it's kind of
chilling to sit there and watch as the defendant
manipulates some innocent person's account, goes
through the spreadsheet, pulls up data, cuts and
pastes, drops it in, you know, changes the password,
and the next thing you know is just siphoning money
out of that account, some innocent person just losing
his or her funds.  How knows, you know, with SunTrust.
We don't know.

       But what we do know is he was accessing those
cards, those numbers for the purpose of committing
fraud, and he admits in the plea agreement to
participation in the brute force conspiracy, and he
admits to obtaining -- he obtained and possessed
credit card information from customers of various
institutions; that's the 16,000 data sets with credit
card numbers, account numbers, tracking numbers, PINs
and dates of expiration.  Well, those are the raw
materials of a brute force attack, and we know that
from the other things that are documented.

1        The 2,100 cards from North Carolina, I'm

2   including them in this because it is the same -- it is

3   the same kind of conduct.  And it's right that we

4   don't have numbers on North Carolina, but I do know

5   from the plea agreement that Mr. Mitan conceded that

6   more than ten, more than ten banks had suffered harm

7   resulting from the conspiracy.  I know that.  I also

8   know that he concedes as part of his role, I mean, he

9   essentially was doing, you know, every step along the

10  path from phishing, from phishing on down -- or

11  vishing, I should say, but it included number 6,

12  making or causing to be made re-encoded cards with the

13  victims' fraudulently obtained information.  And 7,

14  traveling to ATMs and withdrawing money from the

15  victims' accounts.

16       So I don't know why it would be in there if

17  he did not actually go in and cash out to some degree.

18  Now, we don't have it here, but it's not, it's not

19  like a dummy bomb that didn't explode.  There's real

20  harm reflected in the plea agreement for the vishing

21  attack as well.

22       So what do I have to do?  I think I have to

23  sentence the defendant for what he is in that case,

24  and that is he's a brute force attacker, he's a

25  hacker; that's using his own description.  He has used

those status sets to inflict harm, and he's holding 16
to 18,000 additional potential attack foundations or
criteria; he's holding those, and what's to mean the
logical and evidence-based expectation from that?
That he's going to do what he did on that, on that
video or on that screen capture.  He's going to
identify the ones he thinks are usable and he's going
to try to use 'em to commit fraud.

Are they all going to succeed?  No.  Are some
of them invalid?  I'm sure some are.  Are some
outdated?  I'm sure some are.  But he's been doing
this a long time and conceded to possessing those
items as of his plea agreement in this case, so I'm
going to sentence him like he had them with the
intent -- the purpose and intent to inflict pecuniary
harm.

How should it be measured?  Well, the First
Tech number is somewhere from $648 to $813 per card.
The U.S. Bank number is over $500.  The UK number's
over $500.  You know, a number like $500 applied to
the full set takes you up to, you know, 8 or $9
million dollars.  The government has cut that down to
13,000 cards.  Say we're going to lop 25 percent off
as, you know, unusable or invalid.  I'm not sure that
has to be done on the way the guidelines are measured.

But if that is done and you drop to $500 per card below the data supported figures that I think that the Court could use, that gets you to, you know, $6, $6.5 million, something like that.

I think it's -- undoubtedly it's reasonable in a conservative estimate to assign a number like $500 per card, so 13 of the 18,000.  That certainly seems reasonable and conservative to me.  I could go higher and feel pretty confident about it.  But I'm certainly confident in that number based on the empirical information that we've got.

So including the vishing crime within the calculation I've just done, certainly takes the defendant in those cases up to over $6.5 million in intended loss.  And then with the $1.5 or so on the 18-81, obviously, with or without including 18-81, he's well worth the $3.5 million total loss figure.

And so for all those reasons, I am going to overrule the defendant's objection in that regard.

On sophisticated laundering, the scheme's been well described here how the money flowed, and what I'm looking for in 2S1.1 -- and again, this applies to -- because of the brute force conspiracy conviction, which was money laundering.

So in 2S1.1, I'm looking at whether the

offense involved sophisticated laundering.
Sophisticated laundering means complex or intricate
offense conduct pertaining to the execution or
concealment of the money laundering offense.  And the
guidelines give some typical earmarks of that:
Fictitious entities show corporations, two or more
levels, i.e., layering of transactions, transportation
transfers or transmissions involving
criminally-derived funds that were intended to appear
legitimate, or offshore financial accounts.

        Mr. Coffey's right to say, Look, this -- if
something else is being accounted for in this process,
it shouldn't be counted again at this time.  And I
agree generally with that.  But I don't, I don't think
that's happening here because the guideline says
offshore financial accounts, and that's not really
what we had here.  We had the ultimate destination for
the fraud proceeds was -- just happened to be in
Europe.  It wasn't like a fraudster was sending money
to the Cayman's or something, using offshore accounts
to try to make it hard for the government to track the
funds within the government's jurisdiction.  So to me
that's really not applying, and so it's certainly not
counting, not counting twice.

        What's convincing to me, the typical money

flow in the 18-5 laundering involved origination of
the fraud in a way that was, I think, anonymous and
sophisticated, the use of these -- the phishing
technique, getting the numbers, creating the cloned
cards after the brute force, and then creating those
cards and using them to access victim funds, that that
is a sophisticated beginning.

Then from that point, the funds are taken out
and converted into cash, untraceable cash.  The cash
is then put into a clean form in some kind of a card
or money order that is purchased by somebody on the
street, sent to the CS.  So that's a transaction in it
after the initial withdrawal.  Then the CS would take
that form and convert it into bitcoin.  A second
transaction involving the same funds.

Bitcoin is -- it's a relatively sophisticated
embodiment in and of itself, quite anonymous, quite
difficult as this case shows to really run down.  It
takes tremendous resources to do so, so that
intentionally was done.  And then the bitcoin was sent
overseas.  Ultimately that bitcoin taken to an
exchange and traded back for fiat currency, again
untraceable cash from that point.

So that's multiple steps, multiple layers,
and the sophistication is the electronic nature of the

1 transactions in the communications, the use of the CS

2 as kind of a clearinghouse domestically.

3       He talked about solving the U.S. dollar

4 problem, and that's, that's how they treated him, the

5 spreadsheets, the use of bitcoin.  All that to me

6 certainly qualifies as complex or intricate offense

7 conduct pertaining to the execution or concealment of

8 the 1956 offense.  So I think the two points properly

9 apply to the 2S1.1 calculation.

10       On the role adjustment, so the lens there --

11 and I've sentenced a lot of defendants in this case,

12 so very attuned to when and where this should apply.

13       So it applies if the defendant was here a

14 leader in any criminal activity other than that

15 described in A or B, increased by two levels.

16       So probation hit him as a leader; that's what

17 the government has advocated.  So I'm looking for a

18 leader.  And the Sixth Circuit's been clear that to

19 apply, to apply this enhancement, the defendant has to

20 have had decision-making authority over a participant.

21 And so a participant is another person criminally

22 responsible in the case -- and if I could find my

23 email from early this morning.  The Sixth Circuit said

24 in *McDonald* last year, "The exercise of

25 decision-making authority over other participants is

1 necessary to qualify for a sentencing enhancement

2 under that section."  So I'm looking for who was

3 Mr. Mitan over in terms of his decision-making

4 authority.

5        Now, the whole thing is complicated, no doubt

6 about that, but what it looks like to me in 18-5, same

7 quality, same tenor as was the case in 18-81.  What I

8 see is a flat, a flat organization where the different

9 participants had kind of areas of expertise, areas of

10 knowledge, areas of access, and they worked together

11 to accomplish a very ghastly crime.

12        What I don't see is Mr. Mitan having

13 authority or decision-making power over any

14 participant in the case, and I've listened carefully

15 and watched carefully for it.

16        What I see is everybody's got a job.  It sort

17 of all works together.  Everybody takes a cut along

18 the way.

19        So if you're going to the ATM, you're taking

20 out your cut before you buy the money order, and if

21 you're, you know, sending the money order to the CS,

22 you know, the CS, is going to take the cut out before

23 converting the bitcoin, so on, so on.  That's what I

24 see.

25        And with the defendant, just because he's in

Europe and he's telling one of the stops along the way, "This is how to pay me," saying how to pay another participant to me is not -- that's not leadership.  That's just the mechanics of the crime.

This person caught in Portland, you know, I just don't -- I'm not convinced by a preponderance that the defendant had decision-making authority over that person.

The chats, it's just hard to credit it, given what the defendant was saying in 18-81 and kind of maybe overstating the expanse of his team in 18-81.

At the same time, I don't know why he wouldn't sort of also not be credible on the 18-5 representations.  And it just seems to me he really couldn't control the other people.  I mean, he was working with them, but he was critical of them, he couldn't get them to do things the way he wanted.  He had -- like the one guy who kept asking for PINs and, you know, he was like he's scared or behind, and he couldn't get him to do things the way Mitan wanted. That's a sign of not having decision-making authority. That means to me those individuals he was working with kind of had their own way of wanting to do it, and there was some tension there.  That's not a sign of leadership.

1        And, you know, the CS wanted to be introduced
2    to the people Mitan was working with, and Mitan's like
3    they're weird with new people.  So, you know, if he's
4    leading them, he would say, Look, you're going to work
5    with the CS, and that's it.  Didn't seem to be the
6    case.
7        So all that said, I am going to sustain the
8    objection on the leadership role.
9        On restitution, it's been a challenge in this
10   case, I will say.  It is mandatory under the MVRA, and
11   so I've got to watch out for it, even when the
12   presentation maybe has not been as tailored and
13   detailed in particular as I would like.  I have to
14   look out for restitution in a case of this nature.
15       On this record, I am going to grant a
16   restitution award on the following, the following
17   bases:
18       On the brute force, I am going to grant
19   restitution to each of the banks or financial entities
20   to the degree that's been demonstrated.
21       So First Tech, $60,672.98; U.S. Bank,
22   $12,371.48; and UK $21,76.05.  The defendant will have
23   full responsibility for those payments.
24       On 18-81, so the government sought the full,
25   the full burn on the known loss amounts, and the

government tendered a sealed document detailing each of those entries, so something north of $2.7 million on the table for the restitution award in 18-81.

Without a doubt, the *Bailey* case tells me that I can hold each conspirator responsible for the full amount. *Bailey* says I can do it; the statute says I can do it, so I think I've got the power to do that. But I'm also operating in a case where I've got multiple defendants in a kind of a tortured restitution history in the case.

And, Mr. Coffey, you weren't around for all this, but, but I'll tell you what happened and, you know, I may end up getting lectured about this at the Sixth Circuit. But what happened was early on, the restitution amounts were negotiated, and so I'd have a plea agreement with a restitution figure, and we'd be in these sentencings, nobody's, you know, advocating over it; it's agreed. So I would order the agreed amount. And then those stopped and we started getting contested restitution, which caused me a lot of heartburn as I'm try to figure out how do I square everything I've done in this case and how do I make rational decisions about how to treat restitution 'cause it's hard, it's hard to tell one person, "You're on the hook for $2.7 million, and another

1  person in the same case, a comparable place in the

2  same case, you're on the hook for $31,000." That's

3  difficult for me to do and feel well-grounded over.

4         So, you know, how have I sorted it out? It's

5  not been easy, but what I'm trying to do is fairly

6  protect the victims' expectations, fairly reflect the

7  overall management of the case, and fairly, to the

8  extent I can, tailor the individual's responsibility

9  in some rational way to his overall place in the

10  conspiracy. And so I probably have not done that

11  perfectly, but that's been, that's been my, that's

12  been my endeavor.

13         What I'm going to do here is sort of take a

14  look at three points that I'm trying to work from and

15  make sense. One is the way Nedelcu got treated. He

16  had a $32,000 agreed restitution figure, shockingly

17  low in this case, but that's what it -- that's what

18  was negotiated and that's what the Court did.

19         Brown, Brown had direct involvement here. He

20  was a 28, I. I imposed 847,988 on Brown in 18-81.

21  Various factors I discussed in an order anybody can

22  look at and see my thoughts on that. But those two

23  matter because those two are related specifically to

24  Mitan and his conduct. So I'm looking at those.

25         I'm also looking at the defendant's

1  individual handle and that, that was a big focus
2  Mr. Coffey had, was how much did -- you know, how much
3  went through his account?  How much did he, did he
4  handle relative to the CS compared to the other
5  conspirators?
6          And so I have looked at that carefully, and I
7  think what I'm going to do -- I'm not going to impose
8  a liability for the full known restitution loss of
9  $2.7 million.  Restitution is different from loss
10 amount.  It's got a different aim, different purpose,
11 different type of measure, but the number's, the
12 ultimate number still ends up being comparable.  So
13 I'm not going to impose full joint several liability
14 for the $2.7 million.  What I'm going to do is an
15 approximation based on his individual handle and the
16 period of known activity in the case, but measured by
17 his overall temporal involvement in the conspiracy.
18         And so what I'm going to do there is
19 essentially treat a window that results in a
20 calculation of $675,000 in restitution.
21         What that essentially does is it looks at
22 what his financial experience was in the conspiracy
23 and, you know, it can be debated how it ought to be
24 measured, but, you know, taking Mr. Coffey's numbers,
25 I'm looking at something like $5K per month if you

1  look at that reduced period Mr. Coffey was defining it

2  as.  But you measure it by his full involvement in the

3  conspiracy gets you to the number of 675 by my

4  calculation.

5         So that's not perfect.  That's an endeavor to

6  make sense of a difficult restitutionary road in the

7  case, but that's going to be the Court's ruling on

8  restitution.  That will be his several responsibility

9  as a co-conspirator in the case.

10         So those are my rulings on the various

11  components.

12         Any question on those objections or any

13  requests for additional findings by the Court on the

14  objections?  Mr. Taylor?

15         MR. TAYLOR:  No, Your Honor.

16         THE COURT:  Mr. Coffey?

17         MR. COFFEY:  Yes, Your Honor, a couple

18  matters, if I may.

19         On the -- I certainly don't want to rehash

20  all this -- on the 18-81, when he's -- when he stopped

21  the conspiracy I made a note here you did see a

22  concrete fact that he, that he stopped.

23         I want to go back and remind you that in that

24  Jabber chat he sold the trick for $6,000.  So, in

25  other words, he had a, you know, he had some mechanism

1  to commit fraud, but he sold it for $6,000.  And that

2  would seem to be a concrete event if you accept that

3  as accurate, that -- now, I agree with you, it

4  doesn't -- you know, it doesn't reconcile with the

5  subsequent Jabber chats; I agree with that, but still,

6  that is a concrete event.

7         And I had one other point I wanted to make.

8  Do you want me to make it now or do you want to

9  respond?

10        THE COURT:  Yeah, I just want to look at --

11        MR. COFFEY:  If you had pages numbers on that

12  PowerPoint, it would be helpful.

13        THE COURT:  Yes, yes, they would.

14        MR. COFFEY:  It's mid-way through, but I

15  don't have numbers on them.

16        THE COURT:  Yeah.  No, I know that one.

17        What was convincing to me, Mr. Coffey, was

18  that whatever the truth of what Nedelcu said at the

19  time, whatever the truth of that, in April he is

20  looking for bank accounts from the CS and the CI says,

21  "How are you doing transfers?"  He says, "Selling

22  cars.  Smiley face."  And he's looking for -- as I

23  read that, fairly put, he's looking for continued

24  activity of the same type, so that's, so maybe he's

25  out with Nedelcu.  Maybe that part has changed, but

1    I'm not convinced it stopped.

2          MR. COFFEY:  Okay.  The second thing I'd

3    point out to you, you went beyond what the government

4    sought in the restitution motion, and I went back and

5    double-checked.

6          THE COURT:  On restitution the government's

7    sought $2.7 million.

8          MR. COFFEY:  You're right about that, but in

9    the restitution they only sought it in the RICO case

10   under 18-05.  They didn't seek anything.  That's why

11   --

12         THE COURT:  That's true; you're right about

13   that.  You're -- this is what -- this is the problem

14   for me, Mr. Coffey.  Like the government filing its

15   brief late.  What am I supposed to do when the

16   government files a restitution brief late?  Do I say

17   to the victim, "I'm sorry the government didn't file a

18   brief on time, no restitution."  I don't think I can

19   do it.  I'm charged with ordering restitution where

20   it's warranted.  And so here, there's been proof that

21   the banks themselves took the loss on those figures.

22         So you're right, I concede that.  The

23   government did not seek it, and so what do I do when I

24   know there's a victim --

25         MR. COFFEY:  I hear ya, but it's his day, you

1 know, and I, I don't think I missed the deadline.  I

2 really try to follow 'em, and so I tailored my -- I

3 caught that, and I tailored my response -- I didn't

4 go -- you know, and then for them not to seek it, and

5 then for you to grant -- I don't know what that comes

6 to -- $75,000 roughly.  I mean, you know, you're kind

7 of just picking them up and carrying them -- I don't

8 mean that mean, but, I mean, you know, on something

9 they didn't even seek restitution in, I just don't

10 think you should do that.

11        THE COURT:  I think you're right, and I do

12 not feel great about it.  What I have is a statute

13 telling me restitution is mandatory; I shall order

14 restitution.  And so I'm at a sentencing and I've got

15 proof of loss and proof that these banks themselves

16 took the loss on this activity.

17        So I could, I could ignore it and say the

18 government didn't seek it, no award.  Nobody's going

19 to appeal that.  That's probably the safer play, but I

20 don't think it's, I don't think it's showing fidelity

21 to the statute.  I am to award a known victim a loss;

22 I'm to do that, and so it's a conundrum.

23        What do you say, Mr. Taylor?

24        MR. TAYLOR:  I think you have to follow the

25 statute and order restitution as you see it.

1        MR. COFFEY:  I thought it might have been too

2   hard for them to calculate it.  I mean, I mean that --

3   because it is hard, and I thought they just were

4   satisfied with the two, you know, whatever you set

5   when they filed this document, that whatever you

6   decided in 18 -- keep the numbers straight -- 18-81,

7   they were going to live with.  That's why I was

8   careful to respond the way I did to it.  Now today it

9   might be taking a different position.  I don't know.

10  That's kind I why --

11        THE COURT:  No, I think that's totally fair.

12  The government did reference some of the credit card

13  fraud in the restitution brief, but did not segregate

14  it in any way.  I agree with that.

15        Mr. Datta's here.  He could -- do you want to

16  address that at all?  Mr. Datta.

17        MR. DATTA:  Good afternoon, judge.  Yeah,

18  that wasn't -- the intention was to include

19  everything.  It was rushed.  It wasn't on my calendar

20  to file a restitution brief.  I know it was in the

21  sentencing schedule.  Obviously, there's a number of

22  defendants in these cases.  I am a small segment of

23  the prosecution team, so it wasn't aware -- I wasn't

24  aware that that was something that I needed to file at

25  that point.  It wasn't on my calendar.  And so when I

1  found out about it, I immediately filed what we

2  generally file in all —— a lot of these conspiracy

3  cases alleging liability for the entire conspiracy.

4  　　　　　But the intention was to seek restitution.

5  My understanding from Ms. Anderson when she was here

6  this morning was that there was additional victims in

7  that credit card scheme.  I was unaware of that, and

8  so she provided me the exhibit that was shown earlier

9  this morning to the institutions.

10  　　　　　And so we would still request —— I mean,

11  based on the fact that the statute mandates

12  restitution in these types of cases, it's only fair to

13  the victims, regardless of who was at fault ——

14  certainly in this case I was at fault, so the

15  government was at fault filing the late restitution

16  brief, but it shouldn't be taken out on the victims in

17  this case.

18  　　　　　THE COURT:  Okay.  Well, I think it's —— and

19  Mr. Mitan can legitimately feel like, you know, you

20  know, that's he's got an argument that the Court

21  should close the door on that.

22  　　　　　I would say the restitution brief talks about

23  the defendant engaging in a credit card fraud scheme,

24  stealing card information, conspiring with others to

25  provide the information to blank cards to withdraw

1  money.

2        So, you know, the underlying conduct is not

3  ignored, but there's not a specific request; you're

4  right about that.  Maybe I'm wrong to do it, but it's

5  sort of like, Mr. Coffey, when the government doesn't

6  present a timely plea agreement and we're coming up on

7  the deadline, and that deadline passes, but the

8  government has not offered a plea agreement, what do I

9  do in that situation?  Do I say, Well, the government

10 didn't offer an agreement.  You missed your

11 rearraignment deadline, so too bad, defendant.  That,

12 you know, that doesn't seem fair because the

13 government, the government's action theoretically

14 could have a negative effect on somebody else.  And so

15 maybe that's not an appropriate parallel.  But my view

16 is if I've got proof on a known victim and the statute

17 makes restitution mandatory, I've got -- I can't

18 ignore it, I can't close my eyes to it.

19        MR. COFFEY:  You know, I get it, and I've

20 certainly filed things late, and I'm not -- I

21 understand it, I understand it.  This was just kind of

22 a tough pill to swallow.

23        There was a time that we, you know, we didn't

24 bring additional objections.  I remember that over the

25 evolution of my period in federal court.  You didn't

come to sentencing and seek an additional objection

that, you know, for the PSR or whatever that hadn't

already been raised, we didn't address them at that

point.  But, I mean, I understand your ruling, and

we'll live by it.

THE COURT:  Okay.  Any other request for

additional findings?

MR. COFFEY:  No, sir.

THE COURT:  Okay.  All right.

I will otherwise adopt the presentence

report, findings and guideline calculations as

accurate.

Mr. Taylor's already mentioned the third

level motion, and so I'll grant that now.  The

presentence report does further substantiate the

factual basis for the plea under Rule 11.  I'll accept

the plea agreement as tendered.  The government's

moving to dismiss all other charges and indictment

versions; is that correct?

MR. TAYLOR:  That's correct, Your Honor.

THE COURT:  Okay.  Okay.  All right.

Mr. Mitan, we are here on three distinct

cases in terms of the charges and conviction, so I

want to talk about -- before we discuss the specifics

of the sentence, I do want to talk about the

boundaries for the sentence, what it could be or what it must be in some cases, and so I'm going to point to two different sources, one more important than the other.

The most important source is the statute or statutes at issue.  Those come from Congress.  They tell me fixed limits I have to respect when it comes to imposing a sentence.

Here, by statute, the 18-81 conviction, the RICO carries up to 20 years of imprisonment in federal prison, a fine of the greater of $250,000, or twice the gross gain or loss.

And then following prison, you're subject to a supervision term of up to three years.

The brute force case, which is money laundering, carries up to 20 years in federal prison. Any prison time I impose among these three counts could be consecutive, one after the other, or could be concurrent, running at the same time.  I'll evaluate that later in the day.

So 20 years is the maximum on the brute force case.  The fine maximum is $500,000, or twice the value of the laundered funds, and a supervision term not more than three years.  Any supervision term would run concurrently.

1          The vishing case, the bank fraud actually

2    carries the highest potential penalty up to 30 years

3    in federal prison.  You could be fined up to $1

4    million or twice the gain or loss involved in the

5    fraud, and then up to five years of supervised release

6    on that count because it is a Class B, rather than

7    Class C felony.  Those are the statutory limits.  Do

8    you understand that, sir?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Okay.  The other source to look

11   to are the sentencing guidelines.  And the guidelines

12   are not as important, although we've spent the whole

13   day talking about them -- they're not as important

14   because they're not binding on the Court.  They're

15   only advisory.  They're only a recommendation, and so

16   I have to calculate the guidelines correctly, but I'm

17   not ultimately bound to stay within the guidelines.  I

18   can go outside the guideline range, above or below,

19   based on my consideration of other factors and

20   characteristics in the case.

21         The guidelines here we've talked about are

22   primarily driven by the loss calculation.  And I've

23   put that all into one basket to evaluate what that

24   should be.  And the driving conviction is the brute

25   force, the brute force money laundering conviction in

18-5.

Under that calculation, based on the rulings that I've made today, the offense level is going to be a 32, the Criminal History Category you fall in is a III.

A 32, III produces a non-binding guideline range of 151 months at the low end to 188 months at the high end.  Again, that's only advisory, but that's the range the Court will consider as part of sentencing.

Subject to the objections and rulings the Court has already made, of course, any additional disagreement with my findings and announcements to this point, Mr. Taylor?

MR. TAYLOR:  No, Your Honor.

THE COURT:  Mr. Coffey?

MR. COFFEY:  Nothing new, Your Honor.

THE COURT:  Okay.  All right.  Any departure motions by the government?

MR. TAYLOR:  No, Your Honor.

THE COURT:  Any by the defense?

MR. COFFEY:  No, sir.

THE COURT:  I did want to note on forfeiture, I believe that was -- we did do a preliminary forfeiture judgment that the parties had worked out,

1  and so did enter that and would intend to make that

2  final in the judgment today.

3            Is that appropriate, Mr. Taylor?

4            MR. TAYLOR:  It is.

5            THE COURT:  Do you agree, Mr. Coffey?

6            MR. COFFEY:  Yes, sir.

7            THE COURT:  Okay.  Okay.  We'll now turn to

8  consideration of the sentencing statute, 18 U.S.C.,

9  Section 3553.  That statute is really the controlling

10 authority when it comes to the Court's task today.  I

11 have to, under the statute, assign a sentence that is

12 sufficient but no greater than necessary to comply

13 with specific purposes identified in the statute.

14 Those include to show the seriousness of the offense

15 or offenses, to promote respect for the law, to justly

16 punish the defendant, to deter or discourage further

17 criminal activity, to protect the public from further

18 crimes of the defendant, and to provide the defendant

19 necessary correctional treatment if applicable in the

20 most effective manner.

21            I have to consider the need to meet those

22 purposes and must as a whole take into account the

23 particulars of the crime or crimes, your individual

24 background, the sentencing guidelines, which are a

25 starting point or a benchmark for sentencing, I have

1  to look at the kind of sentences available, and the

2  need to avoid unwarranted disparities among similar

3  defendants.  That idea is, anyone in America who

4  commits this crime, this type of crime and has a

5  background similar to yours ought to receive roughly

6  the same result from the Court.  That's a matter of

7  fairness and predictability in the federal system that

8  there ought to be those characteristics in federal

9  sentencing.  I certainly take that seriously while

10 recognizing that it's hard to find two crimes that

11 compare perfectly, and it's impossible to find two

12 people who compare perfectly.  Everyone's got a unique

13 story, leading to an event like today, and so I try to

14 sentence the individual carefully while also fairly

15 operating within the overall federal system.

16         And again, restitution is a required

17 component of consideration, and I've dealt with that

18 already during the course of the hearing.

19         So I'm going to hear argument from the

20 lawyers, Mr. Mitan.  You'll then have a chance to

21 address the Court if you choose to.

22         Let's first listen to the lawyers and see

23 what they have to say, and I'll start with Mr. Taylor.

24         MR. TAYLOR:  May it please the Court.

25         THE COURT:  Mr. Taylor.

1        MR. TAYLOR:  I know Your Honor has been

2   involved in the sentencing of a lot of these

3   co-defendants, and I'm sure, judging from the very

4   meticulous way you handle all the issues in a

5   sentencing, that you have developed a sentencing

6   philosophy for these groups of cases.  And I know

7   you're not going to stray from that based on anything

8   I say here today, so I'm going to be brief.

9        The thing that jumps out at us, about this

10  case, as opposed to all the other cases, really

11  basically two things.  One is the recidivism that

12  we're seeing.  He's been convicted before and got a

13  relatively light sentence, and it didn't take at all.

14  In fact, he took it up a notch or two or three, and

15  was very willing to associate with this big group, and

16  he became even more sophisticated.  He's very

17  sophisticated.  I wish I had the computer skills that

18  he has.  If he could just put those to good use, he

19  could be very productive.

20       But the other thing that jumps out that says

21  a guideline sentence is appropriate, irrespective of

22  what you've imposed on any other defendant, is I don't

23  know how to characterize this, whether it's attitude

24  or demeanor, but he's cold and brazen, and disdainful

25  of his victims when he calls them "suckers," and he

enjoys draining people's bank account, goes to extra
effort to take their last $20, and then says, "The MF
has no money left.  Ha ha."  That's pretty cold and
it's pretty deliberate.

And unlike some of the other defendants who
have expressed what appears to be sincere remorse,
they want to get on with their life and do something
more productive.  We're not seeing that here.  And
there was only token effort at cooperating and making
it better.

So for all of those reasons, we believe he
stands out and that a guideline range sentence is
appropriate in this case.

Now, I don't know -- Ms. Anderson drives the
ship on these cases, and I'm here pretty much at her
request because she's doing more important things to
her, not important things to society, but to her; it
has something to do with her wedding.  And so I don't
know if the fact that you sustained one of the
objections and reduce the guideline range would prompt
her to go for -- or to ask for the middle, but we'll
stick with our recommendation of the bottom of the
guideline range, but it should be a guideline range
sentence.

THE COURT:  All right.  Thank you,

1  Mr. Taylor.  Mr. Coffey.

2      MR. COFFEY:  Judge, could I take just a

3  break, and I want to make sure Mr. Mitan's caught up

4  on where we are.  We've covered a lot of ground here.

5      THE COURT:  Are you okay conferring in here

6  or do you need --

7      MR. COFFEY:  I am, and I want this just to be

8  brief.

9      THE COURT:  Sure.

10      MR. COFFEY:  Thank you very much.

11      THE COURT:  Sure.

12      [DEFENDANT AND COUNSEL CONFERRING]

13      MR. COFFEY:  Judge, I'm getting ready to

14  bring up one part that needs to be sealed.  I don't

15  see anyone in here that's not official, so I'm happy

16  to do it as we are, but I did want to bring that up.

17      THE COURT:  Okay.  You just flag it and we'll

18  be glad to seal that.

19      MR. COFFEY:  Okay.  I may -- I'm like

20  Mr. Taylor; I'm going to be brief, too, because I've

21  talked all day.

22      I think he deserves a reduced sentence, a

23  variance again, on the amount of loss, what you called

24  "what he handled."  I thought of this when you were

25  giving your explanation, because you kept focusing on

his intent and, you know, we'll let the Circuit tell
us later if the guidelines are being calculated
correctly or not, but his intent; you kept going back
to that.

        And what I remember from my days of defending
drug cases -- and this is not a drug case, but, you
know, what we've come up with is a defendant who has a
pound of marijuana seed and ten marijuana growing
plants, but his intent was to have a big crop of
marijuana and, you know, we got him over some type of
statutory minimum over 100 or over a thousand plants,
because his intent was to have a pretty lucrative
marijuana operation.  And now again, I follow how you
done that, but he doesn't have a large marijuana
operation.  And this whole case I kept thinking about
probably within a half-mile from this courthouse
there's some kid selling marijuana, the corner weed
seller, if you will.  That kid may want to be Pablo
Escobar, but he's not, for a variety of reasons.  And
Mr. Mitan is not a major leader of one these fraud
networks.  He's involved.  He's a fraudster.  He's a
hacker.  I mean, you can't say he's not, but his
sentence ought to be not at the top and somewhere
along the lines of what these other defendants have
received, and it -- and this just seems to me to be

obvious, it almost has to be less than Nedelcu.  I
mean, Nedelcu brought him in.  Officer Moore testified
they were together.  You know, I think I used the word
"co-equal."  I don't know if he agreed with that, but
certainly, Mr. Mitan wasn't Nedelcu's boss.  I think
the most the evidence will show that Nedelcu was his
boss, and now I'm sure Nedelcu probably had a Criminal
History Category of I, and that matters, but he got 82
months, so it seems like Mr. Mitan has to get less
than Nedelcu.  So that's the first thing I'd point out
to you is -- and I go back to that slide, you know, of
$26,000 or whatever at the end of the day is all that
he had.

          The other slides I showed you that his
bitcoin account was certainly less than anybody
else's, certainly less than Nedelcu's, almost three to
one.  So in 18-81, you know, he was one of the
smallest players.

          But Mr. Taylor brings up a good point, as he
always does, you know, he did that once before; I
agree, he did he got a relatively light sentence, and
here he is again, and you got to address that.  But
still, it doesn't warrant a sentence near 151 months.
That's point one.

          Point two.  I always like to point out the

1    statistics from the Sentencing Commission.  I put

2    those in the memorandum.  I think the average sentence

3    for money laundering was 58 months, or something like

4    that, so you're still at a guideline sentence of a

5    little bit less than three times the average, and that

6    seems to me to be a gross over-statement.

7            Then this third part would be the part that I

8    would ask that be sealed.  And I have it.  Bear with

9    me one sec.

10           [SEALED PROCEEDINGS]

11

12

13

14

15           [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15          [SEALED PORTION OF TRANSCRIPT]
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15            [SEALED PORTION OF TRANSCRIPT]

16

17

18

19

20

21

22

23

24        [SEALED PROCEEDINGS CONCLUDED]

25        THE COURT:  Okay.  We'll send end the seal

1  now and back on the public record.  Thank you.

2           MR. COFFEY:  So to finish up, at the

3  beginning, I asked for a sentence of 36 months.  I

4  don't know if you can go -- it's almost five times

5  lower than where you are right now under the

6  guidelines based on your ruling on the amount of loss,

7  and I get that.  But it, it needs to be in line --

8  even if you can't go to 36 months, it needs to be in

9  line, in my mind, less than Nedelcu, something under

10 82 months, and I'd like you to do that, please.

11          THE COURT:  And what's the view on supervised

12 release for this defendant?  What's the government's

13 posture on that?  I've not, I've not been imposing it

14 on the foreign defendants.

15          My expectation is they'll serve, and then be

16 deported.  I haven't been imposing it.  I'm on the

17 fence a little bit with this defendant because of his

18 record, and maybe some added benefit of having

19 something else hanging over him.  I just wanted to get

20 input from both sides.

21          MR. TAYLOR:  I haven't really talked to

22 Ms. Anderson about that, but I -- my default would be

23 to treat him the same as the others in that respect.

24          THE COURT:  Okay.  Mr. Coffey?

25          MR. COFFEY:  Yeah.  I didn't think about that

1  being an issue.  I thought he would just be deported

2  back to Romania as soon as the sentence is served.

3  And that's what -- I think that's what I've seen in

4  all the judgments I've read, isn't it?

5           THE COURT:  I haven't imposed it -- what

6  section is that, Brittany, 5G --

7           MR. COFFEY:  Is there something you're

8  thinking about differently in this case that made you

9  trigger this?

10           THE COURT:  Yeah.  Let me, let me explain.

11  I've got too many notes.  5D1.1.  That's where it is.

12  5D1.1C, the Court ordinarily should not impose a term

13  of supervised release in a case in which supervised

14  release is not required by statute, and the defendant

15  is a deportable alien who likely will be deported

16  after imprisonment.

17           So on that basis, I've not been imposing it.

18  I've just got a little bit of -- why I'm hesitant here

19  is I'm just thinking.  Nobody else has a prior federal

20  conviction, and then, you know, three further crimes

21  committed from outside the country.  And so I guess

22  I've got more worry here in that does it add anything

23  of benefit to just have that hanging over him?  I

24  mean, he's not truly going to be supervised, so that's

25  not beneficial, but just -- is there added deterrence

1  to knowing if he commits some violation, in theory, he

2  could be pulled back over here and face up to three

3  years for a violation.  That's my, that's my

4  hesitation.

5          Anything else you want to say on that,

6  Mr. Taylor?

7          MR. TAYLOR:  I haven't researched it.  I

8  think if there is going to be a period of supervision,

9  if there could be some kind of agreement with Romanian

10  authorities; that might be appropriate.  But when

11  you're talking about a foreign national with a family,

12  that's, that's extra punishment keeping him here for

13  supervision.

14          THE COURT:  Okay.  Anything else, Mr. Coffey?

15          MR. COFFEY:  Last point:  You're not

16  suggesting he stay in the United States?

17          MR. TAYLOR:  No.

18          THE COURT:  I'm not.

19          MR. COFFEY:  Yeah.  Okay.  Well, I mean, I'd

20  obviously ask you not do that and just -- the

21  authority you cited would be the reason not to do it.

22          THE COURT:  Okay.  All right.  Anything else,

23  Mr. Taylor?

24          MR. TAYLOR:  No, Your Honor.

25          THE COURT:  Mr. Coffey?

1          MR. COFFEY:  No, sir.  Thank you.

2          THE COURT:  All right.  It's 4:00.  I do want

3  to take 15 or 20 minutes and get my final thoughts

4  together before I come out and announce the decision.

5          So I know it's late in the day; it's been a

6  long day, but it's important to try to get it right,

7  so let's take about a 15 minute break at this point.

8          Thank you.

9          [RECESS - 4:02 - 4:16 p.m.]

10          [IN OPEN COURT]

11          THE COURT:  Thank you.  I do need to, all the

12  extra process, sort of push that out of the way.

13          So, Mr. Mitan, I do want to hear from you,

14  anything you'd like to say.  You have the right to

15  communicate to the Court.  You're not obligated to.  I

16  won't hold it against you if you don't, but I'm

17  interested in hearing from you now, anything you'd

18  like to convey.

19          THE DEFENDANT:  Yes, Your Honor.  I would

20  like to say that I don't have no -- I cannot find the

21  proper words to express myself how much I -- I'm

22  sorry.

23          And, I mean, I meet with them a couple of

24  times, explained to them how I got those cards and

25  like the -- the big lease that I -- that they got my

1  computer, the 16,000 credit cards that I was working

2  for this company in Romania for these guys that they

3  were selling lotions, and that's a database that I

4  were using the email address, and I have two witnesses

5  that they could confirm that.  And like, for example,

6  the 18-81 case, well, I just went one week to his

7  house, one week.  Two months later, the CI, he contact

8  me and he ask me, Can you log into this bank account,

9  the BBT account?  Can you see if this transaction's

10 yours?  And I was like, Oh, okay.  And I sold $9,000,

11 $9,882, and I was like, Yeah, send me the money.  But

12 that was not mine.  I never put no fake ads.  I didn't

13 put no, no -- I just keep nobody in the RICO case.

14 And from one week, they said I got a -- I got agreed

15 that I got to be two months in the conspiracy.  But

16 now from two months, I'm 31 months in the conspiracy?

17 I don't think that is fair, Your Honor, 'cause they

18 know.  They know that from where I got the credit

19 cards, they know that.  And where I got those credit

20 card for four years, I meet this guy in January.  I

21 told him that I have somebody that they doing this for

22 a long time.  I show them the picture of those people

23 in Romania, that they have $100,000 cars.  I don't

24 have none of that.  My wife, she don't have money to

25 get my daughter to the kindergarten, and I won't be

there.

I don't know how this is possible, Your
Honor.  That way I told you, I want to get my plea
agreement back because I feel like the first lawyer,
he set me up with a plea agreement.  I had like six
plea guilty agreements with six different facts.
Every time, different stuff, different money, and
different, different facts.

You know, like the last time when Mr. Abell
he came with this agreement, he said, "If that's not
this, you're going to get 30 years.  What do you
want?"  If you change the transcripts one justice
three man, told me to plead guilty, I told him I
didn't put no ads.  Why do I have to lie?  Why do I
have to come here to lie?  I skim a hundred people.  I
did a million credit cards.  Plus when I start talking
in Woodford County with my, with my wife about -- that
I want to have the statement with those people that I
work with them and the -- about the 16,000 credit
cards, they restrict all day international phone
calls.  They restrict all the money that I got.  I
can't get no more money in my account.  I can't get no
more money to see my daughter.  I mean, but I got to
be responsible for $10 million?  I didn't get nothing
but 0.0 percent.  I don't know if this is fair, but

it's up to you, Your Honor.  I sold, for example, the
chat logs because I didn't see all the, all the
conversations and then the chat logs because I have
800,000 Jabber conversations, and I was like where are
those Jabber logs when this here is he is asking me
like, so you don't give me no more calls.  This is a
one-time deal.  I just got these cards from these
guys.  These guys, they want 60 percent -- no, they
want 40 percent.  They want 55 percent for five
percent.  I'm not getting involved in that.  Don't
call me no more, don't nothing.

          After that, after three months, he'd asked
me, Where you at?  You was being missing in action.
We made $1.1 million last week.  I was like, Yeah, all
right.  So if you're making $1.1 million, yeah, I'm
going to hire an army of people to work for me, too,
but I was just blowing, sir.  I never hired no people
working for me.

          So Nedelcu, I was over at their house so --
and that's when he told me, so you have somebody and I
said, I have this guy.  Which one?  This one.  Oh, I
know this guy.  I know him from three years ago.
Okay.  I got cards.  Do you want me to give it to him?
Maybe he's going to give you a better price because he
knows you, and he said, yeah, I'll give you some cards

because they give me some cards and I give it to him
in February, and I think he's legit, you know, he's
going to -- he's not around for the money.

        So he give me some OneVanilla cards, and the
Secret Service memo, those $5,000.  So I give him that
ten cards.  Nedelcu, he send me that bitcoin, that 33
or 65 percent or the $5,000 that is $3,300, so I
exchange that.  I make 10 percent.

        Two months later, I told him, Listen, I been
a week to your house, I not make no money, I'm not
trying to do no spam for Craigslist account because
the CI send me some words for some Craigslist account.
So I give him some random, some random Craigslist
account from Nedelcu that he has because he knows all
these, all these are fraud, and he was trying to
convince me that he's making a lot of money and
whatever.

        And after that, after two months -- no, after
a week, I told him, Listen, after a week, we, I make,
I make zero dollar with you.  I'm going to work
because I got the kid coming in September, so I'm
done.  Don't contact me no more.  I think after a
week, or I don't know exactly when, I don't want to
say something that is not true, I sold him a van with
those bitcoins, and he send me bitcoins, and I don't

know if those bitcoins came from -- I don't know from
-- he put the $100 from Filip or -- I don't know, I
don't know that.

So two months later, like I said, the CI, he
ask me about that account, if that is mine, and I told
him, Yeah, it's mine.  Send me the money.  After that
he answered no more 'cause at the end of the
conversation, I told him that's not mine, Bro.  I
don't know you give these accounts to other people, I
don't know who.  I asked him for accounts.  I was
trying to get involved in this fraud, but I, I said no
'cause I was thinking that it's better to go to work
and instead of selling cards and exchanging bitcoin
for people, and I was not thinking on doing nothing
illegally.

So two months later in June, the CI, no,
Nedelcu, he contact me, he said, Listen, I get to the
CI some credit cards, some OneVanilla, so, you know,
it's your boy, so if you don't want to give me the
money, I'm going to come to your house and I will take
that car from you because I'm going to take your car
from you.  And I said, What?  What do you mean?  He
said, Yeah, I'm coming to your house and talk to him
to send me the money because I've take away the cars
for two days, and he didn't send me the money.  I

1  said, Okay.  Let me talk to him.  So I talk to him,

2  and is the conversation over there where it's saying I

3  know those Vanilla cards, they're not yours, they're

4  Nedelcu.  And I told him, No, no, no, they're mine,

5  too, but, you know, send me the money.  And after he

6  send the money.  Did he send you the money?  Yes.  Did

7  you send him the money to Nedelcu?  Yes.  Listen, you

8  guys, don't contact me no more 'cause I ain't making

9  no money.  So why do I have to be responsible for

10 anybody money?  I don't understand this.  So don't

11 contact me anymore.  So that was only with what was

12 it, the RICO case, you know.  So, I mean, I tried to

13 get this off my chest, I've been frustrated and with

14 this stuff, you know.  I'm just trying to -- I want

15 you to know everything, Your Honor.

16         I'm really sorry, and I hope you're going to

17 give me probation ten years and I know that you can

18 send that probation to Romania because the

19 international treaty allow it.  I forgot the law, the

20 number, but I know I'm a hundred percent sure that you

21 can -- you can do that, Your Honor, to give me

22 probation and send the probation over there and they

23 will be like be in probation over there 'cause I was,

24 I was done with all this a long time ago.

25         THE COURT:  Okay.  Anything else?

1          THE DEFENDANT:  No.  That's everything.
2  Thank you.

3          THE COURT:  Thank you.  Okay.

4          Again, I appreciate the good lawyering in
5  this difficult case.  Every one of these cases is a
6  big challenge all the way around as this day-long
7  sentencing would attest.

8          So the defendant has allocuted, and I'll
9  certainly consider what he has said.  He's said he's
10  sorry, but essentially, he's denying or radically
11  minimizing his involvement in the RICO conviction.

12          And what I'm paying attention to is the
13  content of the plea agreement.  The plea was taken
14  under oath before a federal judge.  The defendant
15  admitted his guilt, and so the minimization today
16  honestly is not terribly helpful, certainly not
17  persuasive to the Court.

18          What I have before me every time I talk about
19  the crime or crimes, I want to remember and remind
20  everyone I'm talking about three crimes, three
21  distinct felony acts that are melded into one
22  sentencing, but it's three crimes, not just, not just
23  one.

24          I'm endeavoring to apply the correct
25  standards, stay within my proper role as a judge in

1  the judiciary, and this is how I see it.

2       In a sentence, I'm aiming for particular

3  goals that Congress tells me to aim for.  These are

4  the purposes that apply.  In my view they all come

5  from the sentencing statute.  Each of the three crimes

6  implicates each of the purposes listed in the statute

7  to one degree or another.

8       I do need to reflect the seriousness of the

9  offenses, all three of them.  They include Class B and

10 Class C felony, fraud-based conduct, one of which is,

11 of course, is bank fraud.

12      It's all extremely serious, extremely

13 far-reaching, extremely injurious to the public, and

14 this sentence has got to reflect that.  Not one time,

15 but three times the defendant has engaged in serious

16 criminal activity, and this sentence has got to aim

17 for all of that.

18      I do need to promote respect for the law.

19 It's difficult on this record to find that the

20 defendant has had any enduring respect for the law.

21 It just does not appear during his adulthood.  It's

22 just not been a feature of his life.  Respect for the

23 law means following the law.  I can't control him in

24 his home country, but if he comes over here or targets

25 Americans through his activity, then that certainly

gets the attention of the U.S. government, ultimately

this Court, and so I have to promote respect for the

law abiding by American law and the result in this

case.

Just punishment is a high value here.  The

defendant needs to be punished appropriately, not over

punished, but does need to be punished for the

criminal activity.  Each crime warrants punishment,

and the fact that he's marched through three separate

endeavors certainly in my mind heightens the

importance of a punitive consequence for the

decisions, repeated decisions to commit crime.

Deterrence is a goal.  I certainly want to

deter the defendant from returning to any type of

computer crime.  I'm hopeful that happens.  I'm

certainly talking more broadly to the community.  The

international community, I hope, is paying attention

to these sentencings and acknowledges that this kind

of behavior is going to get on the government's radar,

and we'll get a response from the government,

including prosecution if there's a conviction, and an

appropriate result from a federal court.  So that's

certainly -- it's something that I'm aiming for.

There's a protection component here.  I do

have significant worry that the defendant will return

to this kind of conduct.  He has been doing it for a long time, and he's got the prior conviction.  He's got conduct here spanning really close to a decade of behavior.  That gives me very little confidence that he's just going to stop and go lead a quiet law abiding life.  So I've got worry that he's going to get out and just do it again.

And so I know I can protect the public by incarcerating him.  I'd like to think that Mr. Mitan and every defendant has the capacity to change and the capacity to live within society's rules.

Mr. Mitan, you are a smart, talented person and you've got gifts, but you've used them in a dark way.  And when I look at the content of the chats and the attitude you took, and the discussion, you know, even around the birth of your daughter, the things that you were into and commenting on, it's worrisome to me, and I hope you can turn.  But frankly, your allocution doesn't give me tremendous encouragement that that's really where you are.

You don't seem to have treatment needs.  Your crime is not -- crimes are not based on addiction or anything that I can really address through a programming activity.  It seems like most of the defendants in this case to be greed-based and

 1  circumstantial, crimes of opportunity, crimes
 2  facilitated by our electronic world and the talents
 3  that you have and watching the computer manipulation
 4  and the intrusion into that account and the emptying
 5  of it just so casually is concerning conduct, and this
 6  sentence has got to address what was going on.
 7       The other factors I have to consider include
 8  the guidelines.  The guidelines are not binding on me.
 9  I treat them as an influence or a magnet drawing me
10  toward a particular result.  I can resist them.  I can
11  go away from them for a valid reason, and so I'm
12  certainly always willing to consider that.  I'm doing
13  that here as a consideration.
14       I've looked at the policy statements in the
15  guidelines and accounted for all of them.  I think if
16  I fairly apply the guidelines and consistently apply
17  the guidelines, I'm avoiding unwarranted disparities,
18  and I certainly endeavor to do that on a small scale
19  and on a large scale across the course of sentencings
20  that I conduct.
21       Restitution again is a requirement
22  specifically in the case.  It's a requirement as a
23  consideration in the statute, and I think I
24  mis-explained my ruling on the 18-81 restitution.  I
25  treated the 45K per month average generated by the

conspiracy in the EDKY, and applied that to the 15
months roughly that we know the defendant was directly
involved from early '16 to spring of '17.  That's how
I got to that restitution calculation.  I think I've
inverted my factors earlier, so I wanted to correct
that.

         The nature and circumstances of the offense
or offenses.  Importantly, these were all
conspiracies, as I've noted, and a conspiracy in my
view is -- it's a different kind of crime.  It's a
crime that multiplies the effect because you are
adjoining with others to commit a crime.  These aren't
single instance, single act circumstances.  Each of
them is a conspiracy that the force multiplier by
being engaged with others in the conduct is certainly
a significant circumstance.  They're all greed and
monetary exploitation of vulnerable victims.
Obviously the phishing and scamming and vishing and
smishing is all designed to get people who are
vulnerable to respond and give information that
somebody paying attention probably wouldn't give,
somebody who's careful wouldn't give, but the
vulnerable, enough of them do it to fund this kind of
activity.  That is something I can't ignore in
evaluating the circumstances.

        And I think with all due respect, Mr. Mitan,
I read the letters from your family and your wife, and
certainly your wife sounds like a very kind person and
very invested in your well-being and hopeful about
your ability to change.  But I think about their
economic circumstance and the vulnerability they have,
and the way over here this scheme was targeting people
who also are vulnerable.  And you weren't at the
trial, but I remember Mr. Frutose coming in and
testifying and telling the story about how he had
tried to better himself and he had scrimped and saved
and, you know, told his family no, and put this money
together to buy another truck to expand his business,
and sent that money off.  And when it dawned on him he
had been defrauded, he was just crushed by it and very
angry.

        And so that took a person who's working
really hard and honestly trying to better himself and
his family and just swept that money away that he had
worked so hard to gather.  And victim after victim
told similar stories.  And, you know, you understand
what financial deprivation is.  You understand what it
is to live without much.  And those were the people
really that were most vulnerable to your scheme.
That's a bitter irony in the circumstances of the

1  case.

2         Your individual background and history.

3  Certainly, I note your age.  I note that you've

4  basically been on your own since you were a young man

5  without significant parental involvement.  Once you

6  turned age 17, you've been having to fend for

7  yourself.  I'm sure that's affected your

8  decision-making in some ways that perhaps are coming

9  to bear today on the course of your life.  So I do, I

10  do note that as part of the background that you've

11  had.

12         However, I just cannot ignore or understate

13  the significance of the prior criminal record that

14  you've got, the convictions that relate to the same

15  type of conduct, including a federal bank fraud

16  conviction where you got a pretty modest term for it.

17  And instead of doing your time and thinking I never

18  want to go through that again, you got out.  And it

19  seems to me pretty much have continuously been

20  involved in this kind of behavior based on your own

21  words going all the way back to before that, and it's

22  hard to see any significant break in that conduct.

23         That's precisely the opposite of what we hope

24  happens when a person does time for a federal felony.

25  It did not work out that way for you.

1            So when it comes to the sentence, I do as

2    instructed aim for a sentence that is sufficient but

3    no greater than necessary to achieve the purposes that

4    I've listed, and the government has sought a bottom of

5    the guideline sentence, and the defense has sought a

6    significant variance really primarily based on the

7    sealed part of the hearing, which I've certainly

8    considered, but also based on the comparative

9    punishment for other defendants in the case, and in an

10   effort to really liken you or compare you to

11   especially Nedelcu.  And I've looked at all that

12   carefully.  I've sentenced all the defendants, and

13   certainly, I'm sensitive to that idea.

14           But, you know, what I'd say is if we're going

15   to make comparisons within the case, and I'm always

16   willing to glance at that to try and make sure I'm

17   comfortable with the relative treatment everybody's

18   getting, if we're going to do comparison, it ought to

19   be apples to apples.  And the problem is, nobody in

20   the case to this point has a record that compares to

21   yours.  And as I'm looking through the listing of

22   defendants, I think everybody sentenced to this point

23   has a Criminal History Category of I.  All -- and I

24   think all of the foreign defendants have had a I.  You

25   don't; you've got a III.  That's because of the prior

convictions you've got, including that federal felony.

That's not, that's not some academic difference.

That's a concrete difference between you and everybody

else on this list.  So that's a big distinction

between you and everybody, including Nedelcu.

Also the offense level, of course, is a

significant driver on the guideline calculation,

properly so.  And the offense level here, of course,

reflects the cumulative loss over the course of the

three distinct felony crimes.  That's also a factor

that is part of what results in your offense level

being among the highest of anybody sentenced today,

probably close to the highest putting you at a 32,

III.  That certainly produces the highest guideline

range to this point.  All legitimately because again,

I'm talking about three crimes, not -- you know, if I

was comparing you and you just had the 18-81, then you

could say, Well, we're comparing the same conviction

to everybody else.  Where does he fall?  Is that

right?  Is that fair?  You've got two other felonies

on top of that built into the same sentencing.  And

that's a distinction between you and everybody else.

I can't and won't ignore.

So I've taken all of that into account.  It

seems to me very contrary to your allocution today

that you had an eagerness and a thirst to be involved
in this kind of conduct, a pride about your ability to
do the kind of fraud involved in an effective way.
You touted yourself, you touted your credentials and
your expertise in it, and you do have credentials and
expertise in it, I'm sad to say, but you, you embraced
that with an eagerness that is discouraging to me.

          I've considered the variance request in the
case.  What I've done in some of the other cases and I
do think it -- it's worth consideration.  You've had
32 months in, you know, difficult, a difficult period
to be incarcerated, during the pandemic, far, far from
your home.  I believe that time surely is harder and
more impactful than otherwise would be the case in
normal circumstances.  Being in the county jail for 32
months is hard period during a pandemic far from home,
it's got to increase the punch of that time to some
degree.  That is somewhat persuasive to me on a reason
why the guideline range might be a shade high.

          On the sealed content, I've considered that
and I think, you know, to be consistent in my role and
to stay within the framework, I've got to be really
reluctant to take that power that I have to vary,
which I do recognize I can vary in this context, to
take that power and use it very liberally, I'm

1  endangering the normal process that governs that kind

2  of analysis which puts primary power in the

3  prosecutor's hands.

4        And so I want to acknowledge that I could

5  vary on that basis.  I'm reluctant to do so in a case

6  where I've heard rational reasons for the decision not

7  to file a motion, and so I'm reluctant to do much if

8  anything there.

9        However, the fact that others in your case

10  are going to perceive you as having engaged in

11  cooperative conduct, I do think that is not -- that's

12  not nothing.  That is something.  And I do just know

13  what I know about sentencing federal defendants.  I

14  know that having that label is going to have the

15  potential to cause you problems, and so I'm certainly

16  willing in a limited way to take that into account.

17        All that said, this case -- the triple legs

18  of the case, three different convictions, a case calls

19  for a significant term of incarceration for all the

20  reasons that I've stated.

21        The numbers the defense pointed out to me

22  comparing other money laundering sentences, I

23  appreciate that comparison as far as it goes, but it's

24  a very vague and untethered way to look at comparing

25  this case with that average, what are the offense

levels, what are the criminal history categories, what
are the lot amounts, and I have to feel like this case
would be relatively at the high end of a true
comparison of underlying cases.  I don't have the
data, so I can't make it, but I think just looking at
the average, to me, is not terribly persuasive.

All that said, on a guideline range of 151 to
188, I am, for the reasons I stated, going to vary
slightly, nowhere near the degree sought, and find
that a sentence of 140 months of incarceration is
sufficient, but no greater than necessary to serve all
the purposes that I've listed.

The defendant will get credit -- should get
credit all the way back to his arrest outside the
country, which I believe is in December 2018, so he
ought to get credit for all of that.

I considered imposing supervised release
because of the recidivism.  I'm not going to do that.
I do anticipate the defendant would serve his time and
be deported.  And I don't think -- other than some
deterrent value -- I don't think adding supervision
would add much, and so consistent with how I treated
the other defendants, I will not impose supervision on
the defendant here.

At the BOP I am going to recommend that the

1  defendant get a full medical screening, get

2  appropriate eye care and eyeglasses; I know he needs

3  that, and I'll recommend appropriate educational

4  vocational training while the defendant is in custody.

5          You've got tremendous mental skill,

6  Mr. Mitan.  I think you could use it for good.  And I

7  hope that a program or class at the BOP will open a

8  door and give you a pathway to using your considerable

9  talent in a way that's productive, rather than

10  destructive.  So I will make that recommendation, but

11  not impose supervision.

12          The 140 months will be concurrent time on all

13  of the three counts, so that'll all run concurrently,

14  for a total of 140 months of incarceration.

15          Mr. Coffey, you do not have a placement

16  request; is that correct?

17          MR. COFFEY:  Judge, I didn't ask him.  Let me

18  ask real quickly if he has one.

19          [DEFENDANT AND COUNSEL CONFERRING]

20          MR. COFFEY:  No, sir.

21          THE COURT:  Okay.  Well, then I'm going to

22  just indicate that the BOP should place him consistent

23  with his programming needs, and my hope would be the

24  placement could somehow take account of the

25  defendant's nationality and alien status and perhaps

1   put him in a community where he might have some

2   support.  So that will be up to the BOP.

3            All right.  Is there any request for

4   additional discussion of the basis for the Court's

5   sentence, Mr. Taylor?

6            MR. TAYLOR:  No, Your Honor.

7            THE COURT:  Mr. Coffey?

8            MR. COFFEY:  Did you cover the fine?

9            THE COURT:  I'm sorry?

10           MR. COFFEY:  Did you cover whether there was

11  going to be a fine or not?

12           THE COURT:  I did not impose a fine.  I think

13  with the considerable restitution award and the

14  forfeiture, and given his financial circumstances, I

15  don't think a fine is warranted, so I will not impose

16  a fine.

17           Anything else on that, Mr. Coffey?

18           MR. COFFEY:  No, sir.

19           THE COURT:  Other than the objections already

20  stated and covered, are there any additional

21  objections under *Bostick* or otherwise, Mr. Taylor?

22           MR. TAYLOR:  No, Your Honor.

23           THE COURT:  Mr. Coffey?

24           MR. COFFEY:  No, sir.

25           THE COURT:  Thank you.  The clerk now will,

1   Mr. Mitan, will read you your appeal notice.  And,
2   Madam Clerk.
3           COURTROOM DEPUTY:  Unless waived, you have a
4   right to appeal your case to the United States Court
5   of Appeals for the Sixth Circuit.  A defendant may
6   waive some or all of his rights as part of the plea
7   agreement, and you have entered a plea agreement
8   containing a waiver.  Such waivers are generally
9   enforceable, but if you believe it is unenforceable,
10  you could present that theory to the appellate court.
11          An appeal is taken by timely filing a notice
12  of appeal with the district clerk.  If you do not have
13  sufficient money to pay for the appeal, you may apply
14  to leave to appeal informa pauperis, which means you
15  may ask to appeal without paying fees.  The clerk of
16  this court will, on your request, prepare and file a
17  notice of appeal on your behalf.
18          With very few exceptions, any notice of
19  appeal must be filed within 14 days of the date of
20  entry of judgment in your case.
21          If you do not have sufficient funds to employ
22  an attorney, the Court of Appeals may appoint counsel,
23  potentially your current attorney, to prosecute the
24  appeal.  The qualifying defendant has a right to
25  appointed counsel on appeal.

1          THE COURT:  Thank you, Madam Clerk.  Do we

2  have a copy of that we can give to the -- very good.

3          COURTROOM DEPUTY:  Yes.

4          THE COURT:  Thank you.  Mr. Coffey, if you'll

5  just ensure he understands that, and that he has a

6  copy of it he can keep, that's all I'd ask.

7          MR. COFFEY:  Do you want us to sign a copy,

8  too, don't you?

9          THE COURT:  Do you have a signature on there?

10         MR. COFFEY:  Yes.

11         THE COURT:  Okay.  Fine.  If you're

12  comfortable with him signing it.

13         MR. COFFEY:  Okay.  All right.

14         [DEFENDANT AND COUNSEL CONFERRING]

15         MR. COFFEY:  He signed it, Your Honor.  Thank

16  you.

17         THE COURT:  Thank you very much.  Thank you,

18  Madam Clerk.

19         Okay.  And so, Counsel, if you'll just attend

20  to the post-hearing issues we've had on redactions,

21  and I'll count on you guys to follow up on that

22  appropriately.

23         Mr. Taylor, is there anything else we need to

24  take up at this time?

25         MR. TAYLOR:  No, Your Honor.

```
 1              THE COURT:  Mr. Coffey, how about for you?
 2              MR. COFFEY:  No, sir.  Thank you.
 3              THE COURT:  Mr. Coffey, I appreciate you
 4  taking this case, a difficult assignment.  I
 5  appreciate your thoughtful and creative work on
 6  Mr. Mitan's behalf as CJA counsel.  I'm sure he does
 7  as well, but thank you for taking that.
 8              Any questions, Mr. Mitan?
 9              THE DEFENDANT:  No.
10              THE COURT:  Okay.  Well, I do wish you the
11  best going forward.  I hope you'll use the time
12  productively and emerge prepared to return to your
13  home society in a productive and lawful way.
14              He'll be remanded to the marshal's custody
15  pending BOP assignment, and we will stand adjourned.
16              Thank to you the court staff for your
17  patience throughout a long day.
18              [END OF PROCEEDINGS - 4:51 p.m.]
19                        *  *  *  *  *
20
21
22
23
24
25
```

1                     C E R T I F I C A T E

2

3          I, SANDRA L. WILDER, RMR, CRR, certify that

4    the foregoing is a correct transcript from the record

5    of proceedings in the above-entitled matter.

6

7    /s/ Sandra L. Wilder RMR, CRR        Date of Certification:
     Official Court Reporter              December 1, 2021

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

GOVERNMENT WITNESS:

NATHAN MOORE
    Direct Examination . . . . . . . . . . . . Page  15
    Cross-examination. . . . . . . . . . . . . Page  93
    Redirect Examination . . . . . . . . . . . Page 120


EXHIBITS

GOVERNMENT EXHIBITS:

Government Exhibit Number 1A — Loss Amount Notes
    Identified . . . . . . . . . . . . . . . . Page  18
    Admitted . . . . . . . . . . . . . . . . . Page  55

Government Exhibit Number 1K-1 — Jabber Communication
between Confidential Witness and Defendant — 8/23/2016
    Identified . . . . . . . . . . . . . . . . Page  22
    Admitted . . . . . . . . . . . . . . . . . Page  55

Government Exhibit Number 1K-2 — Jabber Communication
between Confidential Witness and Defendant — 4/26/2017
    Identified . . . . . . . . . . . . . . . . Page  26
    Admitted . . . . . . . . . . . . . . . . . Page  55

Government Exhibit Number 1B — PowerPoint Presentation
    Identified . . . . . . . . . . . . . . . . Page  28
    Admitted . . . . . . . . . . . . . . . . . Page  55

Government Exhibit Number 1G — Jabber Communication
between Confidential Witness and Defendant — 6/2/2016
    Identified . . . . . . . . . . . . . . . . Page  33
    Admitted . . . . . . . . . . . . . . . . . Page  55

Government Exhibit Number 1D — Link Chart of Various
Members of AOAF Network and Domestic Processors
    Identified . . . . . . . . . . . . . . . . Page  34
    Admitted . . . . . . . . . . . . . . . . . Page  55

1

2    GOVERNMENT EXHIBITS:   (Cont.)

3

4    Government Exhibit Number 1E-1 - Jabber Communication
     between Confidential Witness and Defendant - 5/25/2016
       Identified . . . . . . . . . . . . . . . Page   36
5      Admitted . . . . . . . . . . . . . . . . Page   55

6    Government Exhibit Number 1E-2 - Jabber Communication
     between Confidential Witness and Defendant - 6/13/2016
7      Identified . . . . . . . . . . . . . . . Page   40
       Admitted . . . . . . . . . . . . . . . . Page   55

8
     Government Exhibit Number 1F - Google Spreadsheet
9    Shared between Confidential Witness and Defendant
       Identified . . . . . . . . . . . . . . . Page   42
10     Admitted . . . . . . . . . . . . . . . . Page   55

11   Government Exhibit Number 1H - Snapshots of Jabber
     Communication and Google Spreadsheet
12     Identified . . . . . . . . . . . . . . . Page   43
       Admitted . . . . . . . . . . . . . . . . Page   55

13
     Government Exhibit Number 1L - Jabber Communication
14   between Confidential Witness and Defendant
       Identified . . . . . . . . . . . . . . . Page   48
15     Admitted . . . . . . . . . . . . . . . . Page   55

16   Government Exhibit Number 1J - Jabber Communication
     between Confidential Witness and Defendant - 7/1/2016
17     Identified . . . . . . . . . . . . . . . Page   54
       Admitted . . . . . . . . . . . . . . . . Page   55

18
     Government Exhibit Number 3C-1 - Jabber Communication
19   between Confidential Witness and Defendant - 2/20/2016
       Identified . . . . . . . . . . . . . . . Page   59
20     Admitted . . . . . . . . . . . . . . . . Page

21   Government Exhibit Number 3C-2 - Jabber Communication
     between Confidential Witness and Defendant - 1/29/2016
22     Identified . . . . . . . . . . . . . . . Page   62
       Admitted . . . . . . . . . . . . . . . . Page

23
     Government Exhibit Number 3A - Video of Defendant's
24   Shared Computer Screen
       Identified . . . . . . . . . . . . . . . Page   66
25     Admitted . . . . . . . . . . . . . . . . Page

GOVERNMENT EXHIBITS:   (Cont.)

Government Exhibit Number 2A - File Located on
Defendant's Device
     Identified . . . . . . . . . . . . . . . Page   73
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 2C - Spreadsheet Provided by
First Tech Federal Credit Union
     Identified . . . . . . . . . . . . . . . Page   75
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 2D - Chart of U.S. Bank
Documenting Card Number Found on Defendant's Device
     Identified . . . . . . . . . . . . . . . Page   76
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 2E - Fraud Transaction Report
     Identified . . . . . . . . . . . . . . . Page   79
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 2G - Respective Institutions'
Losses and Average Per Card
     Identified . . . . . . . . . . . . . . . Page   79
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 3B - Chart of Laundering
Brute Force Proceeds
     Identified . . . . . . . . . . . . . . . Page   81
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 4A-1 - Jabber Communication
between Confidential Witness and Defendant - 2/11/2016
     Identified . . . . . . . . . . . . . . . Page   81
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 4A-2 - Jabber Communication
between Confidential Witness and Defendant - 7/22/2016
     Identified . . . . . . . . . . . . . . . Page   85
     Admitted . . . . . . . . . . . . . . . . Page

Government Exhibit Number 4A-3 - Jabber Communication
between Confidential Witness and Defendant - 2/21/2016
     Identified . . . . . . . . . . . . . . . Page   88
     Admitted . . . . . . . . . . . . . . . . Page

GOVERNMENT EXHIBITS:  (Cont.)

Government Exhibit Number 4A-4 – Jabber Communication
between Confidential Witness and Defendant – 2/20/2016
   Identified . . . . . . . . . . . . . . . Page  90
   Admitted . . . . . . . . . . . . . . . Page

Government Exhibit Number 1M – Case Records from
Bitstamp Related to Defendant
   Identified . . . . . . . . . . . . . . . Page 122
   Admitted . . . . . . . . . . . . . . . Page

Government Exhibit Number 2D-1 – U.S. Bank Fraud
Records – Tendered Under Seal
   Identified . . . . . . . . . . . . . . . Page 123
   Admitted . . . . . . . . . . . . . . . Page 123

DEFENSE EXHIBITS:

Defendant Exhibit Number 10 – PowerPoint Presentation
– Maintained Under Seal

Defendant Exhibit Number 1 – Mitan's Plea Agreement

Defendant Exhibit Number 2 – Secret Service Memo

Defendant Exhibit Number 3 – Mitan's Forfeiture
Motion

Defendant Exhibit Number 4 – Mitan's Affidavit
in Support of Motion

Defendant Exhibit Number 5 – Jabber Conversation –
1/17/2017

Defendant Exhibit Number 6 – Excel Spreadsheet

Defendant Exhibit Number 7 – Preda Judgment

Defendant Exhibit Number 8 – Preda Restitution Order

Defendant Exhibit Number 9 – Assistance in Prosecution

                            – – –